Funds in the Corridor Contract Reserve Fund may be invested in
Permitted Investments at the direction of Bank of America LLC, which
Permitted
Investments shall mature not later than the Business Day immediately
preceding
the first Distribution Date that follows the date of such investment (except
that if such Permitted Investment is an obligation of the institution that
maintains the Corridor Contract Reserve Fund, then such Permitted Investment
shall mature not

66

| EX-99.1 | 73rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 73rd |
|---------|------------------|-----|-----|----------|------|---------|-----------|

later than such Distribution Date) and shall not be sold or disposed of prior
to maturity. All such Permitted Investments shall be made in the name of the
Trustee, for the benefit of the Holders of the Class 2-A-1, Class 2-A-2,
Class
II-M-1, Class II-B-1 and Class II-B-2 Certificates. In the absence of such
written direction, all funds in the Corridor Contract Reserve Fund shall be
invested by the Trustee in The Bank of New York cash reserves. Any net
investment earnings on such amounts shall be retained therein until withdrawn
as provided in Section 3.08. Any losses incurred in the Corridor Contract
Reserve Fund in respect of any such investments shall be charged against
amounts on deposit in the Corridor Contract Reserve Fund (or such
investments)
immediately as realized. The Trustee shall not be liable for the amount of
any
loss incurred in respect of any investment or lack of investment of funds
held
in the Corridor Contract Reserve Fund and made in accordance with this
Section
3.05. The Corridor Contract Reserve Fund will not constitute an asset of any
REMIC created hereunder.

### SECTION 3.06. Collection of Taxes, Assessments and Similar Items; Escrow Accounts.

(a) To the extent required by the related Mortgage Note and not
violative of current law, the Master Servicer shall establish and maintain
one
or more accounts (each, an *"Escrow Account"*) and deposit and retain therein
all collections from the Mortgagors (or advances by the Master Servicer) for
the payment of taxes, assessments, hazard insurance premiums or comparable
items for the account of the Mortgagors. Nothing in this Agreement shall
require the Master Servicer to compel a Mortgagor to establish an Escrow
Account in violation of applicable law.

(b) Withdrawals of amounts so collected from the Escrow Accounts may
be made only to effect timely payment of taxes, assessments, hazard insurance
premiums, condominium or PUD association dues, or comparable items, to
reimburse the Master Servicer out of related collections for any payments
made
pursuant to Sections 3.01 (with respect to taxes and assessments and
insurance
premiums) and 3.09 (with respect to hazard insurance), to refund to any

Mortgagors any sums determined to be overages, to pay interest, if required by
law or the terms of the related Mortgage or Mortgage Note, to Mortgagors on
balances in the Escrow Account or to clear and terminate the Escrow Account at
the termination of this Agreement in accordance with Section 9.01. The Escrow
Accounts shall not be a part of the Trust Fund.

(c) The Master Servicer shall advance any payments referred to in
Section 3.06(a) that are not timely paid by the Mortgagors on the date when
the tax, premium or other cost for which such payment is intended is due, but
the Master Servicer shall be required so to advance only to the extent that
such advances, in the good faith judgment of the Master Servicer, will be
recoverable by the Master Servicer out of Insurance Proceeds, Liquidation
Proceeds or otherwise.

**SECTION 3.07. Access to Certain Documentation and Information
Regarding the Mortgage Loans.**

The Master Servicer shall afford each Seller, the Depositor and the
Trustee reasonable access to all records and documentation regarding the
Mortgage Loans and all accounts, insurance information and other matters
relating to this Agreement, such access being afforded

67

| EX-99.1 | 74th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 74th |

without charge, but only upon reasonable request and during normal business
hours at the office designated by the Master Servicer.

Upon reasonable advance notice in writing, the Master Servicer will
provide to each Certificateholder and/or Certificate Owner which is a savings
and loan association, bank or insurance company certain reports and reasonable
access to information and documentation regarding the Mortgage Loans
sufficient to permit such Certificateholder and/or Certificate Owner to comply
with applicable regulations of the OTS or other regulatory authorities with
respect to investment in the Certificates; provided that the Master Servicer
shall be entitled to be reimbursed by each such Certificateholder and/or
Certificate Owner for actual expenses incurred by the Master Servicer in
providing such reports and access.

**SECTION 3.08. Permitted Withdrawals from the Certificate Account, the
Distribution Account, the Carryover Shortfall Reserve Fund and Corridor
Contract Reserve Fund.**

(a) The Master Servicer may from time to time make withdrawals from
the Certificate Account for the following purposes:

(i) to pay to the Master Servicer (to the extent not previously
retained by the Master Servicer) the servicing compensation to which
it is entitled pursuant to Section 3.14 and to pay to the Master
Servicer, as additional servicing compensation, earnings on or
investment income with respect to funds in or credited to the

Certificate Account;

(ii) to reimburse each of the Master Servicer and the Trustee for unreimbursed Advances made by it, such right of reimbursement pursuant to this subclause (ii) being limited to amounts received on the Mortgage Loan(s) in respect of which any such Advance was made;

(iii) to reimburse each of the Master Servicer and the Trustee for any Nonrecoverable Advance previously made by it;

(iv) to reimburse the Master Servicer for Insured Expenses from the related Insurance Proceeds;

(v) to reimburse the Master Servicer for (a) unreimbursed Servicing Advances, the Master Servicer's right to reimbursement pursuant to this clause (a) with respect to any Mortgage Loan being limited to amounts received on such Mortgage Loan(s) that represent late recoveries of the payments for which such advances were made pursuant to Section 3.01 or Section 3.06 and (b) for unpaid Master Servicing Fees as provided in Section 3.11;

(vi) to pay to the purchaser, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased pursuant to Section 2.02, 2.03 or 3.11, all amounts received on such Mortgage Loan after the date of such purchase;

(vii) to reimburse the Sellers, the Master Servicer or the Depositor for expenses incurred by any of them and reimbursable pursuant to Section 6.03;

68

| EX-99.1 | 75th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 75th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

(viii) to withdraw any amount deposited in the Certificate Account and not required to be deposited in the Certificate Account;

(ix) on or prior to the Distribution Account Deposit Date, to withdraw an amount equal to the related Available Funds and the Trustee Fee for such Distribution Date and remit such amount to the Trustee for deposit in the Distribution Account; and

(x) to clear and terminate the Certificate Account upon termination of this Agreement pursuant to Section 9.01.

The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Certificate Account pursuant to such subclauses (i), (ii), (iv), (v) and (vi). Prior to making any withdrawal from the Certificate Account pursuant to subclause (iii), the Master Servicer shall deliver to the Trustee an Officer's Certificate of a Servicing Officer indicating the amount of any previous Advance determined by the Master Servicer to be a Nonrecoverable Advance and identifying the related Mortgage Loans(s), and their respective portions of such Nonrecoverable Advance.

(b) The Trustee shall withdraw funds from the Distribution Account for distributions to Certificateholders in the manner specified in this Agreement (and to withhold from the amounts so withdrawn, the amount of any taxes that it is authorized to withhold pursuant to the last paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Distribution Account for the following purposes:

(i) to pay to itself the Trustee Fee for the related Distribution Date;

(ii) to pay to the Master Servicer as additional servicing compensation, earnings on or the investment income with respect to funds in the Distribution Account;

(iii) to withdraw and return to the Master Servicer any amount deposited in the Distribution Account and not required to be deposited therein;

(iv) to reimburse the Trustee for any unreimbursed Advances made by it pursuant to Section 4.01(b) hereof, such right of reimbursement pursuant to this subclause (iv) being limited to (x) amounts received on the related Mortgage Loan(s) in respect of which any such Advance was made and (y) amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(ii) hereof;

(v) to reimburse the Trustee for any Nonrecoverable Advance previously made by the Trustee pursuant to Section 4.01(b) hereof, such right of reimbursement pursuant to this subclause (v) being limited to amounts not otherwise reimbursed to the Trustee pursuant to Section 3.08(a)(iii) hereof; and

(vi) to clear and terminate the Distribution Account upon termination of the Agreement pursuant to Section 9.01.

(c) The Trustee shall withdraw funds from the Carryover Shortfall Reserve Fund for distribution to the LIBOR Certificates, the related Notional Amount Certificates and the related

69

| EX-99.1 | 76th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 76th |

Notional Amount Components in the manner specified in Section 4.02(a)(7) (and to withhold from the amounts so withdrawn the amount of any taxes that it is authorized to retain pursuant to the last paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Carryover Shortfall Reserve Fund for the following purposes:

(i) to withdraw any amount deposited in the Carryover Shortfall Reserve Fund and not required to be deposited therein; and

(ii) to clear and terminate the Carryover Shortfall Reserve Fund upon the retirement of LIBOR Certificates, the related Notional Amount Certificates and the related Notional Amount Components pursuant to Section 9.01.

(d) The Trustee shall withdraw funds from the Corridor Contract Reserve Fund for distribution to the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates in the manner specified in Section 4.09 (and to withhold from the amounts so withdrawn the amount of any taxes that it is authorized to retain pursuant to the last paragraph of Section 8.11). In addition, the Trustee may from time to time make withdrawals from the Corridor Contract Reserve Fund for the following purposes:

(i) to withdraw any amount deposited in the Corridor Contract Reserve Fund and not required to be deposited therein; and

(ii) to clear and terminate the Corridor Contract Reserve Fund upon the earlier of (i) the Corridor Contract Scheduled Termination Date and (ii) the termination of this Agreement pursuant to Section 9.01.

**SECTION 3.09. Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies.**

(a) The Master Servicer shall cause to be maintained, for each Mortgage Loan, hazard insurance with extended coverage in an amount that is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the greater of (y) the outstanding principal balance of the Mortgage Loan, including any Deferred Interest, and (z) an amount such that the proceeds of such policy shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. Each such policy of standard hazard insurance shall contain, or have an accompanying endorsement that contains, a standard mortgagee clause. Any amounts collected by the Master Servicer under any such policies (other than the amounts to be applied to the restoration or repair of the related Mortgaged Property or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Certificate Account. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders or remittances to the Trustee for their benefit, be added to the principal balance of the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of late payments by the related Mortgagor or out of liquidation proceeds or Subsequent Recoveries to the extent permitted by Section 3.08. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a

70

Mortgage other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property is located at the time of origination of the Mortgage Loan in a federally designated special flood hazard area and such area is

participating in the national flood insurance program, the Master Servicer shall cause flood insurance to be maintained with respect to such Mortgage Loan. Such flood insurance shall be in an amount equal to the least of (i) the outstanding principal balance of the related Mortgage Loan, (ii) the replacement value of the improvements which are part of such Mortgaged Property, and (iii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program.

(b) The Master Servicer shall not take any action which would result in non-coverage under any applicable Primary Insurance Policy of any loss which, but for the actions of the Master Servicer, would have been covered thereunder. The Master Servicer shall not cancel or refuse to renew any such Primary Insurance Policy that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for such canceled or non-renewed policy is maintained with a Qualified Insurer.

Except with respect to any Lender PMI Mortgage Loans, the Master Servicer shall not be required to maintain any Primary Insurance Policy (i) with respect to any Mortgage Loan with a Loan-to-Value Ratio less than or equal to 80% as of any date of determination or, based on a new appraisal, the principal balance of such Mortgage Loan represents 80% or less of the new appraised value or (ii) if maintaining such Primary Insurance Policy is prohibited by applicable law. With respect to the Lender PMI Mortgage Loans, the Master Servicer shall maintain the Primary Insurance Policy for the life of such Mortgage Loans, unless otherwise provided for in the related Mortgage Note or prohibited by law.

The Master Servicer agrees to effect the timely payment of the premiums on each Primary Insurance Policy, and such costs not otherwise recoverable shall be recoverable by the Master Servicer from the related liquidation proceeds and Subsequent Recoveries.

(c) In connection with its activities as Master Servicer of the Mortgage Loans, the Master Servicer agrees to present on behalf of itself, the Trustee and Certificateholders, claims to the insurer under any Primary Insurance Policies and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any Primary Insurance Policies respecting defaulted Mortgage Loans. Any amounts collected by the Master Servicer under any Primary Insurance Policies shall be deposited in the Certificate Account.

### SECTION 3.10. Enforcement of Due-on-Sale Clauses; Assumption Agreements.

(a) Except as otherwise provided in this Section, when any property subject to a Mortgage has been conveyed by the Mortgagor, the Master Servicer shall to the extent that it has knowledge of such conveyance, enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing, the Master

Servicer is not required to exercise such rights with respect to a Mortgage
Loan if the Person to whom the

71

| EX-99.1 | 78th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 78th |

related Mortgaged Property has been conveyed or is proposed to be conveyed
satisfies the terms and conditions contained in the Mortgage Note and
Mortgage
related thereto and the consent of the mortgagee under such Mortgage Note or
Mortgage is not otherwise so required under such Mortgage Note or Mortgage as
a condition to such transfer. In the event that the Master Servicer is
prohibited by law from enforcing any such due-on-sale clause, or if coverage
under any Required Insurance Policy would be adversely affected, or if
nonenforcement is otherwise permitted hereunder, the Master Servicer is
authorized, subject to Section 3.10(b), to take or enter into an assumption
and modification agreement from or with the person to whom such property has
been or is about to be conveyed, pursuant to which such person becomes liable
under the Mortgage Note and, unless prohibited by applicable state law, the
Mortgagor remains liable thereon, provided that the Mortgage Loan shall
continue to be covered (if so covered before the Master Servicer enters such
agreement) by the applicable Required Insurance Policies. The Master
Servicer,
subject to Section 3.10(b), is also authorized with the prior approval of the
insurers under any Required Insurance Policies to enter into a substitution
of
liability agreement with such Person, pursuant to which the original
Mortgagor
is released from liability and such Person is substituted as Mortgagor and
becomes liable under the Mortgage Note. Notwithstanding the foregoing, the
Master Servicer shall not be deemed to be in default under this Section by
reason of any transfer or assumption which the Master Servicer reasonably
believes it is restricted by law from preventing, for any reason whatsoever.

        (b) Subject to the Master Servicer's duty to enforce any due-on-sale
clause to the extent set forth in Section 3.10(a), in any case in which a
Mortgaged Property has been conveyed to a Person by a Mortgagor, and such
Person is to enter into an assumption agreement or modification agreement or
supplement to the Mortgage Note or Mortgage that requires the signature of
the
Trustee, or if an instrument of release signed by the Trustee is required
releasing the Mortgagor from liability on the Mortgage Loan, the Master
Servicer shall prepare and deliver or cause to be prepared and delivered to
the Trustee for signature and shall direct, in writing, the Trustee to
execute
the assumption agreement with the Person to whom the Mortgaged Property is to
be conveyed and such modification agreement or supplement to the Mortgage
Note
or Mortgage or other instruments as are reasonable or necessary to carry out
the terms of the Mortgage Note or Mortgage or otherwise to comply with any
applicable laws regarding assumptions or the transfer of the Mortgaged
Property to such Person. In connection with any such assumption, no material
term of the Mortgage Note may be changed. In addition, the substitute
Mortgagor and the Mortgaged Property must be acceptable to the Master
Servicer

in accordance with its underwriting standards as then in effect. Together with
each such substitution, assumption or other agreement or instrument delivered to the Trustee for execution by it, the Master Servicer shall deliver an Officer's Certificate signed by a Servicing Officer stating that the requirements of this subsection have been met in connection therewith. The Master Servicer shall notify the Trustee that any such substitution or assumption agreement has been completed by forwarding to the Trustee the original of such substitution or assumption agreement, which in the case of the original shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all
other documents and instruments constituting a part thereof. Any fee collected
by the Master Servicer for entering into an assumption or substitution of liability agreement will be retained by the Master Servicer as additional servicing compensation.

72

| EX-99.1 | 79th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 79th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

**SECTION 3.11. Realization Upon Defaulted Mortgage Loans; Repurchase of Certain Mortgage Loans.**

(a) The Master Servicer shall use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such
of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In connection with such foreclosure or other conversion, the Master Servicer shall follow such practices and procedures as it shall deem necessary or advisable and as shall be normal and usual in its general mortgage servicing activities and meet the requirements of the insurer under any Required Insurance Policy; provided, however, that the Master Servicer shall not be required to expend its own funds in connection with any foreclosure or towards
the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan after reimbursement to itself of such expenses and (ii) that
such expenses will be recoverable to it through Liquidation Proceeds and Subsequent Recoveries (respecting which it shall have priority for purposes of
withdrawals from the Certificate Account). The Master Servicer shall be responsible for all other costs and expenses incurred by it in any such proceedings; provided, however, that it shall be entitled to reimbursement of such costs and expenses from the liquidation proceeds and Subsequent Recoveries with respect to the related Mortgaged Property, as provided in the definition of Liquidation Proceeds. If the Master Servicer has knowledge that a Mortgaged Property which the Master Servicer is contemplating acquiring in foreclosure or by deed in lieu of foreclosure is located within a one-mile radius of any site listed in the Expenditure Plan for the Hazardous Substance Clean Up Bond Act of 1984 or other site with environmental or hazardous waste risks known to the Master Servicer, the Master Servicer will, prior to acquiring the Mortgaged Property, consider such risks and only take action in

accordance with its established environmental review procedures.

With respect to any REO Property, the deed or certificate of sale shall be taken in the name of the Trustee for the benefit of the Certificateholders, or its nominee, on behalf of the Certificateholders. The Trustee's name shall be placed on the title to such REO Property solely as the Trustee hereunder and not in its individual capacity. The Master Servicer shall ensure that the title to such REO Property references the Pooling and Servicing Agreement and the Trustee's capacity thereunder. Pursuant to its efforts to sell such REO Property, the Master Servicer shall either itself or through an agent selected by the Master Servicer protect and conserve such REO Property in the same manner and to such extent as is customary in the locality where such REO Property is located and may, incident to its conservation and protection of the interests of the Certificateholders, rent the same, or any part thereof, as the Master Servicer deems to be in the best interest of the Certificateholders for the period prior to the sale of such REO Property. The Master Servicer shall prepare for and deliver to the Trustee a statement with respect to each REO Property that has been rented showing the aggregate rental income received and all expenses incurred in connection with the maintenance of such REO Property at such times as is necessary to enable the Trustee to comply with the reporting requirements of the REMIC Provisions. The net monthly rental income, if any, from such REO Property shall be deposited in the Certificate Account no later than the close of business on each Determination Date. The Master Servicer shall perform the tax reporting and withholding required by Sections 1445 and 6050J of the Code with respect to foreclosures and abandonments, the tax reporting required by Section 6050H of the Code with respect to the receipt of mortgage interest from individuals and any tax reporting

73

| EX-99.1 | 80th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 80th |

required by Section 6050P of the Code with respect to the cancellation of indebtedness by certain financial entities, by preparing such tax and information returns as may be required, in the form required, and delivering the same to the Trustee for filing.

In the event that the Trust Fund acquires any Mortgaged Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer shall dispose of such Mortgaged Property as soon as practicable in a manner that maximizes the Liquidation Proceeds thereof, but in no event later than three years after its acquisition by the Trust Fund. In that event, the Trustee shall have been supplied with an Opinion of Counsel to the effect that the holding by the Trust Fund of such Mortgaged Property subsequent to a three-year period, if applicable, will not result in the imposition of taxes on "prohibited transactions" of any REMIC hereunder as defined in Section 860F of the Code or cause any REMIC hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding, and that the Trust Fund may continue to hold such Mortgaged

Property (subject to any conditions contained in such Opinion of Counsel) after the expiration of such three-year period. Notwithstanding any other provision of this Agreement, no Mortgaged Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used for the production of income by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such Mortgaged Property to fail to qualify as *"foreclosure property"* within the meaning of Section 860G(a)(8) of the Code or (ii) subject any REMIC hereunder to the imposition of any federal, state or local income taxes on the income earned from such Mortgaged Property under Section 860G(c) of the Code or otherwise, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

In the event of a default on a Mortgage Loan one or more of whose obligor is not a United States Person, as that term is defined in Section 7701(a)(30) of the Code, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, *"foreclosure"*) in respect of such Mortgage Loan, the Master Servicer will cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

The decision of the Master Servicer to foreclose on a defaulted Mortgage Loan shall be subject to a determination by the Master Servicer that the proceeds of such foreclosure would exceed the costs and expenses of bringing such a proceeding. The income earned from the management of any REO Properties, net of reimbursement to the Master Servicer for expenses incurred (including any property or other taxes) in connection with such management and net of unreimbursed Master Servicing Fees, Advances and Servicing Advances, shall be applied to the payment of principal of and interest on the related defaulted Mortgage Loans (with interest accruing as though such Mortgage Loans were still current) and all such income shall be deemed, for all purposes in this Agreement, to be payments on account of principal and interest on the related Mortgage Notes and shall be deposited into the Certificate Account. To the extent the net income received during any calendar month is in excess of the amount attributable to amortizing principal and accrued interest at the related Mortgage Rate on the related Mortgage Loan for

74

such calendar month, such excess shall be considered to be a partial prepayment of principal of the related Mortgage Loan.

The proceeds from any liquidation of a Mortgage Loan, as well as any income from an REO Property, will be applied in the following order of

priority: first, to reimburse the Master Servicer for any related unreimbursed
Servicing Advances and Master Servicing Fees; second, to reimburse the Master
Servicer or the Trustee for any unreimbursed Advances; third, to reimburse the
Certificate Account for any Nonrecoverable Advances (or portions thereof) that
were previously withdrawn by the Master Servicer pursuant to Section
3.08(a)(iii) that related to such Mortgage Loan; fourth, to accrued and unpaid
interest (to the extent no Advance has been made for such amount or any such
Advance has been reimbursed) on the Mortgage Loan or related REO Property, at
the Adjusted Net Mortgage Rate to the Due Date occurring in the month in which
such amounts are required to be distributed; and fifth, as a recovery of
principal of the Mortgage Loan. Excess Proceeds, if any, from the liquidation
of a Liquidated Mortgage Loan will be retained by the Master Servicer as
additional servicing compensation pursuant to Section 3.14.

The Master Servicer, in its sole discretion, shall have the right to
purchase for its own account from the Trust Fund any Mortgage Loan that is 151
days or more delinquent at a price equal to the Purchase Price; provided,
however, that the Master Servicer may only exercise this right on or before
the next to the last day of the calendar month in which such Mortgage Loan
became 151 days delinquent (such month, the *"Eligible Repurchase Month"*);
provided further, that any such Mortgage Loan that becomes current but
thereafter becomes delinquent may be purchased by the Master Servicer pursuant
to this Section in any ensuing Eligible Repurchase Month. The Purchase Price
for any Mortgage Loan purchased under this Section 3.11 shall be deposited in
the Certificate Account and the Trustee, upon receipt of a certificate from
the Master Servicer in the form of Exhibit N to this Agreement, shall release
or cause to be released to the purchaser of such Mortgage Loan the related
Mortgage File and shall execute and deliver such instruments of transfer or
assignment prepared by the purchaser of such Mortgage Loan, in each case
without recourse, as shall be necessary to vest in the purchaser of such
Mortgage Loan any Mortgage Loan released pursuant hereto and the purchaser of
such Mortgage Loan shall succeed to all the Trustee's right, title and
interest in and to such Mortgage Loan and all security and documents related
thereto. Such assignment shall be an assignment outright and not for security.
The purchaser of such Mortgage Loan shall thereupon own such Mortgage Loan,
and all security and documents, free of any further obligation to the Trustee
or the Certificateholders with respect thereto.

(b) The Master Servicer may agree to a modification of any Mortgage
Loan (the *"Modified Mortgage Loan"*) if (i) the modification is in lieu of a
refinancing, (ii) the Mortgage Rate on the Modified Mortgage Loan is
approximately a prevailing market rate for newly-originated mortgage loans
having similar terms and (iii) the Master Servicer purchases the Modified
Mortgage Loan from the Trust Fund as described below. Effective immediately
after the modification, and, in any event, on the same Business Day on which
the modification occurs, all interest of the Trustee in the Modified Mortgage
Loan shall automatically be deemed transferred and assigned to the Master
Servicer and all benefits and burdens of ownership thereof, including the
right to accrued interest thereon from the date of modification and the risk

of default thereon, shall pass to the Master Servicer. The Master Servicer
shall promptly deliver

75

to the Trustee a certification of a Servicing Officer to the effect that all
requirements of this paragraph have been satisfied with respect to the
Modified Mortgage Loan. For federal income tax purposes, the Trustee shall
account for such purchase as a prepayment in full of the Modified Mortgage
Loan.

The Master Servicer shall deposit the Purchase Price for any Modified
Mortgage Loan in the Certificate Account pursuant to Section 3.05 within one
Business Day after the purchase of the Modified Mortgage Loan. Upon receipt
by
the Trustee of written notification of any such deposit signed by a Servicing
Officer, the Trustee shall release to the Master Servicer the related
Mortgage
File and shall execute and deliver such instruments of transfer or
assignment,
in each case without recourse, as shall be necessary to vest in the Master
Servicer any Modified Mortgage Loan previously transferred and assigned
pursuant hereto. The Master Servicer covenants and agrees to indemnify the
Trust Fund against any liability for any *prohibited transaction* taxes and
any related interest, additions, and penalties imposed on the Trust Fund
established hereunder as a result of any modification of a Mortgage Loan
effected pursuant to this subsection (b), any holding of a Modified Mortgage
Loan by the Trust Fund or any purchase of a Modified Mortgage Loan by the
Master Servicer (but such obligation shall not prevent the Master Servicer or
any other appropriate Person from in good faith contesting any such tax in
appropriate proceedings and shall not prevent the Master Servicer from
withholding payment of such tax, if permitted by law, pending the outcome of
such proceedings). The Master Servicer shall have no right of reimbursement
for any amount paid pursuant to the foregoing indemnification, except to the
extent that the amount of any tax, interest, and penalties, together with
interest thereon, is refunded to the Trust Fund or the Master Servicer.

**SECTION 3.12. Trustee to Cooperate; Release of Mortgage Files.**

Upon the payment in full of any Mortgage Loan, or the receipt by the
Master Servicer of a notification that payment in full will be escrowed in a
manner customary for such purposes, the Master Servicer will immediately
notify the Trustee by delivering, or causing to be delivered a *"Request for
Release"* substantially in the form of Exhibit N of this Agreement. Upon
receipt of such request, the Trustee shall promptly release the related
Mortgage File to the Master Servicer, and the Trustee shall at the Master
Servicer's direction execute and deliver to the Master Servicer the request
for reconveyance, deed of reconveyance or release or satisfaction of mortgage
or such instrument releasing the lien of the Mortgage in each case provided
by
the Master Servicer, together with the Mortgage Note with written evidence of
cancellation on the Mortgage Note. The Master Servicer is authorized to cause
the removal from the registration on the MERS(R) System of such Mortgage and

to execute and deliver, on behalf of the Trustee and the Certificateholders
or
any of them, any and all instruments of satisfaction or cancellation or of
partial or full release. Expenses incurred in connection with any instrument
of satisfaction or deed of reconveyance shall be chargeable to the related
Mortgagor. From time to time and as shall be appropriate for the servicing or
foreclosure of any Mortgage Loan, including for such purpose, collection
under
any policy of flood insurance, any fidelity bond or errors or omissions
policy, or for the purposes of effecting a partial release of any Mortgaged
Property from the lien of the Mortgage or the making of any corrections to
the
Mortgage Note or the Mortgage or any of the other documents included in the
Mortgage File, the Trustee shall, upon delivery to the Trustee of a Request
for Release in the form of Exhibit M signed by a Servicing Officer, release
the Mortgage File to the Master Servicer. Subject to the further limitations
set forth below, the

76

| **EX-99.1** | **83rd Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 83rd |

Master Servicer shall cause the Mortgage File or documents so released to be
returned to the Trustee when the need therefor by the Master Servicer no
longer exists, unless the Mortgage Loan is liquidated and the proceeds
thereof
are deposited in the Certificate Account, in which case the Master Servicer
shall deliver to the Trustee a Request for Release in the form of Exhibit N,
signed by a Servicing Officer.

If the Master Servicer at any time seeks to initiate a foreclosure
proceeding in respect of any Mortgaged Property as authorized by this
Agreement, the Master Servicer shall deliver or cause to be delivered to the
Trustee, for signature, as appropriate, any court pleadings, requests for
trustee's sale or other documents necessary to effectuate such foreclosure or
any legal action brought to obtain judgment against the Mortgagor on the
Mortgage Note or the Mortgage or to obtain a deficiency judgment or to
enforce
any other remedies or rights provided by the Mortgage Note or the Mortgage or
otherwise available at law or in equity.

### SECTION 3.13. Documents, Records and Funds in Possession of Master Servicer to be Held for the Trustee.

Notwithstanding any other provisions of this Agreement, the Master
Servicer shall transmit to the Trustee as required by this Agreement all
documents and instruments in respect of a Mortgage Loan coming into the
possession of the Master Servicer from time to time and shall account fully
to
the Trustee for any funds received by the Master Servicer or which otherwise
are collected by the Master Servicer as Liquidation Proceeds, Insurance
Proceeds or Subsequent Recoveries in respect of any Mortgage Loan. All
Mortgage Files and funds collected or held by, or under the control of, the
Master Servicer in respect of any Mortgage Loans, whether from the collection
of principal and interest payments or from Liquidation Proceeds and any
Subsequent Recoveries, including but not limited to, any funds on deposit in

the Certificate Account, shall be held by the Master Servicer for and on
behalf of the Trustee and shall be and remain the sole and exclusive property
of the Trustee, subject to the applicable provisions of this Agreement. The
Master Servicer also agrees that it shall not create, incur or subject any
Mortgage File or any funds that are deposited in the Certificate Account,
Distribution Account or any Escrow Account, or any funds that otherwise are
or
may become due or payable to the Trustee for the benefit of the
Certificateholders, to any claim, lien, security interest, judgment, levy,
writ of attachment or other encumbrance, or assert by legal action or
otherwise any claim or right of setoff against any Mortgage File or any funds
collected on, or in connection with, a Mortgage Loan, except, however, that
the Master Servicer shall be entitled to set off against and deduct from any
such funds any amounts that are properly due and payable to the Master
Servicer under this Agreement.

**SECTION 3.14. Servicing Compensation.**

As compensation for its activities hereunder, the Master Servicer
shall be entitled to retain or withdraw from the Certificate Account an
amount
equal to the Master Servicing Fee; provided, that the aggregate Master
Servicing Fee with respect to any Distribution Date shall be reduced (i) by
an
amount equal to the aggregate of the Prepayment Interest Shortfalls for each
Aggregate Loan Group, if any, with respect to such Distribution Date, but not
to exceed the related Compensating Interest for each Aggregate Loan Group for
such Distribution Date, and

77

| EX-99.1 | 84th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 84th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

(ii) with respect to the first Distribution Date, an amount equal to any
amount to be deposited into the Distribution Account by the Depositor
pursuant
to Section 2.01(a) and not so deposited.

Additional servicing compensation in the form of Excess Proceeds,
prepayment penalties, assumption fees, late payment charges and all income
and
gain net of any losses realized from Permitted Investments shall be retained
by the Master Servicer to the extent not required to be deposited in the
Certificate Account pursuant to Section 3.05. The Master Servicer shall be
required to pay all expenses incurred by it in connection with its master
servicing activities hereunder (including payment of any premiums for hazard
insurance and any Primary Insurance Policy and maintenance of the other forms
of insurance coverage required by this Agreement) and shall not be entitled
to
reimbursement therefor except as specifically provided in this Agreement.

**SECTION 3.15. Access to Certain Documentation.**

The Master Servicer shall provide to the OTS and the FDIC and to
comparable regulatory authorities supervising Certificateholders and/or
Certificate Owners and the examiners and supervisory agents of the OTS, the

FDIC and such other authorities, access to the documentation regarding the Mortgage Loans required by applicable regulations of the OTS and the FDIC. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Master Servicer. Nothing in this Section shall limit the obligation of the Master Servicer to observe any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of the Master Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.

### SECTION 3.16. Annual Statement as to Compliance.

The Master Servicer shall deliver to the Depositor and the Trustee on or before 80 days after the end of the Master Servicer's fiscal year, commencing with its 2005 fiscal year, an Officer's Certificate stating, as to the signer thereof, that (i) a review of the activities of the Master Servicer during the preceding calendar year and of the performance of the Master Servicer under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Master Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof. The Trustee shall forward a copy of each such statement to each Rating Agency.

### SECTION 3.17. Annual Independent Public Accountants' Servicing Statement; Financial Statements.

On or before 80 days after the end of the Master Servicer's fiscal year, commencing with its 2005 fiscal year, the Master Servicer at its expense shall cause a nationally or regionally recognized firm of independent public accountants (who may also render other services to the Master Servicer, a Seller or any affiliate thereof) which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Trustee and the Depositor to the effect

78

| EX-99.1 | 85th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 85th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

that such firm has examined certain documents and records relating to the servicing of the Mortgage Loans under this Agreement or of mortgage loans under pooling and servicing agreements substantially similar to this Agreement (such statement to have attached thereto a schedule setting forth the pooling and servicing agreements covered thereby) and that, on the basis of such examination, conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for Mortgages serviced for FNMA and FHLMC, such servicing has been conducted in compliance with such pooling and servicing agreements except for such significant exceptions or errors in records that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for

Mortgages serviced for FNMA and FHLMC requires it to report. In rendering such statement, such firm may rely, as to matters relating to direct servicing of mortgage loans by Subservicers, upon comparable statements for examinations conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for Mortgages serviced for FNMA and FHLMC (rendered within one year of such statement) of independent public accountants with respect to the related Subservicer. Copies of such statement shall be provided by the Trustee to any Certificateholder upon request at the Master Servicer's expense, provided that such statement is delivered by the Master Servicer to the Trustee.

### SECTION 3.18. Errors and Omissions Insurance; Fidelity Bonds.

The Master Servicer shall for so long as it acts as master servicer under this Agreement, obtain and maintain in force (a) a policy or policies of insurance covering errors and omissions in the performance of its obligations as Master Servicer hereunder and (b) a fidelity bond in respect of its officers, employees and agents. Each such policy or policies and bond shall, together, comply with the requirements from time to time of FNMA or FHLMC for persons performing servicing for mortgage loans purchased by FNMA or FHLMC. In the event that any such policy or bond ceases to be in effect, the Master Servicer shall obtain a comparable replacement policy or bond from an insurer or issuer, meeting the requirements set forth above as of the date of such replacement.

### SECTION 3.19. Notification of Adjustments.

On each Adjustment Date, the Master Servicer shall make interest rate and/or monthly payment adjustments for each Mortgage Loan in compliance with the requirements of the related Mortgage and Mortgage Note and applicable regulations. The Master Servicer shall execute and deliver the notices required by each Mortgage and Mortgage Note and applicable regulations regarding interest rate and/or monthly payment adjustments. The Master Servicer also shall provide timely notification to the Trustee of all applicable data and information regarding such interest rate or monthly payment adjustments and the Master Servicer's methods of implementing such adjustments. Upon the discovery by the Master Servicer or the Trustee that the Master Servicer has failed to adjust or has incorrectly adjusted a Mortgage Rate or a monthly payment pursuant to the terms of the related Mortgage Note and Mortgage, the Master Servicer shall immediately deposit in the Certificate Account from its own funds the amount of any interest and/or principal loss caused thereby without reimbursement therefor; provided, however, the Master Servicer shall be held harmless with respect to any interest rate and/or monthly payment adjustments made by any servicer prior to the Master Servicer.

79

### SECTION 3.20. Corridor Contracts.

The Master Servicer shall cause Bank of America LLC (or its relevant affiliate) to assign all of its right, title and interest in and to the Corridor Contracts to, and shall cause all of Bank of America LLC's obligations in respect of such transaction to be assumed by, the Trustee on behalf of the Trust Fund, on the terms and conditions set forth in the Assignment Agreement. The Corridor Contracts will be assets of the Trust Fund but will not be assets of any REMIC. The Master Servicer, on behalf of the Trustee, shall cause to be deposited any amounts received from time to time with respect to the Corridor Contracts into the Corridor Contract Reserve Fund.

The Master Servicer, on behalf of the Trustee, shall, upon receipt of direction from Bank of America LLC., prepare and deliver any notices required to be delivered under the Corridor Contracts.

The Master Servicer, on behalf of the Trustee, shall act as calculation agent and/or shall terminate the Corridor Contracts, in each case upon the occurrence of certain events of default or termination events to the extent specified thereunder. Upon any such termination, the Corridor Contract Counterparty will be obligated to pay the Trustee, for the benefit of the Trust Fund, an amount in respect of such termination. Any amounts received by the Trustee for the benefit of the Trust Fund in respect of such termination shall be deposited and held in the Corridor Contract Reserve Fund and applied on future Distribution Dates to pay any Carryover Shortfall Amounts on the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates. Any amounts remaining in the Corridor Contract Reserve Fund, after the Class Certificate Balance of the aggregate Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates has been reduced to zero, will be distributed to Bank of America Securities LLC.

80

| EX-99.1 | 87th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 87th |

## ARTICLE IV
## DISTRIBUTIONS AND
## ADVANCES BY THE MASTER SERVICER

### SECTION 4.01. Advances.

(a) The Master Servicer shall determine on or before each Master Servicer Advance Date whether it is required to make an Advance pursuant to the definition thereof. If the Master Servicer determines it is required to make an Advance, it shall, on or before the Master Servicer Advance Date, either (i) deposit into the Certificate Account an amount equal to the Advance or (ii) make an appropriate entry in its records relating to the Certificate Account that any Amount Held for Future Distribution has been used by the Master Servicer in discharge of its obligation to make any such Advance. Any funds so applied shall be replaced by the Master Servicer by deposit in the Certificate Account no later than the close of business on the next Master Servicer Advance Date. The Master Servicer shall be entitled to be reimbursed from the Certificate Account for all Advances of its own funds made pursuant to this Section as provided in Section 3.08. The obligation to make Advances

with respect to any Mortgage Loan shall continue if such Mortgage Loan has been foreclosed or otherwise terminated and the related Mortgaged Property has
not been liquidated.

(b) If the Master Servicer determines that it will be unable to comply with its obligation to make the Advances as and when described in the second sentence of Section 4.01(a), it shall use its best efforts to give written notice thereof to the Trustee (each such notice a *"Trustee Advance Notice"*; and such notice may be given by telecopy), not later than 3:00 P.M., New York time, on the Business Day immediately preceding the related Master Servicer Advance Date, specifying the amount that it will be unable to deposit
(each such amount an *"Advance Deficiency"*) and certifying that such Advance Deficiency constitutes an Advance hereunder and is not a Nonrecoverable Advance. If the Trustee receives a Trustee Advance Notice on or before 3:30 P.M., New York time on a Master Servicer Advance Date, the Trustee shall, not later than 3:00 P.M., New York time, on the related Distribution Date, deposit
in the Distribution Account an amount equal to the Advance Deficiency identified in such Trustee Advance Notice unless it is prohibited from so doing by applicable law. Notwithstanding the foregoing, the Trustee shall not be required to make such deposit if the Trustee shall have received written notification from the Master Servicer that the Master Servicer has deposited or caused to be deposited in the Certificate Account an amount equal to such Advance Deficiency. All Advances made by the Trustee pursuant to this Section 4.01(b) shall accrue interest on behalf of the Trustee at the Trustee Advance Rate from and including the date such Advances are made to but excluding the date of repayment, with such interest being an obligation of the Master Servicer and not the Trust Fund. The Master Servicer shall reimburse the Trustee for the amount of any Advance made by the Trustee pursuant to this Section 4.01(b) together with accrued interest, not later than the fifth day following the related Master Servicer Advance Date. In the event that the Master Servicer does not reimburse the Trustee in accordance with the requirements of the preceding sentence, the Trustee shall immediately (a) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (b) subject to the limitations set forth in Section 3.04, assume all of the rights and obligations of the Master Servicer hereunder.

81

| EX-99.1 | 88th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 88th |
| --- | --- | --- | --- | --- | --- | --- | --- |

(c) The Master Servicer shall, not later than the close of business on the second Business Day immediately preceding each Distribution Date, deliver to the Trustee a report (in form and substance reasonably satisfactory
to the Trustee) that indicates (i) the Mortgage Loans with respect to which the Master Servicer has determined that the related Scheduled Payments should be advanced and (ii) the amount of the related Scheduled Payments. The Master Servicer shall deliver to the Trustee on the related Master Servicer Advance Date an Officer's Certificate of a Servicing Officer indicating the amount of any proposed Advance determined by the Master Servicer to be a Nonrecoverable Advance.

SECTION 4.02. Priorities of Distribution.

(a) (1) With respect to the Available Funds for Loan Group 1, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 1 Senior Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 1 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount for such Distribution Date, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount that would have been distributed in the absence of such shortfall; provided, however, that the amount of interest otherwise distributable to the Class 1-X Certificates shall be deposited into the Carryover Shortfall Reserve Fund and shall be distributed in accordance with Section 4.02(a)(8);

(iii) [Reserved];

(iv) to each Class of Group 1 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 1 for such Distribution Date will be distributed, sequentially, first, to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero, and second, concurrently, to the Class 1-A-1 and Class 1-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(2) With respect to the Available Funds for Loan Group 2, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 2 Senior Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 2 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution

82

Amount for such Distribution Date, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount that would have been distributed in the absence of such shortfall; provided, however, that the amount of

interest otherwise distributable to the Class 2-X IO Component shall be deposited into the Carryover Shortfall Reserve Fund and shall be distributed in accordance with Section 4.02(a)(8);

(iii) [Reserved];

(iv) to each Class of Group 2 Senior Certificates, concurrently, as follows:

(x) [Reserved]; and

(y) the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 2 for such Distribution Date will be distributed sequentially, first concurrently to the Class 2-A-1 and Class 2-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero, and second, to the Class 2-X P Component, until its Component Principal Balance is reduced to zero;

(3) With respect to the Available Funds for Loan Group 3, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 3 Senior Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 3 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount for such Distribution Date, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount that would have been distributed in the absence of such shortfall;

(iii) [Reserved];

(iv) to each Class of Group 3 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 3 for such Distribution Date will be distributed sequentially, first concurrently to the Class 3-A-1, Class 3-A-2 and Class 3-A-3 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero, and second, to the Class 3-X P Component, until its Component Principal Balance is reduced to zero;

(4) On each Distribution Date, Available Funds from each Loan Group in Aggregate Loan Group II remaining after making the distributions described in Section 4.02(a)(1) through

83

| EX-99.1 | 90th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 90th |

Section 4.02(a)(3) above, will be distributed to each Class and Component of the related Senior Certificates to the extent provided in Section 4.05 hereof.

(5) On each Distribution Date, Available Funds from Loan Group 1 remaining after making the distributions described in Section 4.02(a)(1) and Section 4.02(a)(4) above, will be distributed to the Group I Subordinated Certificates and the Class A-R Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(A) to the Class I-M-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(B) to the Class I-M-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(C) to the Class I-B-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(D) to the Class I-B-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(E) to the Class I-B-2 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(F) to the Class I-B-2 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(G) to the Class I-B-3 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(H) to the Class I-B-3 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(I) to the Class I-B-4 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date; and

(J) to the Class I-B-4 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

84

(K) to the Class I-B-5 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(L) to the Class I-B-5 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero; and

(M) to the Class A-R Certificates, any remaining funds related to Aggregate Loan Group I.

(6) On each Distribution Date, Available Funds from Loan Groups 2 and 3 remaining after making the distributions described in Section 4.02(a)(2), Section 4.02(a)(3) and Section 4.02(a)(4) above, will be distributed to the Group II Subordinated Certificates and the Class A-R Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(A) to the Class II-X Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date; provided, however, that the amount of interest otherwise distributable to the Class II-X Certificates shall be deposited into the Carryover Shortfall Reserve Fund and shall be distributed in accordance with Section 4.02(a)(7);

(B) to the Class II-X P Component, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Component Principal Balance thereof is reduced to zero;

(C) to the Class II-M-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(D) to the Class II-M-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(E) to the Class II-B-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(F) to the Class II-B-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(G) to the Class II-B-2 Certificates, an amount allocable

to interest equal to the Class Optimal Interest Distribution
Amount for such Class for such Distribution Date;

85

(H) to the Class II-B-2 Certificates, an amount allocable
to principal equal to its Pro Rata Share for such Distribution
Date until the Class Certificate Balance thereof is reduced to
zero;

(I) to the Class II-B-3 Certificates, an amount allocable
to interest equal to the Class Optimal Interest Distribution
Amount for such Class for such Distribution Date;

(J) to the Class II-B-3 Certificates, an amount allocable
to principal equal to its Pro Rata Share for such Distribution
Date until the Class Certificate Balance thereof is reduced to
zero;

(K) to the Class II-B-4 Certificates, an amount allocable
to interest equal to the Class Optimal Interest Distribution
Amount for such Class for such Distribution Date; and

(L) to the Class II-B-4 Certificates, an amount allocable
to principal equal to its Pro Rata Share for such Distribution
Date until the Class Certificate Balance thereof is reduced to
zero;

(M) to the Class II-B-5 Certificates, an amount allocable
to interest equal to the Class Optimal Interest Distribution
Amount for such Class for such Distribution Date; and

(N) to the Class II-B-5 Certificates, an amount allocable
to principal equal to its Pro Rata Share for such Distribution
Date until the Class Certificate Balance thereof is reduced to
zero; and

(O) to the Class A-R Certificates, any remaining funds
related to Aggregate Loan Group II.

(7) On each Distribution Date, any amounts deposited in the Carryover
Shortfall Reserve Fund pursuant to Sections 4.02(a)(1)(ii), 4.02(a)(2)(ii)
and
4.02(a)(6)(A) hereof will be distributed after taking account amounts paid
for
the Corridor Contract Reserve Fund, sequentially, in the following order of
priority:

(i) first, from amounts originally on deposit in the Carryover
Shortfall Reserve Fund, concurrently, to the Class 1-A-1, Class
1-A-2, Class I-M-1, Class I-B-1, Class 2-A-1, Class 2-A-2, Class
II-M-1, Class II-B-1 and Class II-B-2 Certificates, pro rata, based
on the Carryover Shortfall Amount allocated to such Class, in an
amount up to their respective Carryover Shortfall Amounts with

respect to each such Class of Certificates; and

(ii) second,

(A) any amounts on deposit in the Carryover Shortfall
Reserve Fund otherwise payable to the Class 1-X Certificates on
that Distribution Date pursuant to Section 4.02(a)(1)(ii) will
be distributed, first, concurrently, to the Class 1-A-1 and
Class 1-A-2 Certificates, pro rata, based on their respective
Carryover

86

Shortfall Amounts, second, sequentially, to the Class I-M-1 and
Class I-B-1 Certificates, in that order, in an amount up to
their respective Carryover Shortfall Amounts with respect to
each such Class of Certificates for that Distribution Date,
and third to the Class 1-X Certificates;

(B) any amounts on deposit in the Carryover Shortfall
Reserve Fund otherwise payable to the Class 2-X Certificates on
that Distribution Date pursuant to Section 4.02(a)(2)(ii) will
be distributed, first, concurrently, to the Class 2-A-1 and
Class 2-A-2 Certificates, pro rata, based on their respective
Carryover Shortfall Amounts and second, to the Class 2-X
Certificates; and

(C) any amounts on deposit in the Carryover Shortfall
Reserve Fund otherwise payable to the Class II-X Certificates
on that Distribution Date pursuant to Section 4.02(a)(6)(A)
will be distributed, first, sequentially, to the Class II-M-1,
Class II-B-1 and Class II-B-2 Certificates, in that order, in
an amount up to their respective Carryover Shortfall Amounts
with respect to each such Class of Certificates, and second to
the Class II-X Certificates;

(b) [Reserved].

(c) [Reserved].

(d) On each Distribution Date, the amount referred to in clause (i)
of the definition of Class Optimal Interest Distribution Amount for each
Class
of Certificates or Component thereof for such Distribution Date shall be
reduced for each Class or Component of Senior Certificates of a Senior
Certificate Group, each related Class of Subordinated Certificates by (i) the
related Class' pro rata share of the Net Prepayment Interest Shortfalls for
the related Loan Group based (x) with respect to a Class of Senior
Certificates or Component thereof, on the related Class Optimal Interest
Distribution Amount for such Distribution Date, and (y) with respect to the
Group II Subordinated Certificates on and prior to the related Senior
Termination Date on the Assumed Interest Amount or after the Senior
Termination Date, the related Class Optimal Interest Distribution Amount for
such Distribution Date in the absence of such Net Prepayment Interest

Shortfalls, and (ii) the related Class' Allocable Share of (A) with respect
to
each Mortgage Loan in the related Loan Group (or after the related Senior
Credit Support Depletion Date, any Mortgage Loan in Aggregate Loan Group I or
any Mortgage Loan in Aggregate Loan Group II, as applicable) that became
subject to a Debt Service Reduction during the calendar month preceding the
month of such Distribution Date, the interest portion of the related Debt
Service Reduction, (B) each Relief Act Reduction for the Mortgage Loans in
the
related Loan Group (or after the related Senior Credit Support Depletion
Date,
any Mortgage Loan in Aggregate Loan Group I or any Mortgage Loan in Aggregate
Loan Group II, as applicable) incurred during the calendar month preceding
the
month of such Distribution Date.

    (e) Notwithstanding the priority and allocation contained in Section
4.02(a)(5), if, on any Distribution Date, with respect to any Class of Group
I
Subordinated Certificates (other than the Class of Group I Subordinated
Certificates then outstanding with the highest priority of distribution), the
sum of the related Class Subordination Percentages of such Class and of all
Classes of Group I Subordinated Certificates which have a higher numerical
Class designation than such Class (the "*Applicable Credit Support
Percentage*")
is less than the Original

87

| EX-99.1 | 94th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 94th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

Applicable Credit Support Percentage for such Class, no distribution of
Principal Prepayments will be made to any such Classes (the "*Restricted
Classes*") and the amount of such Principal Prepayments otherwise
distributable
to the Restricted Classes shall be distributed to any Classes of Group I
Subordinated Certificates having lower numerical Class designations than such
Class, pro rata, based on their respective Class Certificate Balances
immediately prior to such Distribution Date and shall be distributed in the
sequential order provided in Section 4.02(a)(5). Notwithstanding anything in
this Agreement to the contrary, the Class of Group I Subordinated
Certificates
then outstanding with the highest distribution priority shall not be a
Restricted Class.

    Notwithstanding the priority and allocation contained in
Section 4.02(a)(6), if, on any Distribution Date, with respect to any Class
of
Group II Subordinated Certificates (other than the Class of Group II
Subordinated Certificates then outstanding with the highest priority of
distribution), the Applicable Credit Support Percentage for a Class of Group
II Subordinated Certificates is less than the Original Applicable Credit
Support Percentage for such Class, no distribution of Net Prepayments will be
made to any such Classes (the "*Restricted Classes*") and the amount of such
Net
Prepayments, otherwise distributable to the Restricted Classes shall be

distributed to any Classes of Group II Subordinated Certificates having lower numerical Class designations than such Class, pro rata, based on their respective Class Certificate Balances immediately prior to such Distribution Date and shall be distributed in the sequential order provided in Section 4.02(a)(6). Notwithstanding anything in this Agreement to the contrary, the Class of Group II Subordinated Certificates then outstanding with the highest distribution priority shall not be a Restricted Class.

(f) If Subsequent Recoveries have been received with respect to a Liquidated Mortgage Loan in an Aggregate Loan Group, the amount of such Subsequent Recoveries will be applied sequentially, in the order of payment priority to increase the Class Certificate Balance or Component Principal Balance of each Class of Certificates or Component thereof related to that Aggregate Loan Group to which Realized Losses have been allocated, but in each case by not more than the amount of Realized Losses previously allocated to that Class of Certificates or Component pursuant to Section 4.04. Holders of such Certificates will not be entitled to any payment in respect of the Class Optimal Interest Distribution Amount on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied pro rata to the Certificate Balance or Component Balance of each Certificate of such Class or Component thereof.

### SECTION 4.03. Allocation of Net Deferred Interest.

For any Distribution Date, the Net Deferred Interest on the Mortgage Loans in loan group 2 will be allocated among the Class 2-A-1, Class 2-A-2 and Class 2-X Certificates and the Group II Subordinated Certificates as follows:

(a) the related Senior Percentage of the Net Deferred Interest will be allocated among the Class 2-A-1, Class 2-A-2 and Class 2-X Certificates, except that Net Deferred Interest allocable to the Class 2-X Certificates will be added as principal to the outstanding Component Principal Balance of the Class 2-X P Component, based on and to the extent of interest entitlements (prior to any reduction for Net Deferred Interest) with respect to the Class 2-A-1, Class 2-A-2 and Class 2-X Certificates, respectively on such Distribution Date, and

88

(b) the related Subordinated Percentage of Net Deferred Interest will be allocated among the Group II Subordinated Certificates, except that Net Deferred Interest allocable to the Class II-X Certificates will be added as principal to the outstanding Component Principal Balance of the Class II-X P Component, based on and to the extent of the portion of the interest entitlements (prior to any reduction for Net Deferred Interest) with respect to the Class II-X, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates, respectively on such Distribution Date attributable to the related Subordinated Portion.

For any Distribution Date, the Net Deferred Interest on the Mortgage Loans in loan group 3 will be allocated among the Class 3-A-1, Class 3-A-2, Class 3-A-3 and Class 3-X Certificates and the Group II Subordinated Certificates as follows:

(a) the related Senior Percentage of the Net Deferred Interest will be allocated among the Class 3-A-1, Class 3-A-2, Class 3-A-3 and Class 3-X Certificates, except that Net Deferred Interest allocable to the Class 3-X Certificates will be added as principal to the outstanding Component Principal Balance of the Class 3-X P Component, based on and to the extent of interest entitlements (prior to any reduction for Net Deferred Interest) with respect to the Class 3-A-1, Class 3-A-2, Class 3-A-3 and Class 3-X Certificates, respectively on such Distribution Date, and

(b) the related Subordinated Percentage of Net Deferred Interest will be allocated among the Group II Subordinated Certificates, except that Net Deferred Interest allocable to the Class II-X Certificates will be added as principal to the outstanding Component Principal Balance of the Class II-X P Component, based on and to the extent of the portion of the interest entitlements (prior to any reduction for Net Deferred Interest) with respect to the Class II-X, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates, respectively on such Distribution Date attributable to the related Subordinated Portion.

### SECTION 4.04. Allocation of Realized Losses.

(a) On or prior to each Determination Date, the Trustee shall determine the total amount of Realized Losses, including Excess Losses, with respect to the related Distribution Date.

Realized Losses with respect to any Distribution Date shall be allocated as follows:

(i) [Reserved];

(ii) (1) any Realized Loss on the Mortgage Loans in a Loan Group in Aggregate Loan Group I shall be allocated first, to the Group I Subordinated Certificates in reverse order of their respective numerical Class designations (beginning with the Class of Group I Subordinated Certificates then outstanding with the highest numerical Class designation) until the respective Class Certificate Balance of each such Class is reduced to zero, and second, to the Senior Certificates of the related Senior Certificate Group (other than any Notional Amount Certificates, if applicable), pro rata, on the basis of their respective Class Certificate Balances immediately prior to the related Distribution Date until the respective Class Certificate Balance of each such Class is reduced to zero, and (2) any Realized Loss on the Mortgage Loans in a Loan Group in Aggregate Loan Group II shall be allocated first, to the Group II Subordinated Certificates in reverse order

89

of their respective numerical Class designations (beginning with the
Class of Group II Subordinated Certificates then outstanding with
the highest numerical Class designation) until the respective Class
Certificate Balance of each such Class is reduced to zero, and
second, to the Senior Certificates of the related Senior Certificate
Group (other than any Notional Amount Certificates, if applicable),
pro rata, on the basis of their respective Class Certificate
Balances immediately prior to the related Distribution Date until
the respective Class Certificate Balance of each such Class is
reduced to zero; provided, however, that any Realized Losses on the
Mortgage Loans in Loan Group 1, otherwise allocable to the Class
1-A-1 Certificates shall be allocated instead to the Class 1-A-2
Certificates, until its Class Certificate Balance is reduced to
zero; any Realized Losses on the Mortgage Loans in Loan Group 2,
otherwise allocable to the Class 2-A-1 Certificates shall be
allocated instead to the Class 2-A-2 Certificates, until its Class
Certificate Balance is reduced to zero; and any Realized Losses on
the Mortgage Loans in Loan Group 3, otherwise allocable to the Class
3-A-2 Certificates shall be allocated instead to the Class 3-A-3
Certificates, until its Class Certificate Balance is reduced to
zero; and

(b) The Class Certificate Balance of the Class of Group I
Subordinated Certificates and Group II Subordinated Certificates, as
applicable, then outstanding with the highest numerical Class designation
shall be reduced on each Distribution Date by the amount, if any, by which
the
aggregate Class Certificate Balance of all outstanding Classes of Group I
Certificates or Group II Certificates, as applicable, (after giving effect to
the distribution of principal and the allocation of Realized Losses on such
Distribution Date) exceeds the Pool Stated Principal Balance of the
applicable
Aggregate Loan Group as of the last day of the Due Period related to such
Distribution Date (after giving effect to Principal Prepayments in the
related
Prepayment Period).

(c) Any Realized Loss allocated to a Class of Certificates or any
reduction in the Class Certificate Balance of a Class of Certificates
pursuant
to Section 4.04(b) above shall be allocated among the Certificates of such
Class in proportion to their respective Certificate Balances.

(d) Any allocation of Realized Losses to a Certificate or any
reduction in the Certificate Balance of a Certificate, pursuant to Section
4.04(b) above shall be accomplished by reducing the Certificate Balance or
Subordinated Portion thereof, as applicable, immediately following the
distributions made on the related Distribution Date in accordance with the
definition of _"Certificate Balance"_ or _"Subordinated Portion,"_ as the case
may
be.

For purposes of allocating losses to the Group II Subordinated
Certificates, the Class II-X P Component will be considered to have a lower
numerical class designation than the Class II-M-1 Certificates and each other
class of Group II Subordinated Certificates.

SECTION 4.05. Cross-Collateralization; Adjustments to Available Funds

If on any Distribution Date the aggregate Class Certificate Balance of the Senior Certificates in a Senior Certificate Group related to a Loan Group in Aggregate Loan Group II is greater than the aggregate Stated Principal Balance of the Mortgage Loans in that Loan Group as of the first day of the related Due Period (the *"Undercollateralized Group"*), then the Trustee shall reduce the Available Funds of the other Loan Group related to Aggregate Loan Group II that is not undercollateralized (the *"Overcollateralized Groups"*), as follows:

90

| EX-99.1 | 97th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 97th |
|---|---|---|---|---|---|---|---|

(1) to add to the Available Funds of the Undercollateralized Group in the related Aggregate Loan Group an amount equal to the lesser of (a) one month's interest on the Transfer Payment of such Undercollateralized Group at the Weighted Average Adjusted Net Mortgage Rate applicable to such Undercollateralized Group and (b) Available Funds of the Overcollateralized Group related to Aggregate Loan Group II remaining after making distributions to the Certificates of such Overcollateralized Group on such Distribution Date pursuant to Section 4.02; and

(2) to the related Senior Certificates of the Undercollateralized Group related to Aggregate Loan Group II, to the extent of the principal portion of Available Funds of the Overcollateralized Group in Aggregate Loan Group II remaining after making distributions to the Senior Certificates of the Overcollateralized Group on such Distribution Date pursuant to Section 4.02, until the aggregate Class Certificate Balance of the Senior Certificates of the Undercollateralized Group equals the aggregate Stated Principal Balance of the Mortgage Loans in the related Loan Group.

The amount of principal from the Mortgage Loans in a Loan Group in an Aggregate Loan Group that is distributed to the Holders of Senior Certificates of an unrelated Loan Group in the same Aggregate Loan Group is referred to as a *"Transfer Payment."* The Transfer Payment received by the Undercollateralized Group is referred to as a *"Transfer Payment Received."* The Transfer Payment made by the Overcollateralized Group is referred to as a *"Transfer Payment Made."*

SECTION 4.06. Monthly Statements to Certificateholders.

(a) Not later than each Distribution Date, the Trustee shall prepare and cause to be forwarded by first class mail to each Certificateholder, the Master Servicer, the Depositor and each Rating Agency a statement setting forth with respect to the related distribution and the Group I Certificates or the Group II Certificates, as applicable:

(i) the amount thereof allocable to principal, separately

identifying the aggregate amount of any Principal Prepayments, Liquidation Proceeds and Subsequent Recoveries included therein;

(ii) the amount thereof allocable to interest, any Class Unpaid Interest Amounts included in such distribution and any remaining Class Unpaid Interest Amounts after giving effect to such distribution;

(iii) if the distribution to the Holders of such Class of Certificates is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall and the allocation thereof as between principal and interest;

(iv) the Class Certificate Balance or Notional Amount of each Class of Certificates after giving effect to the distribution of principal on such Distribution Date;

(v) the Pool Stated Principal Balance of each Aggregate Loan Group for the following Distribution Date;

91

| EX-99.1 | 98th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 98th |

(vi) the Senior Percentage and Subordinated Percentage for each Loan Group for the following Distribution Date;

(vii) the amount of the Master Servicing Fees paid to or retained by the Master Servicer with respect to such Distribution Date;

(viii) the Pass-Through Rate for each Class of Certificates with respect to such Distribution Date;

(ix) the amount of Advances included in the distribution on such Distribution Date and the aggregate amount of Advances outstanding as of the close of business on such Distribution Date;

(x) the number and aggregate principal amounts of Mortgage Loans in each Loan Group and in the aggregate (A) delinquent (exclusive of Mortgage Loans in foreclosure) (1) 1 to 30 days (2) 31 to 60 days (3) 61 to 90 days and (4) 91 or more days and (B) in foreclosure and delinquent (1) 1 to 30 days (2) 31 to 60 days (3) 61 to 90 days and (4) 91 or more days, as of the close of business on the last day of the calendar month preceding such Distribution Date;

(xi) with respect to any Mortgage Loan that became an REO Property during the preceding calendar month, the loan number and Stated Principal Balance of such Mortgage Loan as of the close of business on the Determination Date preceding such Distribution Date and the date of acquisition thereof;

(xii) the total number and principal balance of any REO Properties in each Loan Group and in the aggregate (and market value, if available) as of the close of business on the

Determination Date preceding such Distribution Date;

(xiii) the Senior Prepayment Percentage and Subordinated Prepayment Percentage for each Loan Group for the following Distribution Date;

(xiv) the aggregate amount of Realized Losses in each Loan Group and in the aggregate incurred during the preceding calendar month and the aggregate amount of Subsequent Recoveries, if any, reducing the Realized Losses from the preceding calendar months;

(xv) [reserved];

(xvi) with respect to the second Distribution Date, the number and aggregate balance of any Delay Delivery Mortgage Loans not delivered within thirty days after the Closing Date;

(xvii) the amount of Net Deferred Interest added to the Class Certificate Balance of any related Class of Certificates;

(xviii) the amount due, and the amount paid, under the Corridor Contracts;

92

| EX-99.1 | 99th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 99th |

(xix) the amount paid to the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates from the Corridor Contract Reserve Fund pursuant to the Corridor Contracts;

(xx) the amount paid from the Carryover Shortfall Reserve Amount and the amount of Carryover Shortfall remaining unpaid; and

(xxi) the amount on deposit in the Corridor Contract Reserve Fund for the following Distribution Date.

The Trustee may make the above information available to Certificateholders via the Trustee's website at http://www.bnyinvestorreporting.com.

(b) The Trustee's responsibility for disbursing the above information to the Certificateholders is limited to the availability, timeliness and accuracy of the information provided by the Master Servicer.

(c) On or before the fifth Business Day following the end of each Prepayment Period (but in no event later than the third Business Day prior to the related Distribution Date), the Master Servicer shall deliver to the Trustee (which delivery may be by electronic data transmission) a report in substantially the form set forth as Schedule VI to this Agreement.

(d) Within a reasonable period of time after the end of each calendar year, the Trustee shall cause to be furnished to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information set forth in clauses (a)(i), (a)(ii) and (a)(vii) of this Section 4.06 aggregated for such calendar year or applicable portion thereof during

which such Person was a Certificateholder. Such obligation of the Trustee
shall be deemed to have been satisfied to the extent that substantially
comparable information shall be provided by the Trustee pursuant to any
requirements of the Code as from time to time in effect.

### SECTION 4.07. [Reserved].

### SECTION 4.08. Determination of Pass-Through Rates for LIBOR Certificates.

(a) On each Interest Determination Date so long as any LIBOR
Certificates are outstanding, the Trustee will determine LIBOR on the basis
of
the British Bankers' Association ("BBA") "Interest Settlement Rate" for
one-month deposits in U.S. dollars as found on Telerate page 3750 as of 11:00
a.m. London time on each LIBOR Determination Date. "Telerate Page 3750" means
the display page currently so designated on the Moneyline Telerate Service
(formerly the Dow Jones Markets) (or such other page as may replace that page
on that service for the purpose of displaying comparable rates or prices).

(b) If on any Interest Determination Date, LIBOR cannot be determined
as provided in paragraph (A) of this Section 4.08, the Trustee shall either
(i) request each Reference Bank to inform the Trustee of the quotation
offered
by its principal London office for making one-month United States dollar
deposits in leading banks in the London interbank market, as of 11:00 a.m.
(London time) on such Interest Determination Date or (ii) in lieu of making
any such request, rely on such Reference Bank quotations that appear at such
time on the Reuters Screen LIBO

93

| **EX-99.1** | **100th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 100th |

Page (as defined in the International Swap Dealers Association Inc. Code of
Standard Wording, Assumptions and Provisions for Swaps, 1986 Edition), to the
extent available. LIBOR for the next Interest Accrual Period will be
established by the Trustee on each interest Determination Date as follows:

(i) If on any Interest Determination Date two or more Reference
Banks provide such offered quotations, LIBOR for the next applicable
Interest Accrual Period shall be the arithmetic mean of such offered
quotations (rounding such arithmetic mean upwards if necessary to
the nearest whole multiple of 1/32%).

(ii) If on any Interest Determination Date only one or none of
the Reference Banks provides such offered quotations, LIBOR for the
next Interest Accrual Period shall be whichever is the higher of (i)
LIBOR as determined on the previous Interest Determination Date or
(ii) the Reserve Interest Rate. The "Reserve Interest Rate" shall be
the rate per annum which the Trustee determines to be either (i) the
arithmetic mean (rounded upwards if necessary to the nearest whole
multiple of 1/32%) of the one-month United States dollar lending
rates that New York City banks selected by the Trustee are quoting,
on the relevant Interest Determination Date, to the principal London
offices of at least two of the Reference Banks to which such

quotations are, in the opinion of the Trustee, being so made, or
(ii) in the event that the Trustee can determine no such arithmetic
mean, the lowest one-month United States dollar lending rate which
New York City banks selected by the Trustee are quoting on such
Interest Determination Date to leading European banks.

(iii) If on any Interest Determination Date the Trustee is
required but is unable to determine the Reserve Interest Rate in the
manner provided in paragraph (b) above, LIBOR for the related
Classes of Certificates shall be LIBOR as determined on the
preceding applicable Interest Determination Date or in the case of
the first Distribution Date, 2.55000%.

Until all of the LIBOR Certificates are paid in full, the Trustee
will at all times retain at least four Reference Banks for the purpose of
determining LIBOR with respect to each Interest Determination Date. The
Master
Servicer initially shall designate the Reference Banks. Each *"Reference Bank"*
shall be a leading bank engaged in transactions in Eurodollar deposits in the
international Eurocurrency market, shall not control, be controlled by, or be
under common control with, the Trustee and shall have an established place of
business in London. If any such Reference Bank should be unwilling or unable
to act as such or if the Master Servicer should terminate its appointment as
Reference Bank, the Trustee shall promptly appoint or cause to be appointed
another Reference Bank. The Trustee shall have no liability or responsibility
to any Person for (i) the selection of any Reference Bank for purposes of
determining LIBOR or (ii) any inability to retain at least four Reference
Banks which is caused by circumstances beyond its reasonable control.

(c) The Pass-Through Rate for each Class of LIBOR Certificates for
each Interest Accrual Period shall be determined by the Trustee on each
Interest Determination Date so long as the LIBOR Certificates are outstanding
on the basis of LIBOR and the respective formulae appearing in footnotes
corresponding to the LIBOR Certificates in the table relating to the
Certificates in the Preliminary Statement.

94

| EX-99.1 | 101st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 101st |

In determining LIBOR, any Pass-Through Rate for the LIBOR
Certificates, any Interest Settlement Rate, or any Reserve Interest Rate, the
Trustee may conclusively rely and shall be protected in relying upon the
offered quotations (whether written, oral or on the Dow Jones Markets) from
the BBA designated banks, the Reference Banks or the New York City banks as
to
LIBOR, the Interest Settlement Rate or the Reserve Interest Rate, as
appropriate, in effect from time to time. The Trustee shall not have any
liability or responsibility to any Person for (i) the Trustee's selection of
New York City banks for purposes of determining any Reserve Interest Rate or
(ii) its inability, following a good-faith reasonable effort, to obtain such
quotations from, the BBA designated banks, the Reference Banks or the New
York
City banks or to determine such arithmetic mean, all as provided for in this
Section 4.08.

The establishment of LIBOR and each Pass-Through Rate for the LIBOR
Certificates by the Trustee shall (in the absence of manifest error) be
final,
conclusive and binding upon each Holder of a Certificate and the Trustee.

**SECTION 4.09. Distributions from the Corridor Contract Reserve Fund.**

(a) On each Distribution Date, amounts on deposit on the Closing Date
in the Corridor Contract Reserve Fund will be distributed, concurrently, to
the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2
Certificates, pro rata, based on Carryover Shortfall Amounts, to the extent
needed to pay any related Carryover Shortfall Amount. On each Distribution
Date on or prior to the earlier of (i) a Corridor Contract Scheduled
Termination Date and (ii) the date on which the related Class Certificate
Balance of the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class
II-B-2 Certificates is reduced to zero, amounts received by the Trustee in
respect of a Corridor Contract for such Distribution Date will be withdrawn
from the Corridor Contract Reserve Fund and distributed to the Class 2-A-1,
Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates, as
applicable, to the extent needed to pay any related Carryover Shortfall
Amount
of the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2
Certificates for such Distribution Date. Any remaining amounts received on a
Corridor Contract shall be held in the Corridor Contract Reserve Fund and
applied on future Distribution Dates to pay any related Carryover Shortfall
Amounts on the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class
II-B-2 Certificates, as applicable.

(b) On each Distribution Date following the Corridor Contract
Scheduled Termination Date but prior to the Distribution Date on which the
Class Certificate Balance of the Class 2-A-1, Class 2-A-2, Class II-M-1,
Class
II-B-1 and Class II-B-2 Certificates is reduced to zero, amounts on deposit
in
the Corridor Contract Reserve Fund will be withdrawn therefrom and
distributed
to the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2
Certificates, to the extent needed to pay any related Carryover Shortfall
Amount of the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class
II-B-2 Certificates for such Distribution Date.

(c) Any amounts remaining in the Corridor Contract Reserve Fund,
after the aggregate Class Certificate Balance of the Class 2-A-1, Class 2-A-
2,
Class II-M-1, Class II-B-1 and Class II-B-2 Certificates has been reduced to
zero, will be distributed to Bank of America Securities LLC.

95

**ARTICLE V**
**THE CERTIFICATES**

**SECTION 5.01. The Certificates.**

The Certificates shall be substantially in the forms attached hereto
as exhibits. The Certificates shall be issuable in registered form, in the
minimum denominations, integral multiples in excess thereof (except that one
Certificate in each Class may be issued in a different amount which must be
in
excess of the applicable minimum denomination) and aggregate denominations
per
Class set forth in the Preliminary Statement.

Subject to Section 9.02 respecting the final distribution on the
Certificates, on each Distribution Date the Trustee shall make distributions
to each Certificateholder of record on the preceding Record Date either (x)
by
wire transfer in immediately available funds to the account of such holder at
a bank or other entity having appropriate facilities therefor, if (i) such
Holder has so notified the Trustee at least five Business Days prior to the
related Record Date and (ii) such Holder shall hold (A) a Notional Amount
Certificate, (B) 100% of the Class Certificate Balance of any Class of
Certificates or (C) Certificates of any Class with aggregate principal
Denominations of not less than $1,000,000 or (y) by check mailed by first
class mail to such Certificateholder at the address of such holder appearing
in the Certificate Register.

The Certificates shall be executed by manual or facsimile signature
on behalf of the Trustee by an authorized officer. Certificates bearing the
manual or facsimile signatures of individuals who were, at the time when such
signatures were affixed, authorized to sign on behalf of the Trustee shall
bind the Trustee, notwithstanding that such individuals or any of them have
ceased to be so authorized prior to the countersignature and delivery of such
Certificates or did not hold such offices at the date of such Certificate. No
Certificate shall be entitled to any benefit under this Agreement, or be
valid
for any purpose, unless countersigned by the Trustee by manual signature, and
such countersignature upon any Certificate shall be conclusive evidence, and
the only evidence, that such Certificate has been duly executed and delivered
hereunder. All Certificates shall be dated the date of their
countersignature.
On the Closing Date, the Trustee shall countersign the Certificates to be
issued at the direction of the Depositor, or any affiliate of the Depositor.

The Depositor shall provide, or cause to be provided, to the Trustee
on a continuous basis, an adequate inventory of Certificates to facilitate
transfers.

**SECTION 5.02. Certificate Register; Registration of Transfer and
Exchange of Certificates.**

(a) The Trustee shall maintain, or cause to be maintained in
accordance with the provisions of Section 5.06, a Certificate Register for
the
Trust Fund in which, subject to the provisions of subsections (b) and (c)
below and to such reasonable regulations as it may prescribe, the Trustee
shall provide for the registration of Certificates and of transfers and
exchanges of Certificates as provided in this Agreement. Upon surrender for
registration of transfer of any Certificate, the Trustee shall execute and
deliver, in the name of the designated transferee or transferees, one or more
new Certificates of the same Class and aggregate Percentage Interest.

96

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Trustee. Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate, and deliver the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of transfer or exchange shall be cancelled and subsequently destroyed by the Trustee in accordance with the Trustee's customary procedures.

(b) No transfer of a Private Certificate shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under said Act and such state securities laws. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer in substantially the forms set forth in Exhibit J (the *"Transferor Certificate"*) and (i) deliver a letter in substantially the form of either Exhibit K (the *"Investment Letter"*) or Exhibit L (the *"Rule 144A Letter"*) or (ii) there shall be delivered to the Trustee at the expense of the transferor an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Trustee and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans and other matters regarding the Trust Fund as the Depositor shall reasonably request to meet its obligation under the preceding sentence. Each Holder of a Private Certificate desiring to effect such transfer shall, and does hereby

agree to, indemnify the Trustee and the Depositor, each Seller and the Master
Servicer against any liability that may result if the transfer is not so
exempt or is not made in accordance with such federal and state laws.

No transfer of an ERISA-Restricted Certificate shall be made unless
the Trustee shall have received either (i) a representation from the
transferee of such Certificate acceptable to and in form and substance
satisfactory to the Trustee (in the event such Certificate is a Private
Certificate, such requirement is satisfied only by the Trustee's receipt of a
representation letter from the transferee substantially in the form of
Exhibit
K or Exhibit L, or in the event such Certificate is a Residual Certificate,
such requirement is satisfied only by the Trustee's receipt of

97

| EX-99.1 | 104th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 104th |

a representation letter from the transferee substantially in the form of
Exhibit I), to the effect that (x) such transferee is not an employee benefit
plan or arrangement subject to Section 406 of ERISA or a plan or arrangement
subject to Section 4975 of the Code, or a person acting on behalf of any such
plan or arrangement, or using the assets of any such plan or arrangement to
effect such transfer or (y) in the case of a Certificate that is an
ERISA-Restricted Certificate and that has been the subject of an
ERISA-Qualifying Underwriting, a representation that the transferee is an
insurance company which is purchasing such Certificates with funds contained
in an "insurance company general account" (as such term is defined in Section
V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that
the purchase and holding of such Certificates satisfy the requirements for
exemptive relief under Sections I and III of PTCE 95-60 or (ii) in the case
of
any ERISA-Restricted Certificate presented for registration in the name of an
employee benefit plan or arrangement subject to ERISA, or a plan or
arrangement subject to Section 4975 of the Code (or comparable provisions of
any subsequent enactments), or a trustee or any other person acting on behalf
of any such plan or arrangement or using such plan's or arrangement's assets,
an Opinion of Counsel satisfactory to the Trustee, which Opinion of Counsel
shall not be an expense of the Trustee, the Master Servicer or the Trust
Fund,
addressed to the Trustee and the Master Servicer, to the effect that the
purchase and holding of such ERISA-Restricted Certificate will not result in
a
non-exempt prohibited transaction under Section 406 of ERISA or Section 4975
of the Code, and will not subject the Trustee or the Master Servicer to any
obligation in addition to those expressly undertaken in this Agreement or to
any liability (such Opinion of Counsel, a "Benefit Plan Opinion"). For
purposes of the preceding sentence, with respect to an ERISA-Restricted
Certificate that is not a Residual Certificate, in the event the
representation letter or Benefit Plan Opinion referred to in the preceding
sentence is not so furnished, one of the representations in clause (i), as
appropriate, shall be deemed to have been made to the Trustee by the
transferee's (including an initial acquiror's) acceptance of the
ERISA-Restricted Certificates. Notwithstanding anything else to the contrary
in this Agreement, any purported transfer of an ERISA-Restricted Certificate

to or on behalf of an employee benefit plan or arrangement subject to ERISA or to the Code without the delivery to the Trustee of a Benefit Plan Opinion satisfactory to the Trustee as described above shall be void and of no effect.

To the extent permitted under applicable law (including, but not limited to, ERISA), the Trustee shall be under no liability to any Person for any registration of transfer of any ERISA-Restricted Certificate that is in fact not permitted by this Section 5.02(b) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the transfer was registered by the Trustee in accordance with the foregoing requirements.

(c) Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i) Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

98

| EX-99.1 | 105th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 105th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

(ii) No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Trustee shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Trustee under subparagraph (b) above, the Trustee shall have been furnished with an affidavit (a *"Transfer Affidavit"*) of the initial owner or the proposed transferee in the form attached to this Agreement as Exhibit I.

(iii) Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transfer Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transfer Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee.

(iv) Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 5.02(c) shall be absolutely null and void and shall vest no rights in the purported Transferee. If any purported

transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 5.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 5.02(b) and this Section 5.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the related Transfer Affidavit, Transferor Certificate and either the Rule 144A Letter or the Investment Letter. The Trustee shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Trustee shall be paid and delivered by the Trustee to the last preceding Permitted Transferee of such Certificate.

(v) The Depositor shall use its best efforts to make available, upon receipt of written request from the Trustee, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 5.02(c) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Trustee of an Opinion of Counsel, which Opinion of Counsel shall not be an expense of the Trust Fund, the Trustee, the Master Servicer or the Sellers, to the effect that the elimination of such restrictions will not cause any REMIC hereunder to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person. Each Person holding or acquiring any Ownership Interest in a Residual

99

| EX-99.1 | 106th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 106th |

Certificate hereby consents to any amendment of this Agreement which, based on an Opinion of Counsel furnished to the Trustee, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate which is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

(d) The preparation and delivery of all certificates and opinions

referred to above in this Section 5.02 in connection with transfer shall be
at
the expense of the parties to such transfers.

(e) Except as provided below, the Book-Entry Certificates shall at
all times remain registered in the name of the Depository or its nominee and
at all times: (i) registration of the Certificates may not be transferred by
the Trustee except to another Depository; (ii) the Depository shall maintain
book-entry records with respect to the Certificate Owners and with respect to
ownership and transfers of such Book-Entry Certificates; (iii) ownership and
transfers of registration of the Book-Entry Certificates on the books of the
Depository shall be governed by applicable rules established by the
Depository; (iv) the Depository may collect its usual and customary fees,
charges and expenses from its Depository Participants; (v) the Trustee shall
deal with the Depository, Depository Participants and indirect participating
firms as representatives of the Certificate Owners of the Book-Entry
Certificates for purposes of exercising the rights of holders under this
Agreement, and requests and directions for and votes of such representatives
shall not be deemed to be inconsistent if they are made with respect to
different Certificate Owners; and (vi) the Trustee may rely and shall be
fully
protected in relying upon information furnished by the Depository with
respect
to its Depository Participants and furnished by the Depository Participants
with respect to indirect participating firms and persons shown on the books
of
such indirect participating firms as direct or indirect Certificate Owners.

All transfers by Certificate Owners of Book-Entry Certificates shall
be made in accordance with the procedures established by the Depository
Participant or brokerage firm representing such Certificate Owner. Each
Depository Participant shall only transfer Book-Entry Certificates of
Certificate Owners it represents or of brokerage firms for which it acts as
agent in accordance with the Depository's normal procedures.

If (x) (i) the Depository or the Depositor advises the Trustee in
writing that the Depository is no longer willing or able to properly
discharge
its responsibilities as Depository, and (ii) the Trustee or the Depositor is
unable to locate a qualified successor or (y) after the occurrence of an
Event
of Default, Certificate Owners representing at least 51% of the Certificate
Balance of the Book-Entry Certificates together advise the Trustee and the
Depository through the Depository Participants in writing that the
continuation of a book-entry system through the Depository is no longer in
the
best interests of the Certificate Owners, the Trustee shall notify all
Certificate Owners, through the Depository, of the occurrence of any such
event and of the availability of definitive, fully-registered Certificates
(the "_Definitive Certificates_") to Certificate Owners requesting the same.
Upon surrender to the Trustee of the related Class of Certificates by the
Depository, accompanied by the instructions from the Depository for
registration, the Trustee shall issue the Definitive Certificates. Neither
the
Master Servicer, the Depositor nor the Trustee shall be liable for any delay
in delivery of such instruction and each may conclusively rely on, and shall
be protected in relying on, such instructions. The Master Servicer shall

provide the Trustee with an adequate inventory of certificates to facilitate
the

100

| EX-99.1 | 107th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 107th |
|---------|-------------------|-----|-----|----------|------|---------|-----------|

issuance and transfer of Definitive Certificates. Upon the issuance of
Definitive Certificates all references in this Agreement to obligations
imposed upon or to be performed by the Depository shall be deemed to be
imposed upon and performed by the Trustee, to the extent applicable with
respect to such Definitive Certificates and the Trustee shall recognize the
Holders of the Definitive Certificates as Certificateholders hereunder;
provided that the Trustee shall not by virtue of its assumption of such
obligations become liable to any party for any act or failure to act of the
Depository.

**SECTION 5.03. Mutilated, Destroyed, Lost or Stolen Certificates.**

If (a) any mutilated Certificate is surrendered to the Trustee, or
the Trustee receives evidence to its satisfaction of the destruction, loss or
theft of any Certificate and (b) there is delivered to the Master Servicer
and
the Trustee such security or indemnity as may be required by them to save
each
of them harmless, then, in the absence of notice to the Trustee that such
Certificate has been acquired by a bona fide purchaser, the Trustee shall
execute, countersign and deliver, in exchange for or in lieu of any such
mutilated, destroyed, lost or stolen Certificate, a new Certificate of like
Class, tenor and Percentage Interest. In connection with the issuance of any
new Certificate under this Section 5.03, the Trustee may require the payment
of a sum sufficient to cover any tax or other governmental charge that may be
imposed in relation thereto and any other expenses (including the fees and
expenses of the Trustee) connected therewith. Any replacement Certificate
issued pursuant to this Section 5.03 shall constitute complete and
indefeasible evidence of ownership, as if originally issued, whether or not
the lost, stolen or destroyed Certificate shall be found at any time.

**SECTION 5.04. Persons Deemed Owners.**

The Master Servicer, the Trustee and any agent of the Master Servicer
or the Trustee may treat the Person in whose name any Certificate is
registered as the owner of such Certificate for the purpose of receiving
distributions as provided in this Agreement and for all other purposes
whatsoever, and neither the Master Servicer, the Trustee nor any agent of the
Master Servicer or the Trustee shall be affected by any notice to the
contrary.

**SECTION 5.05. Access to List of Certificateholders' Names and
Addresses.**

If three or more Certificateholders and/or Certificate Owners (a)
request such information in writing from the Trustee, (b) state that such
Certificateholders and/or Certificate Owners desire to communicate with other
Certificateholders and/or Certificate Owners with respect to their rights
under this Agreement or under the Certificates, and (c) provide a copy of the

communication which such Certificateholders and/or Certificate Owners propose
to transmit, or if the Depositor or Master Servicer shall request such
information in writing from the Trustee, then the Trustee shall, within ten
Business Days after the receipt of such request, (x) provide the Depositor,
the Master Servicer or such Certificateholders and/or Certificate Owners at
such recipients' expense the most recent list of the Certificateholders of
such Trust Fund held by the Trustee, if any, and (y) assist the Depositor,
the
Master Servicer or such Certificateholders and/or Certificate Owners at such
recipients' expense with obtaining from the Depository a list of the related
Depository Participants acting on behalf of Certificate Owners of Book Entry
Certificates. The Depositor and every Certificateholder and Certificate
Owner,
by receiving and holding a Certificate or beneficial interest therein, agree
that the Trustee shall not be held

101

| EX-99.1 | 108th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 108th |

accountable by reason of the disclosure of any such information as to the
list
of the Certificateholders and/or Depository Participants hereunder,
regardless
of the source from which such information was derived.

**SECTION 5.06. Maintenance of Office or Agency.**

The Trustee will maintain or cause to be maintained at its expense an
office or offices or agency or agencies in New York City where Certificates
may be surrendered for registration of transfer or exchange. The Trustee
initially designates its Corporate Trust Office for such purposes. The
Trustee
will give prompt written notice to the Certificateholders of any change in
such location of any such office or agency.

102

| EX-99.1 | 109th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 109th |

**ARTICLE VI**
**THE DEPOSITOR AND THE MASTER SERVICER**

**SECTION 6.01. Respective Liabilities of the Depositor and the Master
Servicer.**

The Depositor and the Master Servicer shall each be liable in
accordance with this Agreement only to the extent of the obligations
specifically and respectively imposed upon and undertaken by them in this
Agreement.

**SECTION 6.02. Merger or Consolidation of the Depositor or the Master
Servicer.**

The Depositor will keep in full effect its existence, rights and

franchises as a corporation under the laws of the United States or under the
laws of one of the states thereof and will obtain and preserve its
qualification to do business as a foreign corporation in each jurisdiction in
which such qualification is or shall be necessary to protect the validity and
enforceability of this Agreement, or any of the Mortgage Loans and to perform
its duties under this Agreement. The Master Servicer will keep in effect its
existence, rights and franchises as a limited partnership under the laws of
the United States or under the laws of one of the states thereof and will
obtain and preserve its qualification or registration to do business as a
foreign partnership in each jurisdiction in which such qualification or
registration is or shall be necessary to protect the validity and
enforceability of this Agreement or any of the Mortgage Loans and to perform
its duties under this Agreement.

Any Person into which the Depositor or the Master Servicer may be
merged or consolidated, or any Person resulting from any merger or
consolidation to which the Depositor or the Master Servicer shall be a party,
or any person succeeding to the business of the Depositor or the Master
Servicer, shall be the successor of the Depositor or the Master Servicer, as
the case may be, hereunder, without the execution or filing of any paper or
any further act on the part of any of the parties hereto, anything in this
Agreement to the contrary notwithstanding; provided, however, that the
successor or surviving Person to the Master Servicer shall be qualified to
service mortgage loans on behalf of, FNMA or FHLMC.

### SECTION 6.03. Limitation on Liability of the Depositor, the Sellers, the Master Servicer and Others.

None of the Depositor, the Master Servicer or any Seller or any of
the directors, officers, employees or agents of the Depositor, the Master
Servicer or any Seller shall be under any liability to the Certificateholders
for any action taken or for refraining from the taking of any action in good
faith pursuant to this Agreement, or for errors in judgment; provided,
however, that this provision shall not protect the Depositor, the Master
Servicer, any Seller or any such Person against any breach of representations
or warranties made by it in this Agreement or protect the Depositor, the
Master Servicer, any Seller or any such Person from any liability which would
otherwise be imposed by reasons of willful misfeasance, bad faith or gross
negligence in the performance of duties or by reason of reckless disregard of
obligations and duties hereunder. The Depositor, the Master Servicer, each
Seller and any director, officer, employee or agent of the Depositor, the
Master Servicer or each Seller may rely in good faith on any document of any
kind prima facie properly executed and submitted by any Person respecting any
matters arising under this Agreement. The Depositor, the Master Servicer,
each
Seller and

103

| EX-99.1 | 110th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 110th |

any director, officer, employee or agent of the Depositor, the Master
Servicer
or any Seller shall be indemnified by the Trust Fund and held harmless
against
any loss, liability or expense incurred in connection with any audit,

controversy or judicial proceeding relating to a governmental taxing
authority
or any legal action relating to this Agreement or the Certificates, other
than
any loss, liability or expense related to any specific Mortgage Loan or
Mortgage Loans (except as any such loss, liability or expense shall be
otherwise reimbursable pursuant to this Agreement) and any loss, liability or
expense incurred by reason of willful misfeasance, bad faith or gross
negligence in the performance of duties hereunder or by reason of reckless
disregard of obligations and duties hereunder. None of the Depositor, the
Master Servicer or any Seller shall be under any obligation to appear in,
prosecute or defend any legal action that is not incidental to its respective
duties hereunder and which in its opinion may involve it in any expense or
liability; provided, however, that any of the Depositor, the Master Servicer
or any Seller may in its discretion undertake any such action that it may
deem
necessary or desirable in respect of this Agreement and the rights and duties
of the parties hereto and interests of the Trustee and the Certificateholders
hereunder. In such event, the legal expenses and costs of such action and any
liability resulting therefrom shall be expenses, costs and liabilities of the
Trust Fund, and the Depositor, the Master Servicer and each Seller shall be
entitled to be reimbursed therefor out of the Certificate Account.

**SECTION 6.04. Limitation on Resignation of Master Servicer.**

The Master Servicer shall not resign from the obligations and duties
hereby imposed on it except (a) upon appointment of a successor servicer and
receipt by the Trustee of a letter from each Rating Agency that such a
resignation and appointment will not result in a downgrade or withdrawal of
the rating of any of the Certificates or (b) upon determination that its
duties hereunder are no longer permissible under applicable law. Any such
determination under clause (b) permitting the resignation of the Master
Servicer shall be evidenced by an Opinion of Counsel to such effect delivered
to the Trustee. No such resignation shall become effective until the Trustee
or a successor master servicer shall have assumed the Master Servicer's
responsibilities, duties, liabilities and obligations under this Agreement.

104

| EX-99.1 | 111th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 111th |

**ARTICLE VII**
**DEFAULT**

**SECTION 7.01. Events of Default.**

"_Event of Default_," wherever used in this Agreement, means any one of
the following events:

(i) any failure by the Master Servicer to deposit in the
Certificate Account or remit to the Trustee any payment required to
be made under the terms of this Agreement, which failure shall
continue unremedied for five days after the date upon which written
notice of such failure shall have been given to the Master Servicer
by the Trustee or the Depositor or to the Master Servicer and the
Trustee by the Holders of Certificates having not less than 25% of

the Voting Rights evidenced by the Certificates; or

(ii) any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; provided, however, that the sixty day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery; or

(iii) a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

(iv) the Master Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

(v) the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi) the Master Servicer shall fail to reimburse in full the Trustee within five days of the Master Servicer Advance Date for any Advance made by the Trustee pursuant to Section 4.01(b) together with accrued and unpaid interest.

105

If an Event of Default described in clauses (i) to (vi) of this Section shall occur with respect to an Aggregate Loan Group, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, or at the direction of the Holders of Certificates related to that Aggregate Loan Group evidencing not less than 66-2/3% of the Voting Rights evidenced by such Certificates, the Trustee shall by notice in writing to the Master Servicer (with a copy to each Rating Agency), terminate all of the rights and obligations of the Master Servicer under this Agreement

with respect to that Aggregate Loan Group and in and to the related Mortgage
Loans and the proceeds thereof, other than its rights as a Certificateholder
hereunder. On and after the receipt by the Master Servicer of such written
notice, all authority and power of the Master Servicer hereunder with respect
to that Aggregate Loan Group, whether with respect to the related Mortgage
Loans or otherwise, shall pass to and be vested in the Trustee. The Trustee
shall thereupon make any Advance related to that Aggregate Loan Group which
the Master Servicer failed to make subject to Section 4.01 whether or not the
obligations of the Master Servicer with respect to that Aggregate Loan Group
have been terminated pursuant to this Section. With respect to such Aggregate
Loan Group, the Trustee is hereby authorized and empowered to execute and
deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise,
any and all documents and other instruments, and to do or accomplish all
other
acts or things necessary or appropriate to effect the purposes of such notice
of termination, whether to complete the transfer and endorsement or
assignment
of the related Mortgage Loans and related documents, or otherwise. Unless
expressly provided in such written notice, no such termination shall affect
any obligation of the Master Servicer to pay amounts owed pursuant to Article
VIII. The Master Servicer agrees to cooperate with the Trustee in effecting
the termination of the Master Servicer's responsibilities and rights
hereunder
with respect to the related Aggregate Loan Group, including, without
limitation, the transfer to the Trustee of all related cash amounts which
shall at the time be credited to the Certificate Account, or thereafter be
received with respect to the related Mortgage Loans.

        Notwithstanding any termination of the activities of the Master
Servicer hereunder, the Master Servicer shall be entitled to receive, out of
any late collection of a Scheduled Payment on a Mortgage Loan which was due
prior to the notice terminating such Master Servicer's rights and obligations
as Master Servicer hereunder with respect to that Aggregate Loan Group and
received after such notice, that portion thereof to which such Master
Servicer
would have been entitled pursuant to Sections 3.08(a)(i) through (viii), and
any other amounts payable to such Master Servicer hereunder the entitlement
to
which arose prior to the termination of its activities with respect to that
Aggregate Loan Group under this Agreement.

        **SECTION 7.02. Trustee to Act; Appointment of Successor.**

        On and after the time the Master Servicer receives a notice of
termination with respect to an Aggregate Loan Group pursuant to Section 7.01,
the Trustee shall, subject to and to the extent provided in Section 3.04, be
the successor to the Master Servicer in its capacity as master servicer for
such Aggregate Loan Group under this Agreement and the transactions set forth
or provided for in this Agreement and shall be subject to all the
responsibilities, duties and liabilities relating thereto placed on the
Master
Servicer by the terms and provisions of this Agreement and applicable law
including the obligation to make Advances pursuant to Section 4.01. As
compensation therefor, the Trustee shall be entitled to all funds relating to
the Mortgage Loans in that Aggregate Loan Group that the Master Servicer
would
have been entitled

106

to charge to the Certificate Account or Distribution Account if the Master
Servicer had continued to act hereunder. Notwithstanding the foregoing, if
the
Trustee has become the successor to the Master Servicer in accordance with
Section 7.01, the Trustee may, if it shall be unwilling to so act, or shall,
if it is prohibited by applicable law from making Advances pursuant to
Section
4.01 or if it is otherwise unable to so act, appoint, or petition a court of
competent jurisdiction to appoint, any established mortgage loan servicing
institution the appointment of which does not adversely affect the then
current rating of the related Certificates by each Rating Agency as the
successor to the Master Servicer hereunder in the assumption of all or any
part of the responsibilities, duties or liabilities of the Master Servicer
with respect to that Aggregate Loan Group hereunder. Any successor to the
Master Servicer shall be an institution which is a FNMA and FHLMC approved
seller/servicer in good standing, which has a net worth of at least
$15,000,000, and which is willing to service the related Mortgage Loans and
executes and delivers to the Depositor and the Trustee an agreement accepting
such delegation and assignment, which contains an assumption by such Person
of
the rights, powers, duties, responsibilities, obligations and liabilities of
the Master Servicer with respect to that Aggregate Loan Group (other than
liabilities of the Master Servicer under Section 6.03 incurred prior to
termination of the Master Servicer under Section 7.01), with like effect as
if
originally named as a party to this Agreement; and provided further that each
Rating Agency acknowledges that its rating of the related Certificates in
effect immediately prior to such assignment and delegation will not be
qualified or reduced as a result of such assignment and delegation. Pending
appointment of a successor to the Master Servicer hereunder, the Trustee,
unless the Trustee is prohibited by law from so acting, shall, subject to
Section 3.04, act in such capacity as hereinabove provided. In connection
with
such appointment and assumption, the Trustee may make such arrangements for
the compensation of such successor out of payments on the related Mortgage
Loans as it and such successor shall agree; provided, however, that no such
compensation shall be in excess of the related Master Servicing Fee permitted
to be paid to the Master Servicer hereunder. The Trustee and such successor
shall take such action, consistent with this Agreement, as shall be necessary
to effectuate any such succession. Neither the Trustee nor any other
successor
master servicer shall be deemed to be in default hereunder by reason of any
failure to make, or any delay in making, any distribution hereunder or any
portion thereof or any failure to perform, or any delay in performing, any
duties or responsibilities hereunder, in either case caused by the failure of
the Master Servicer to deliver or provide, or any delay in delivering or
providing, any cash, information, documents or records to it.

Any successor to the Master Servicer as master servicer with respect
to an Aggregate Loan Group shall give notice to the related Mortgagors of
such

change of servicer and shall, during the term of its service as master
servicer maintain in force the policy or policies that the Master Servicer is
required to maintain pursuant to Section 3.09.

In connection with the termination or resignation of the Master
Servicer hereunder, either (i) the successor Master Servicer, including the
Trustee if the Trustee is acting as successor Master Servicer, shall
represent
and warrant that it is a member of MERS in good standing and shall agree to
comply in all material respects with the rules and procedures of MERS in
connection with the servicing of the Mortgage Loans that are registered with
MERS, or (ii) the predecessor Master Servicer shall cooperate with the
successor Master Servicer either (x) in causing MERS to execute and deliver
an
assignment of Mortgage in recordable form to transfer the Mortgage from MERS
to the Trustee and to execute and deliver such other notices,

107

| **EX-99.1** | **114th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 114th |

documents and other instruments as may be necessary or desirable to effect a
transfer of such Mortgage Loan or servicing of such Mortgage Loan on the
MERS(R) System to the successor Master Servicer or (y) in causing MERS to
designate on the MERS(R) System the successor Master Servicer as the servicer
of such Mortgage Loan. The predecessor Master Servicer shall file or cause to
be filed any such assignment in the appropriate recording office. The
successor Master Servicer shall cause such assignment to be delivered to the
Trustee promptly upon receipt of the original with evidence of recording
thereon or a copy certified by the public recording office in which such
assignment was recorded.

**SECTION 7.03. Notification to Certificateholders.**

(a) Upon any termination of or appointment of a successor to the
Master Servicer with respect to an Aggregate Loan Group, the Trustee shall
give prompt written notice thereof to the related Certificateholders and to
each Rating Agency.

(b) Within 60 days after the occurrence of any Event of Default with
respect to an Aggregate Loan Group, the Trustee shall transmit by mail to all
related Certificateholders notice of each such Event of Default hereunder
known to the Trustee, unless such Event of Default shall have been cured or
waived.

108

| **EX-99.1** | **115th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 115th |

**ARTICLE VIII
CONCERNING THE TRUSTEE**

**SECTION 8.01. Duties of Trustee.**

The Trustee, prior to the occurrence of an Event of Default and after

the curing of all Events of Default that may have occurred, shall undertake to
perform such duties and only such duties as are specifically set forth in this
Agreement. In case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of
such person's own affairs.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement; provided, however, that the Trustee shall not be responsible for the accuracy or content of any such resolution, certificate, statement, opinion, report, document, order or other instrument.

No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure
to act or its own willful misconduct; provided, however, that:

(i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates evidencing not less than 25% of the Voting Rights of Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement; and

(iv) without in any way limiting the provisions of this Section 8.01 or Section 8.02, the Trustee shall be entitled to rely conclusively on the information delivered to it

109

by the Master Servicer in a Trustee Advance Notice in determining whether it is required to make an Advance under Section 4.01(b), shall have no responsibility to ascertain or confirm any information contained in any Trustee Advance Notice, and shall have no obligation to make any Advance under Section 4.01(b) in the absence of a Trustee Advance Notice or actual knowledge of a Responsible Officer of the Trustee that (A) such Advance was not made by the Master Servicer and (B) such Advance is not a Nonrecoverable Advance.

### SECTION 8.02. Certain Matters Affecting the Trustee.

Except as otherwise provided in Section 8.01:

(i) the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and the Trustee shall have no responsibility to ascertain or confirm the genuineness of any signature of any such party or parties;

(ii) the Trustee may consult with counsel, financial advisers or accountants and the advice of any such counsel, financial advisers or accountants and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii) the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(iv) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by Holders of Certificates evidencing not less than 25% of the Voting Rights allocated to each Class of Certificates;

(v) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, accountants or attorneys;

(vi) the Trustee shall not be required to risk or expend its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against

such risk or liability is not assured to it;

(vii) the Trustee shall not be liable for any loss on any
investment of funds pursuant to this Agreement (other than as issuer
of the investment security);

110

(viii) the Trustee shall not be deemed to have knowledge of an
Event of Default until a Responsible Officer of the Trustee shall
have received written notice thereof; and

(ix) the Trustee shall be under no obligation to exercise any
of the trusts, rights or powers vested in it by this Agreement or to
institute, conduct or defend any litigation hereunder or in relation
hereto at the request, order or direction of any of the
Certificateholders, pursuant to the provisions of this Agreement,
unless such Certificateholders shall have offered to the Trustee
reasonable security or indemnity satisfactory to the Trustee against
the costs, expenses and liabilities which may be incurred therein or
thereby.

**SECTION 8.03. Trustee Not Liable for Certificates or Mortgage Loans.**

The recitals contained in this Agreement and in the Certificates
shall be taken as the statements of the Depositor or a Seller, as the case
may
be, and the Trustee assumes no responsibility for their correctness. The
Trustee makes no representations as to the validity or sufficiency of this
Agreement or of the Certificates or of any Mortgage Loan or related document
or of MERS or the MERS(R) System other than with respect to the Trustee's
execution and counter-signature of the Certificates. The Trustee shall not be
accountable for the use or application by the Depositor or the Master
Servicer
of any funds paid to the Depositor or the Master Servicer in respect of the
Mortgage Loans or deposited in or withdrawn from the Certificate Account by
the Depositor or the Master Servicer.

**SECTION 8.04. Trustee May Own Certificates.**

The Trustee in its individual or any other capacity may become the
owner or pledgee of Certificates with the same rights as it would have if it
were not the Trustee.

**SECTION 8.05. Trustee's Fees and Expenses.**

The Trustee, as compensation for its activities hereunder, shall be
entitled to withdraw from the Distribution Account on each Distribution Date
an amount equal to the Trustee Fee for such Distribution Date. The Trustee
and
any director, officer, employee or agent of the Trustee shall be indemnified
by the Master Servicer and held harmless against any loss, liability or
expense (including reasonable attorney's fees and expenses) (i) incurred in
connection with any claim or legal action relating to (a) this Agreement, (b)

the Certificates or (c) in connection with the performance of any of the
Trustee's duties hereunder, other than any loss, liability or expense
incurred
by reason of willful misfeasance, bad faith or negligence in the performance
of any of the Trustee's duties hereunder or incurred by reason of any action
of the Trustee taken at the direction of the Certificateholders and (ii)
resulting from any error in any tax or information return prepared by the
Master Servicer. Such indemnity shall survive the termination of this
Agreement or the resignation or removal of the Trustee hereunder. Without
limiting the foregoing, the Master Servicer covenants and agrees, except as
otherwise agreed upon in writing by the Depositor and the Trustee, and except
for any such expense, disbursement or advance as may arise from the Trustee's
negligence, bad faith or willful misconduct, to pay or reimburse the Trustee,
for all reasonable expenses, disbursements and advances incurred or made by
the Trustee in accordance with any of the provisions of this Agreement with
respect to: (A) the reasonable compensation and the expenses and
disbursements
of its counsel not associated with

111

| EX-99.1 | 118th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 118th |
| --- | --- | --- | --- | --- | --- | --- | --- |

the closing of the issuance of the Certificates, (B) the reasonable
compensation, expenses and disbursements of any accountant, engineer or
appraiser that is not regularly employed by the Trustee, to the extent that
the Trustee must engage such persons to perform acts or services hereunder
and
(C) printing and engraving expenses in connection with preparing any
Definitive Certificates. Except as otherwise provided in this Agreement, the
Trustee shall not be entitled to payment or reimbursement for any routine
ongoing expenses incurred by the Trustee in the ordinary course of its duties
as Trustee, Registrar, Tax Matters Person or Paying Agent hereunder or for
any
other expenses.

### SECTION 8.06. Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be a corporation or
association organized and doing business under the laws of a state or the
United States of America, authorized under such laws to exercise corporate
trust powers, having a combined capital and surplus of at least $50,000,000,
subject to supervision or examination by federal or state authority and with
a
credit rating which would not cause either of the Rating Agencies to reduce
or
withdraw their respective then current ratings of the Certificates (or having
provided such security from time to time as is sufficient to avoid such
reduction) as evidenced in writing by each Rating Agency. If such corporation
or association publishes reports of condition at least annually, pursuant to
law or to the requirements of the aforesaid supervising or examining
authority, then for the purposes of this Section 8.06 the combined capital
and
surplus of such corporation or association shall be deemed to be its combined
capital and surplus as set forth in its most recent report of condition so
published. In case at any time the Trustee shall cease to be eligible in

accordance with the provisions of this Section 8.06, the Trustee shall resign
immediately in the manner and with the effect specified in Section 8.07. The
entity serving as Trustee may have normal banking and trust relationships
with
the Depositor and its affiliates or the Master Servicer and its affiliates;
provided, however, that such entity cannot be an affiliate of the Master
Servicer other than the Trustee in its role as successor to the Master
Servicer.

### SECTION 8.07. Resignation and Removal of Trustee.

The Trustee may at any time resign and be discharged from the trusts
hereby created by giving written notice of resignation to the Depositor, the
Master Servicer and each Rating Agency not less than 60 days before the date
specified in such notice when, subject to Section 8.08, such resignation is
to
take effect, and acceptance by a successor trustee in accordance with Section
8.08 meeting the qualifications set forth in Section 8.06. If no successor
trustee meeting such qualifications shall have been so appointed and have
accepted appointment within 30 days after the giving of such notice or
resignation, the resigning Trustee may petition any court of competent
jurisdiction for the appointment of a successor trustee.

If at any time the Trustee shall cease to be eligible in accordance
with the provisions of Section 8.06 and shall fail to resign after written
request thereto by the Depositor, or if at any time the Trustee shall become
incapable of acting, or shall be adjudged as bankrupt or insolvent, or a
receiver of the Trustee or of its property shall be appointed, or any public
officer shall take charge or control of the Trustee or of its property or
affairs for the purpose of rehabilitation, conservation or liquidation, or a
tax is imposed with respect to the Trust Fund by any state in which the
Trustee or the Trust Fund is located and the imposition of such tax would be
avoided by the appointment of a different trustee, then the Depositor or the
Master Servicer may remove

112

| EX-99.1 | 119th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 119th |

the Trustee and appoint a successor trustee by written instrument, in
triplicate, one copy of which instrument shall be delivered to the Trustee,
one copy of which shall be delivered to the Master Servicer and one copy to
the successor trustee.

The Holders of Certificates entitled to at least 51% of the Voting
Rights may at any time remove the Trustee and appoint a successor trustee by
written instrument or instruments, in triplicate, signed by such Holders or
their attorneys-in-fact duly authorized, one complete set of which
instruments
shall be delivered by the successor Trustee to the Master Servicer, one
complete set to the Trustee so removed and one complete set to the successor
so appointed. Notice of any removal of the Trustee shall be given to each
Rating Agency by the successor trustee.

Any resignation or removal of the Trustee and appointment of a

successor trustee pursuant to any of the provisions of this Section 8.07 shall
become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08.

### SECTION 8.08. Successor Trustee.

Any successor trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor and to its predecessor trustee and the Master Servicer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee in this Agreement. The Depositor, the Master Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties, and obligations. No successor trustee shall accept appointment as provided in this Section 8.08 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06 and its appointment shall not adversely affect the then current rating of the Certificates.

Upon acceptance of appointment by a successor trustee as provided in this Section 8.08, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates. If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

### SECTION 8.09. Merger or Consolidation of Trustee.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, provided that such corporation shall be eligible under the provisions of Section 8.06 without the execution or filing of any paper or

113

further act on the part of any of the parties hereto, anything in this Agreement to the contrary notwithstanding.

### SECTION 8.10. Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which
any part of the Trust Fund or property securing any Mortgage Note may at the time be located, the Master Servicer and the Trustee acting jointly shall have

the power and shall execute and deliver all instruments to appoint one or
more
Persons approved by the Trustee to act as co-trustee or co-trustees jointly
with the Trustee, or separate trustee or separate trustees, of all or any
part
of the Trust Fund, and to vest in such Person or Persons, in such capacity
and
for the benefit of the Certificateholders, such title to the Trust Fund or
any
part thereof, whichever is applicable, and, subject to the other provisions
of
this Section 8.10, such powers, duties, obligations, rights and trusts as the
Master Servicer and the Trustee may consider necessary or desirable. If the
Master Servicer shall not have joined in such appointment within 15 days
after
the receipt by it of a request to do so, or in the case an Event of Default
shall have occurred and be continuing, the Trustee alone shall have the power
to make such appointment. No co-trustee or separate trustee hereunder shall
be
required to meet the terms of eligibility as a successor trustee under
Section
8.06 and no notice to Certificateholders of the appointment of any co-trustee
or separate trustee shall be required under Section 8.08.

Every separate trustee and co-trustee shall, to the extent permitted
by law, be appointed and act subject to the following provisions and
conditions:

(i) To the extent necessary to effectuate the purposes of this
Section 8.10, all rights, powers, duties and obligations conferred
or imposed upon the Trustee, except for the obligation of the
Trustee under this Agreement to advance funds on behalf of the
Master Servicer, shall be conferred or imposed upon and exercised or
performed by the Trustee and such separate trustee or co-trustee
jointly (it being understood that such separate trustee or
co-trustee is not authorized to act separately without the Trustee
joining in such act), except to the extent that under any law of any
jurisdiction in which any particular act or acts are to be performed
(whether as Trustee hereunder or as successor to the Master Servicer
hereunder), the Trustee shall be incompetent or unqualified to
perform such act or acts, in which event such rights, powers, duties
and obligations (including the holding of title to the applicable
Trust Fund or any portion thereof in any such jurisdiction) shall be
exercised and performed singly by such separate trustee or
co-trustee, but solely at the direction of the Trustee;

(ii) No trustee hereunder shall be held personally liable by
reason of any act or omission of any other trustee hereunder and
such appointment shall not, and shall not be deemed to, constitute
any such separate trustee or co-trustee as agent of the Trustee;

(iii) The Trustee may at any time accept the resignation of or
remove any separate trustee or co-trustee; and

114

| EX-99.1 | 121st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 121st |

(iv) The Master Servicer, and not the Trustee, shall be liable for the payment of reasonable compensation, reimbursement and indemnification to any such separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the separate trustees and co-trustees, when and as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

### SECTION 8.11. Tax Matters.

It is intended that the assets with respect to which any REMIC election is to be made, as set forth in the Preliminary Statement, shall constitute, and that the conduct of matters relating to such assets shall be such as to qualify such assets as, a *"real estate mortgage investment conduit"* as defined in and in accordance with the REMIC Provisions. In furtherance of such intention, the Trustee covenants and agrees that it shall act as agent (and the Trustee is hereby appointed to act as agent) on behalf of any such REMIC and that in such capacity it shall: (a) prepare and file, or cause to be prepared and filed, in a timely manner, a U.S. Real Estate Mortgage Investment Conduit Income Tax Return (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to any such REMIC, containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish or cause to be furnished to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby; (b) within thirty days of the

Closing Date, furnish or cause to be furnished to the Internal Revenue
Service, on Forms 8811 or as otherwise may be required by the Code, the name,
title, address, and telephone number of the person that the holders of the
Certificates may contact for tax information relating thereto, together with
such additional information as may be required by such Form, and update such
information at the time or times in the manner required by the Code; (c) make
or cause to be made elections that such assets be treated as a REMIC on the
federal tax return for its first taxable year (and, if necessary, under
applicable state law); (d) prepare and forward, or cause to be prepared and
forwarded, to the Certificateholders and to the Internal Revenue Service and,
if necessary, state tax authorities, all information returns and reports as
and when required to be provided to them in accordance with the REMIC
Provisions, including

115

| EX-99.1 | 122nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 122nd |

without limitation, the calculation of any original issue discount using the
Prepayment Assumption; (e) provide information necessary for the computation
of tax imposed on the transfer of a Residual Certificate to a Person that is
not a Permitted Transferee, or an agent (including a broker, nominee or other
middleman) of a Non-Permitted Transferee, or a pass-through entity in which a
Non-Permitted Transferee is the record holder of an interest (the reasonable
cost of computing and furnishing such information may be charged to the
Person
liable for such tax); (f) to the extent that they are under its control
conduct matters relating to such assets at all times that any Certificates
are
outstanding so as to maintain the status as a REMIC under the REMIC
Provisions; (g) not knowingly or intentionally take any action or omit to
take
any action that would cause the termination of the REMIC status of any REMIC;
(h) pay, from the sources specified in the last paragraph of this Section
8.11, the amount of any federal or state tax, including prohibited
transaction
taxes as described below, imposed on any such REMIC prior to its termination
when and as the same shall be due and payable (but such obligation shall not
prevent the Trustee or any other appropriate Person from contesting any such
tax in appropriate proceedings and shall not prevent the Trustee from
withholding payment of such tax, if permitted by law, pending the outcome of
such proceedings); (i) ensure that federal, state or local income tax or
information returns shall be signed by the Trustee or such other person as
may
be required to sign such returns by the Code or state or local laws,
regulations or rules; (j) maintain records relating to any such REMIC,
including but not limited to the income, expenses, assets and liabilities
thereof and the fair market value and adjusted basis of the assets determined
at such intervals as may be required by the Code, as may be necessary to
prepare the foregoing returns, schedules, statements or information; and (k)
as and when necessary and appropriate, represent any such REMIC in any
administrative or judicial proceedings relating to an examination or audit by
any governmental taxing authority, request an administrative adjustment as to
any taxable year of any such REMIC, enter into settlement agreements with any
governmental taxing agency, extend any statute of limitations relating to any
tax item of any such REMIC, and otherwise act on behalf of any such REMIC in

relation to any tax matter or controversy involving it.

In order to enable the Trustee to perform its duties as set forth in this Agreement, the Depositor shall provide, or cause to be provided, to the Trustee within ten (10) days after the Closing Date all information or data that the Trustee requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flows of the Certificates and the Mortgage Loans. Thereafter, the Depositor shall provide to the Trustee promptly upon written request therefor, any such additional information or data that the Trustee may, from time to time, reasonably request in order to enable the Trustee to perform its duties as set forth in this Agreement. The Depositor hereby indemnifies the Trustee for any losses, liabilities, damages, claims or expenses of the Trustee arising from any errors or miscalculations of the Trustee that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee on a timely basis.

In the event that any tax is imposed on *"prohibited transactions"* of any REMIC hereunder as defined in Section 860F(a)(2) of the Code, on the *"net income from foreclosure property"* of such REMIC as defined in Section 860G(c) of the Code, on any contribution to any REMIC hereunder after the Startup Day pursuant to Section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any minimum tax imposed upon any REMIC

116

| EX-99.1 | **123rd Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 123rd |

hereunder pursuant to Sections 23153 and 24874 of the California Revenue and Taxation Code, if not paid as otherwise provided for herein, such tax shall be paid by (i) the Trustee, if any such other tax arises out of or results from a breach by the Trustee of any of its obligations under this Agreement, (ii) the Master Servicer, in the case of any such minimum tax, or if such tax arises out of or results from a breach by the Master Servicer or a Seller of any of their obligations under this Agreement, (iii) any Seller, if any such tax arises out of or results from that Seller's obligation to repurchase a Mortgage Loan pursuant to Section 2.02 or 2.03 or (iv) in all other cases, or in the event that the Trustee, the Master Servicer or any Seller fails to honor its obligations under the preceding clauses (i),(ii) or (iii), any such tax will be paid with amounts otherwise to be distributed to the Certificateholders, as provided in Section 3.08(b).

The Trustee shall treat the Carryover Shortfall Reserve Fund as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the holders of the Notional Amount Certificates, and that is not an asset of any REMIC created hereunder. The Trustee shall treat the rights of the holders of the LIBOR Certificates and the Notional Amount Certificates to receive payments from the Carryover Shortfall Reserve Fund, as rights in an interest rate corridor contract written by the Holders of the

Notional Amount Certificates in respect of any Carryover Shortfall Amounts distributed in favor of the Holders of the LIBOR Certificates. Thus, the LIBOR
Certificates and the Notional Amount Certificates shall be treated as representing ownership of not only a Master REMIC regular interest, but also ownership of an interest in an interest rate corridor contract. For purposes of determining the issue price of the Master REMIC regular interests, the Trustee shall assume that the corridor contract entered into by each Class of LIBOR Certificates has a value of $0.01/$1,000 principal balance of such Certificates.

The Trustee shall treat the Corridor Contract Reserve Fund as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the holders of the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates, and that is not an asset of any REMIC created hereunder. The Trustee shall treat the rights of the holders of the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates to receive payments from the Corridor Contract Reserve Fund as rights in an interest rate corridor contract written by the Corridor Contract Counterparty. Thus, the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates shall be treated as representing ownership of not only a Master REMIC regular interest, but also ownership of an interest in
an interest rate corridor contract. For purposes of determining the issue price of the Master REMIC regular interests, the Trustee shall assume that the
Corridor Contracts related to the Class 2-A-1, Class 2-A-2, Class II-M-1, Class II-B-1 and Class II-B-2 Certificates have values of $524,800, $235,500, $59,500, $61,700 and $88,500, respectively.

**ARTICLE IX**
**TERMINATION**

**SECTION 9.01. Termination upon Liquidation or Purchase of all Mortgage Loans.**

(1) Subject to Section 9.03, the obligations and responsibilities of the Depositor, the Sellers, the Master Servicer and the Trustee created hereby
with respect to the portion of the Trust Fund relating to Aggregate Loan Group
I shall terminate upon the earlier of: (a) the purchase by the Master Servicer
of all Mortgage Loans (and REO Properties) in Aggregate Loan

117

| EX-99.1 | 124th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 124th |

Group I remaining in the Trust Fund at the price equal to the sum of (i) 100% of the Stated Principal Balance of each Mortgage Loan in Aggregate Loan Group I plus one month's accrued interest thereon at the applicable Adjusted Mortgage Rate and (ii) the lesser of (x) the appraised value of any REO Property as determined by the higher of two appraisals completed by two independent appraisers selected by the Master Servicer at the expense of the Master Servicer and (y) the Stated Principal Balance of each Mortgage Loan in

Aggregate Loan Group I related to any REO Property and (iii) any remaining
unpaid costs and damages incurred by the Trust Fund with respect to Aggregate
Loan Group I that arises out of an actual violation of any predatory or
abusive lending law or regulation, in all cases plus accrued and unpaid
interest thereon at the applicable Adjusted Mortgage Rate; and (b) the later
of (i) the maturity or other liquidation (or any Advance with respect
thereto)
of the last Mortgage Loan in Aggregate Loan Group I remaining in the Trust
Fund and the disposition of all REO Property in Aggregate Loan Group I and
(ii) the distribution to the Certificateholders of the Group I Certificates
of
all amounts required to be distributed to them pursuant to this Agreement. In
no event shall the trusts created hereby continue beyond the earlier of (i)
the expiration of 21 years from the death of the survivor of the descendants
of Joseph P. Kennedy, the late Ambassador of the United States to the Court
of
St. James's, living on the date hereof and (ii) the Latest Possible Maturity
Date.

        The Master Servicer shall have the right to purchase all Mortgage
Loans and REO Properties relating to Aggregate Loan Group I pursuant to
clause
(a) in the preceding paragraph of this Section 9.01(1); provided, however,
that in no event shall the Master Servicer exercise its right to purchase all
Mortgage Loans and REO Properties relating to Aggregate Loan Group I pursuant
to clause (a) in the preceding paragraph of this Section 9.01(1) before the
related Optional Termination Date.

        (2) Subject to Section 9.03, the obligations and responsibilities of
the Depositor, the Sellers, the Master Servicer and the Trustee created
hereby
with respect to the portion of the Trust Fund relating to Aggregate Loan
Group
II shall terminate upon the earlier of: (a) the purchase by the Master
Servicer of all Mortgage Loans (and REO Properties) in Aggregate Loan Group
II
remaining in the Trust Fund at the price equal to the sum of (i) 100% of the
Stated Principal Balance of each Mortgage Loan in Aggregate Loan Group II
plus
one month's accrued interest thereon at the applicable Mortgage Rate and (ii)
the lesser of (x) the appraised value of any REO Property as determined by
the
higher of two appraisals completed by two independent appraisers selected by
the Master Servicer at the expense of the Master Servicer and (y) the Stated
Principal Balance of each Mortgage Loan in Aggregate Loan Group II related to
any REO Property and (iii) any remaining unpaid costs and damages incurred by
the Trust Fund with respect to Aggregate Loan Group II that arises out of a
violation of any predatory or abusive lending law that also constitutes an
actual breach of clause (49) on Schedule III-A, in all cases plus accrued and
unpaid interest thereon at the applicable Adjusted Mortgage Rate; and (b) the
later of (i) the maturity or other liquidation (or any Advance with respect
thereto) of the last Mortgage Loan in Aggregate Loan Group II remaining in
the
Trust Fund and the disposition of all REO Property in Aggregate Loan Group II
and (ii) the distribution to the Certificateholders of the Group II
Certificates of all amounts required to be distributed to them pursuant to
this Agreement. In no event shall the trusts created hereby continue beyond

the earlier of (i) the expiration of 21 years from the death of the survivor
of the descendants of Joseph P. Kennedy, the late Ambassador of the United
States to the Court of St. James's, living on the date hereof and (ii) the
Latest Possible Maturity Date.

118

| EX-99.1 | 125th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 125th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

The Master Servicer shall have the right to purchase all Mortgage
Loans and REO Properties relating to Aggregate Loan Group II pursuant to
clause (a) in the preceding paragraph of this Section 9.01(2); provided,
however, that in no event shall the Master Servicer exercise its right to
purchase all Mortgage Loans and REO Properties relating to Aggregate Loan
Group II pursuant to clause (a) in the preceding paragraph of this Section
9.01(2) before the related Optional Termination Date.

**SECTION 9.02. Final Distribution on the Certificates.**

If on any Determination Date, the Master Servicer determines that
there are no Outstanding Mortgage Loans and no other funds or assets in the
Trust Fund other than the funds in the Certificate Account, the Master
Servicer shall direct the Trustee promptly to send a final distribution
notice
to each Certificateholder. If the Master Servicer elects to terminate the
related portion of the Trust Fund pursuant to Section 9.01(1) or Section
9.01(2), as applicable, at least 20 days prior to the date notice is to be
mailed to the affected Certificateholders, the Master Servicer shall notify
the Depositor and the Trustee of the date the Master Servicer intends to
cause
a termination pursuant to Section 9.01(1) or Section 9.01(2), as applicable,
and of the applicable repurchase price of the related Mortgage Loans and REO
Properties.

Notice of any termination of the Trust Fund relating to either
Aggregate Loan Group I or Aggregate Loan Group II, specifying the
Distribution
Date on which related Certificateholders may surrender their Certificates for
payment of the final distribution and cancellation, shall be given promptly
by
the Trustee by letter to such Certificateholders mailed not earlier than the
10th day and no later than the 15th day of the month next preceding the month
of such final distribution. Any such notice shall specify (a) the
Distribution
Date upon which final distribution on the related Certificates will be made
upon presentation and surrender of such Certificates at the office therein
designated, (b) the amount of such final distribution, (c) the location of
the
office or agency at which such presentation and surrender must be made, and
(d) that the Record Date otherwise applicable to such Distribution Date is
not
applicable, distributions being made only upon presentation and surrender of
such Certificates at the office therein specified. The Master Servicer will
give such notice to each Rating Agency at the time such notice is given to
the
related Certificateholders.

In the event such notice is given, the Master Servicer shall cause all related funds in the Certificate Account to be remitted to the Trustee for deposit in the Distribution Account on or before the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the related Classes of Certificates. Upon such final deposit with respect to the related Mortgage Loans and REO Properties and the receipt by the Trustee of a Request for Release therefor, the Trustee shall promptly release to the Master Servicer the Mortgage Files for the related Mortgage Loans.

Upon presentation and surrender of the related Certificates, the Trustee shall cause to be distributed to the Certificateholders of each related Class, in each case on the final Distribution Date and in the order set forth in Section 4.02, in proportion to their respective Percentage Interests, with respect to Certificateholders of the same Class, an amount equal to (i) as to each Class of Regular Certificates, the Certificate Balance thereof plus accrued interest thereon (or on their Notional Amount, if applicable) in the case of an interest-bearing Certificate and (ii) as to the Residual Certificates, the amount, if any, which remains on deposit in the Distribution

119

Account (other than the amounts retained to meet claims) after application pursuant to clause (i) above. Notwithstanding the reduction of the Class Certificate Balance of any Class of Certificates to zero, such Class will be outstanding hereunder (solely for the purpose of receiving distributions and not for any other purpose) until the termination of the respective obligations and responsibilities of the Depositor, each Seller, the Master Servicer and the Trustee hereunder in accordance with Article IX.

In the event that any affected Certificateholders shall not surrender Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Trustee shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice all the applicable Certificates shall not have been surrendered for cancellation, the Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets which remain a part of the Trust Fund. If within one year after the second notice all Certificates shall not have been surrendered for cancellation, the Class A-R Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund which remain subject to this Agreement.

**SECTION 9.03. Additional Termination Requirements.**

(a) In the event the Master Servicer exercises its purchase option or options as provided in Section 9.01, the related Mortgage Loans and REO Properties then remaining in the Trust Fund shall be terminated in accordance with the following additional requirements, unless the Trustee has been supplied with an Opinion of Counsel, at the expense of the Master Servicer to the effect that the failure to comply with the requirements of this Section 9.03 will not (i) result in the imposition of taxes on *"prohibited transactions"* on any REMIC as defined in Section 860F of the Code, or (ii) cause any REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding:

(1) Within 90 days prior to the final Distribution Date set forth in the notice given by the Master Servicer under Section 9.02, the Master Servicer shall prepare and the Trustee, at the expense of the *"tax matters person,"* shall adopt a plan of complete liquidation of Aggregate Loan Group I and/or Aggregate Loan Group II within the meaning of Section 860F(a)(4) of the Code which, as evidenced by an Opinion of Counsel (which opinion shall not be an expense of the Trustee or the Tax Matters Person), meets the requirements of a qualified liquidation; and

(2) Within 90 days after the time of adoption of such a plan of complete liquidation with respect to Aggregate Loan Group I and/or Aggregate Loan Group II, the Trustee shall sell the related assets of the Trust Fund to the Master Servicer for cash in accordance with Section 9.01.

(b) The Trustee as agent for any REMIC created under this Agreement hereby agrees to adopt and sign such a plan of complete liquidation with respect to Aggregate Loan Group I and/or Aggregate Loan Group II upon the written request of the Master Servicer and the receipt of the Opinion of Counsel referred to in Section 9.03(a)(1) and to take such other action in connection therewith as may be reasonably requested by the Master Servicer.

120

(c) By their acceptance of the Certificates, the Holders thereof hereby authorize the Master Servicer to prepare and the Trustee to adopt and sign a plan of complete liquidation with respect to Aggregate Loan Group I and/or Aggregate Loan Group II.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

### SECTION 10.01. Amendment.

This Agreement may be amended from time to time by the Depositor, each Seller, the Master Servicer and the Trustee without the consent of any of the Certificateholders (i) to cure any ambiguity or mistake, (ii) to correct any defective provision in this Agreement or to supplement any provision in this Agreement which may be inconsistent with any other provision in this

Agreement, (iii) to conform this Agreement to the Prospectus and Prospectus Supplement provided to investors in connection with the initial offering of the Certificates, (iv) to add to the duties of the Depositor, any Seller or the Master Servicer, (v) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement to comply with any rules or regulations promulgated by the Securities and Exchange Commission from time to time, (vi) to add any other provisions with respect to matters or questions arising hereunder or (vii) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement; provided that any action pursuant to clauses (vi) or (vii) above shall not, as evidenced by an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee or the Trust Fund), adversely affect in any material respect the interests of any Certificateholder; provided, however, that the amendment shall not be deemed to adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates; it being understood and agreed that any such letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating. Notwithstanding the foregoing, no amendment that significantly changes the permitted activities of the trust created by this Agreement may be made without the consent of a Majority in Interest of each Class of Certificates affected by such amendment. Each party to this Agreement hereby agrees that it will cooperate with each other party in amending this Agreement pursuant to clause (v) above. The Trustee, each Seller, the Depositor and the Master Servicer also may at any time and from time to time amend this Agreement without the consent of the Certificateholders to modify, eliminate or add to any of its provisions to such extent as shall be necessary or helpful to (i) maintain the qualification of any REMIC as a REMIC under the Code, (ii) avoid or minimize the risk of the imposition of any tax on any REMIC pursuant to the Code that would be a claim at any time prior to the final redemption of the Certificates or (iii) comply with any other requirements of the Code, provided that the Trustee has been provided an Opinion of Counsel, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee or the Trust Fund, to the effect that such action is necessary or helpful to, as applicable, (i) maintain such qualification, (ii) avoid or minimize the risk of the imposition of such a tax or (iii) comply with any such requirements of the Code.

This Agreement may also be amended from time to time by the Depositor, each Seller, the Master Servicer and the Trustee with the consent of the Holders of a Majority in Interest of

121

each Class of Certificates adversely affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such

Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner other than as described in (i), without the consent of the Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating 66-2/3%, or (iii) reduce the aforesaid percentages of Certificates the Holders of which are required to consent to any such amendment, without the consent of the Holders of all such Certificates then outstanding.

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it shall have first received an Opinion of Counsel, which opinion shall not be an expense of the Trustee or the Trust Fund, to the effect that such amendment will not cause the imposition of any tax on any REMIC or the Certificateholders or cause any REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Trustee shall furnish written notification of the substance or a copy of such amendment to each Certificateholder and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel (which Opinion shall not be an expense of the Trustee or the Trust Fund), satisfactory to the Trustee that
(i) such amendment is permitted and is not prohibited by this Agreement and that all requirements for amending this Agreement have been complied with; and
(ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder or (B) the conclusion set forth in the immediately preceding clause (A) is not required to be reached pursuant to this Section 10.01.

**SECTION 10.02. Recordation of Agreement; Counterparts.**

This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or

elsewhere, such recordation to be effected by the Master Servicer at its
expense, but only upon direction by the Trustee accompanied by an Opinion of
Counsel to the effect that such recordation materially and beneficially
affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as
in this Agreement provided and for other purposes, this Agreement may be
executed simultaneously in any number

122

| **EX-99.1** | **129th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 129th |

of counterparts, each of which counterparts shall be deemed to be an
original,
and such counterparts shall constitute but one and the same instrument.

### SECTION 10.03. Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND
GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO
AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE
OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE
CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

### SECTION 10.04. Intention of Parties.

It is the express intent of the parties hereto that the conveyance of
the (i) of the Mortgage Loans by the Sellers to the Depositor and (ii) Trust
Fund by the Depositor to the Trustee each be, and be construed as, an
absolute
sale thereof to the Trustee. It is, further, not the intention of the parties
that such conveyances be deemed a pledge thereof. However, in the event that,
notwithstanding the intent of the parties, such assets are held to be the
property of any Seller or the Depositor, as the case may be, or if for any
other reason this Agreement is held or deemed to create a security interest
in
either such assets, then (i) this Agreement shall be deemed to be a security
agreement (within the meaning of the Uniform Commercial Code of the State of
New York) with respect to all such assets and security interests and (ii) the
conveyances provided for in this Agreement shall be deemed to be an
assignment
and a grant pursuant to the terms of this Agreement (i) by each Seller to the
Depositor or (ii) by the Depositor to the Trustee, for the benefit of the
Certificateholders, of a security interest in all of the assets that
constitute the Trust Fund, whether now owned or hereafter acquired.

Each Seller and the Depositor for the benefit of the
Certificateholders shall, to the extent consistent with this Agreement, take
such actions as may be necessary to ensure that, if this Agreement were
deemed
to create a security interest in the Trust Fund, such security interest would
be deemed to be a perfected security interest of first priority under
applicable law and will be maintained as such throughout the term of the
Agreement. The Depositor shall arrange for filing any Uniform Commercial Code
continuation statements in connection with any security interest granted or

assigned to the Trustee for the benefit of the Certificateholders.

### SECTION 10.05. Notices.

(a) The Trustee shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

1. Any material change or amendment to this Agreement;

2. The occurrence of any Event of Default that has not been cured;

3. The resignation or termination of the Master Servicer or the Trustee and the appointment of any successor;

4. The repurchase or substitution of Mortgage Loans pursuant to Section 2.03;

123

| EX-99.1 | 130th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 130th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

5. The final payment to Certificateholders; and

6. Any rating action involving the long-term credit rating of Countrywide, which notice shall be made by first class mail within two Business Days after the Trustee gains actual knowledge of such a rating action.

In addition, the Trustee shall promptly furnish to each Rating Agency copies of the following:

1. Each report to Certificateholders described in Section 4.06;

2. Each annual statement as to compliance described in Section 3.16;

3. Each annual independent public accountants' servicing report described in Section 3.17; and

4. Any notice of a purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 3.11.

(b) All directions, demands and notices under this Agreement shall be in writing and shall be deemed to have been duly given when delivered by first class mail, by courier or by facsimile transmission to (1) in the case of the Depositor, CWMBS, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4053, Attention: David A. Spector, (2) in the case of Countrywide, Countrywide Home Loans, Inc., 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4053, Attention: David A. Spector or such other address as may be hereafter furnished to the Depositor and the Trustee by Countrywide in writing, (3) in the case of Park Granada, Park Granada LLC, c/o Countrywide Financial Corporation, 4500 Park Granada, Calabasas, California 91302, facsimile number: (818) 225-4041, Attention: David A. Spector or such other address as may be hereafter furnished to the

Depositor and the Trustee by Park Granada in writing, (4) in the case of the
Master Servicer, Countrywide Home Loans Servicing LP, 400 Countrywide Way,
Simi Valley, California 93065, facsimile number (805) 520-5623, Attention:
Mark Wong, or such other address as may be hereafter furnished to the
Depositor and the Trustee by the Master Servicer in writing, (5) in the case
of the Trustee, The Bank of New York, 101 Barclay Street, 8W, New York, New
York 10286, facsimile number: (212) 815-3986, Attention: Mortgage-Backed
Securities Group, CWMBS, Inc. Series 2005-7, or such other address as the
Trustee may hereafter furnish to the Depositor or Master Servicer, and (6) in
the case of the Rating Agencies, the address specified therefor in the
definition corresponding to the name of such Rating Agency. Notices to
Certificateholders shall be deemed given when mailed, first class postage
prepaid, to their respective addresses appearing in the Certificate Register.

### SECTION 10.06. Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms
of this Agreement shall be for any reason whatsoever held invalid, then such
covenants, agreements, provisions or terms shall be deemed severable from the
remaining covenants, agreements, provisions or terms of this Agreement and
shall in no way affect the validity or enforceability of the other provisions
of this Agreement or of the Certificates or the rights of the Holders of the
Certificates.

124

| EX-99.1 | 131st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 131st |

### SECTION 10.07. Assignment.

Notwithstanding anything to the contrary contained in this Agreement,
except as provided in Section 6.02, this Agreement may not be assigned by the
Master Servicer without the prior written consent of the Trustee and
Depositor.

### SECTION 10.08. Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to
terminate this Agreement or the trust created hereby, nor entitle such
Certificateholder's legal representative or heirs to claim an accounting or
to
take any action or commence any proceeding in any court for a petition or
winding up of the trust created by this Agreement, or otherwise affect the
rights, obligations and liabilities of the parties hereto or any of them.

No Certificateholder shall have any right to vote (except as provided
in this Agreement) or in any manner otherwise control the operation and
management of the Trust Fund, or the obligations of the parties hereto, nor
shall anything set forth in this Agreement or contained in the terms of the
Certificates be construed so as to constitute the Certificateholders from
time
to time as partners or members of an association; nor shall any
Certificateholder be under any liability to any third party by reason of any
action taken by the parties to this Agreement pursuant to any provision of
this Agreement.

No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as provided in this Agreement, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatsoever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner provided in this Agreement and for the common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section 10.08, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

**SECTION 10.09. Inspection and Audit Rights.**

The Master Servicer agrees that, on reasonable prior notice, it will permit and will cause each Subservicer to permit any representative of the Depositor or the Trustee during the Master Servicer's normal business hours, to examine all the books of account, records, reports and other

125

| EX-99.1 | 132nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 132nd |

papers of the Master Servicer relating to the Mortgage Loans, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Depositor or the Trustee and to discuss its affairs, finances and accounts relating to the Mortgage Loans with its officers, employees and independent public accountants (and by this provision the Master Servicer hereby authorizes said accountants to discuss with such representative such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested. Any out-of-pocket expense incident to the exercise by the Depositor or the Trustee of any right under this Section 10.09 shall be borne by the party requesting such inspection; all other such expenses shall be borne by the Master Servicer or the related Subservicer.

**SECTION 10.10. Certificates Nonassessable and Fully Paid.**

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Trustee pursuant to this Agreement, are and shall be deemed fully paid.

### SECTION 10.11. [Reserved].

### SECTION 10.12. Protection of Assets.

(a) Except for transactions and activities entered into in connection with the securitization that is the subject of this Agreement, the Trust Fund created by this Agreement is not authorized and has no power to:

(i) borrow money or issue debt;

(ii) merge with another entity, reorganize, liquidate or sell assets; or

(iii) engage in any business or activities.

(b) Each party to this Agreement agrees that it will not file an involuntary bankruptcy petition against the Trustee or the Trust Fund or initiate any other form of insolvency proceeding until after the Certificates have been paid.

\*    \*    \*    \*    \*    \*

126

| **EX-99.1** | **133rd Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 133rd |
|---|---|---|---|---|---|---|---|

IN WITNESS WHEREOF, the Depositor, the Trustee, the Sellers and the Master Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

CWMBS, INC.,
as Depositor

By:    /s/ *Darren Bigby*
-----------------
Name:  Darren Bigby
Title: Vice President

THE BANK OF NEW YORK,
as Trustee

By     /s/ *Maria Tokarz*
-----------------
Name:  Maria Tokarz
Title: Vice President

COUNTRYWIDE HOME LOANS, INC.,
  as a Seller

By:    /s/ *Darren Bigby*
       -----------------
Name:  Darren Bigby
Title: Senior Vice President

PARK GRANADA LLC,
  as a Seller

By:    /s/ *Darren Bigby*
       -----------------
Name:  Darren Bigby
Title: Vice President

COUNTRYWIDE HOME LOANS SERVICING LP,
  as Master Servicer

By:    *COUNTRYWIDE GP, INC.*

By:    /s/ *Darren Bigby*
       -----------------
Name:  Darren Bigby
Title: First Vice President

| EX-99.1 | 134th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 134th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

Acknowledged solely with respect to its
obligations under Section 4.01(b)

THE BANK OF NEW YORK, in its individual capacity

By:    /s/ *Paul Connolly*
       ------------------
Name:  Paul Connolly
Title: Vice President

| EX-99.1 | 135th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 135th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**SCHEDULE I**
Mortgage Loan Schedule
[Delivered at Closing to Trustee]

**S-I-1**

| EX-99.1 | 136th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 136th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**SCHEDULE II-A**
CWMBS, Inc.
Mortgage Pass-Through Certificates
Series 2005-7
Representations and Warranties of Countrywide

Countrywide Home Loans, Inc. ("*Countrywide*") hereby makes the

representations and warranties set forth in this Schedule II-A to the
Depositor, the Master Servicer and the Trustee, as of the Closing Date.
Capitalized terms used but not otherwise defined in this Schedule II-A shall
have the meanings ascribed thereto in the Pooling and Servicing Agreement
(the
"*Pooling and Servicing Agreement*") relating to the above-referenced Series,
among Countrywide, as a seller, Park Granada LLC as a seller, Countrywide
Home
Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The
Bank of New York, as trustee.

(1) Countrywide is duly organized as a New York corporation
and is validly existing and in good standing under the laws of the State of
New York and is duly authorized and qualified to transact any and all
business
contemplated by the Pooling and Servicing Agreement to be conducted by
Countrywide in any state in which a Mortgaged Property is located or is
otherwise not required under applicable law to effect such qualification and,
in any event, is in compliance with the doing business laws of any such
state,
to the extent necessary to perform any of its obligations under the Pooling
and Servicing Agreement in accordance with the terms thereof.

(2) Countrywide has the full corporate power and authority
to sell each Countrywide Mortgage Loan, and to execute, deliver and perform,
and to enter into and consummate the transactions contemplated by the Pooling
and Servicing Agreement and has duly authorized by all necessary corporate
action on the part of Countrywide the execution, delivery and performance of
the Pooling and Servicing Agreement; and the Pooling and Servicing Agreement,
assuming the due authorization, execution and delivery thereof by the other
parties thereto, constitutes a legal, valid and binding obligation of
Countrywide, enforceable against Countrywide in accordance with its terms,
except that (a) the enforceability thereof may be limited by bankruptcy,
insolvency, moratorium, receivership and other similar laws relating to
creditors' rights generally and (b) the remedy of specific performance and
injunctive and other forms of equitable relief may be subject to equitable
defenses and to the discretion of the court before which any proceeding
therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing
Agreement by Countrywide, the sale of the Countrywide Mortgage Loans by
Countrywide under the Pooling and Servicing Agreement, the consummation of
any
other of the transactions contemplated by the Pooling and Servicing
Agreement,
and the fulfillment of or compliance with the terms thereof are in the
ordinary course of business of Countrywide and will not (A) result in a
material breach of any term or provision of the charter or by-laws of
Countrywide or (B) materially conflict with, result in a material breach,
violation or acceleration of, or result in a material default under, the
terms
of any other material agreement or instrument to which Countrywide is a party
or by which it may be bound, or (C) constitute a material violation of any
statute, order or regulation applicable to Countrywide of any court,
regulatory body, administrative agency or governmental body having
jurisdiction over Countrywide; and Countrywide is not in breach or

S-II-A-1

| **EX-99.1** | **137th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 137th |

violation of any material <u>indenture</u> or other material agreement or
instrument,
or in violation of any statute, order or regulation of any court, regulatory
body, administrative agency or governmental body having jurisdiction over it
which breach or violation may materially impair Countrywide's ability to
perform or meet any of its obligations under the Pooling and Servicing
Agreement.

(4) Countrywide is an approved servicer of conventional
mortgage loans for FNMA or FHLMC and is a mortgagee approved by the Secretary
of Housing and Urban Development pursuant to Sections 203 and 211 of the
National Housing Act.

(5) No litigation is pending or, to the best of Countrywide's
knowledge, threatened, against Countrywide that would materially and
adversely
affect the execution, delivery or enforceability of the Pooling and Servicing
Agreement or the ability of Countrywide to sell the Countrywide Mortgage
Loans
or to perform any of its other obligations under the Pooling and Servicing
Agreement in accordance with the terms thereof.

(6) No consent, approval, authorization or order of any court
or governmental agency or body is required for the execution, delivery and
performance by Countrywide of, or compliance by Countrywide with, the Pooling
and Servicing Agreement or the consummation of the transactions contemplated
thereby, or if any such consent, approval, authorization or order is
required,
Countrywide has obtained the same.

(7) Countrywide intends to treat the transfer of the
Countrywide Mortgage Loans to the Depositor as a sale of the Countrywide
Mortgage Loans for all tax, accounting and regulatory purposes.

(8) Countrywide is a member of MERS in good standing, and will
comply in all material respects with the rules and procedures of MERS in
connection with the servicing of the MERS Mortgage Loans in the Trust Fund
for
as long as such Mortgage Loans are registered with MERS

S-II-A-2

| **EX-99.1** | **138th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 138th |

**SCHEDULE II-B**

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2005-7

Representations and Warranties of Park Granada

Park Granada LLC ("*Park Granada*") and Countrywide Home Loans, Inc.
("*Countrywide*"), each hereby makes the representations and warranties set
forth in this Schedule II-B to the Depositor, the Master Servicer and the
Trustee, as of the Closing Date. Capitalized terms used but not otherwise
defined in this Schedule II-B shall have the meanings ascribed thereto in the
Pooling and Servicing Agreement (the "*Pooling and Servicing Agreement*")
relating to the above-referenced Series, among Park Granada, as a seller,
Countrywide, as a seller, Countrywide Home Loans Servicing LP, as master
servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

(1) Park Granada is a limited liability company duly formed and
validly existing and in good standing under the laws of the State of
Delaware.

(2) Park Granada has the full corporate power and authority to sell
each Park Granada Mortgage Loan, and to execute, deliver and perform, and to
enter into and consummate the transactions contemplated by the Pooling and
Servicing Agreement and has duly authorized by all necessary corporate action
on the part of Park Granada the execution, delivery and performance of the
Pooling and Servicing Agreement; and the Pooling and Servicing Agreement,
assuming the due authorization, execution and delivery thereof by the other
parties thereto, constitutes a legal, valid and binding obligation of Park
Granada, enforceable against Park Granada in accordance with its terms,
except
that (a) the enforceability thereof may be limited by bankruptcy, insolvency,
moratorium, receivership and other similar laws relating to creditors' rights
generally and (b) the remedy of specific performance and injunctive and other
forms of equitable relief may be subject to equitable defenses and to the
discretion of the court before which any proceeding therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing Agreement
by Park Granada, the sale of the Park Granada Mortgage Loans by Park Granada
under the Pooling and Servicing Agreement, the consummation of any other of
the transactions contemplated by the Pooling and Servicing Agreement, and the
fulfillment of or compliance with the terms thereof are in the ordinary
course
of business of Park Granada and will not (A) result in a material breach of
any term or provision of the certificate of formation or the limited
liability
company agreement of Park Granada or (B) materially conflict with, result in
a
material breach, violation or acceleration of, or result in a material
default
under, the terms of any other material agreement or instrument to which Park
Granada is a party or by which it may be bound, or (C) constitute a material
violation of any statute, order or regulation applicable to Park Granada of
any court, regulatory body, administrative agency or governmental body having
jurisdiction over Park Granada; and Park Granada is not in breach or
violation
of any material indenture or other material agreement or instrument, or in
violation of any statute, order or regulation of any court,

S-II-B-1

| EX-99.1 | 139th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 139th |

regulatory body, administrative agency or governmental body having
jurisdiction over it which breach or violation may materially impair Park
Granada's ability to perform or meet any of its obligations under the Pooling
and Servicing Agreement.

(4) No litigation is pending or, to the best of Park Granada's
knowledge, threatened, against Park Granada that would materially and
adversely affect the execution, delivery or enforceability of the Pooling and
Servicing Agreement or the ability of Park Granada to sell the Park Granada
Mortgage Loans or to perform any of its other obligations under the Pooling
and Servicing Agreement in accordance with the terms thereof.

(5) No consent, approval, authorization or order of any court or
governmental agency or body is required for the execution, delivery and
performance by Park Granada of, or compliance by Park Granada with, the
Pooling and Servicing Agreement or the consummation of the transactions
contemplated thereby, or if any such consent, approval, authorization or
order
is required, Park Granada has obtained the same.

Park Granada intends to treat the transfer of the Park Granada
Mortgage Loans to the Depositor as a sale of the Park Granada Mortgage Loans
for all tax, accounting and regulatory purposes.

S-II-B-2

| EX-99.1 | 140th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 140th |

SCHEDULE III-A
CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2005-7

Representations and Warranties of Countrywide as to all of the Mortgage Loans

Countrywide Home Loans, Inc. ("_Countrywide_") hereby makes the
representations and warranties set forth in this Schedule III-A to the
Depositor, the Master Servicer and the Trustee, with respect to all of the
Mortgage Loans as of the Closing Date, or if so specified in this Agreement,
as of the Cut-off Date. Capitalized terms used but not otherwise defined in
this Schedule III-A shall have the meanings ascribed thereto in the Pooling
and Servicing Agreement (the "_Pooling and Servicing Agreement_") relating to
the above-referenced Series, among Countrywide, as a seller, Park Granada
LLC,
as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS,
Inc., as depositor, and The Bank of New York, as trustee.

(1) The information set forth on Schedule I to the Pooling and
Servicing Agreement with respect to each Mortgage Loan is true and correct in
all material respects as of the Closing Date.

(2) As of the Closing Date, all payments due with respect to each Mortgage Loan prior to the Cut-off Date have been made; and as of the Cut-off Date, no Mortgage Loan has been contractually delinquent for 30 or more days more than once during the twelve months prior to the Cut-off Date.

(3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 95.00%.

(4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property subject only to (a) the lien of non delinquent current real property taxes and assessments, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage.

(5) [Reserved].

(6) There is no delinquent tax or assessment lien against any Mortgaged Property.

(7) There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note.

S-III-A-1

| EX-99.1 | 141st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 141st |

(8) There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to, or equal with, the lien of such Mortgage, except those which are insured against by the title insurance policy referred to in item (12) below.

(9) As of the Closing Date, to the best of Countrywide's knowledge, each Mortgaged Property is free of material damage and in good repair.

(10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws.

(11) As of the Closing Date, neither Countrywide nor any prior holder of any Mortgage has modified the Mortgage in any material respect (except that a Mortgage Loan may have been modified by a written instrument

which has been recorded or submitted for recordation, if necessary, to
protect
the interests of the Certificateholders and the original or a copy of which
has been delivered to the Trustee); satisfied, cancelled or subordinated such
Mortgage in whole or in part; released the related Mortgaged Property in
whole
or in part from the lien of such Mortgage; or executed any instrument of
release, cancellation, modification or satisfaction with respect thereto.

(12) A lender's policy of title insurance together with a
condominium endorsement, negative amortization endorsement and extended
coverage endorsement, if applicable, in an amount at least equal to the
Cut-off Date Stated Principal Balance of each such Mortgage Loan or a
commitment (binder) to issue the same was effective on the date of the
origination of each Mortgage Loan, each such policy is valid and remains in
full force and effect, and each such policy was issued by a title insurer
qualified to do business in the jurisdiction where the Mortgaged Property is
located and acceptable to FNMA or FHLMC and is in a form acceptable to FNMA
or
FHLMC, which policy insures Countrywide and successor owners of indebtedness
secured by the insured Mortgage, as to the first priority lien of the
Mortgage
subject to the exceptions set forth in paragraph (4) above and against any
loss by reason of the invalidity or the unenforceability of the lien
resulting
from the provisions of the Mortgage providing for adjustment of the mortgage
interest rate and/or the monthly payment including any negative amortization
thereunder. To the best of Countrywide's knowledge, no claims have been made
under such mortgage title insurance policy and no prior holder of the related
Mortgage, including Countrywide, has done, by act or omission, anything which
would impair the coverage of such mortgage title insurance policy.

(13) With respect to each Mortgage Loan, all mortgage rate and
payment adjustments, if any, made on or prior to the Cut-off Date have been
made in accordance with the terms of the related Mortgage Note or subsequent
modifications, if any, and applicable law.

(14) Each Mortgage Loan was originated (within the meaning of
Section 3(a)(41) of the Securities Exchange Act of 1934, as amended) by an
entity that satisfied

S-III-A-2

| EX-99.1 | 142nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 142nd |

at the time of origination the requirements of Section 3(a)(41) of the
Securities Exchange Act of 1934, as amended.

(15) To the best of Countrywide's knowledge, all of the
improvements which were included for the purpose of determining the Appraised
Value of the Mortgaged Property lie wholly within the boundaries and building
restriction lines of such property, and no improvements on adjoining
properties encroach upon the Mortgaged Property.

(16) To the best of Countrywide's knowledge, no improvement
located on or being part of the Mortgaged Property is in violation of any

applicable zoning law or regulation. To the best of Countrywide's knowledge, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities, unless the lack thereof would not have a material adverse effect on the value of such Mortgaged Property, and the Mortgaged Property is lawfully occupied under applicable law.

(17) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law. To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties.

(18) The proceeds of the Mortgage Loans have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making, or closing or recording the Mortgage Loans were paid.

(19) The related Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.

(20) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Certificateholders to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

(21) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be.

(22) There exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made, and no escrow deposits or payments of other charges or payments due Countrywide have been capitalized under the Mortgage or the related Mortgage Note.

S-III-A-3

| EX-99.1 | 143rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 143rd |

(23) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing

business.

(24) There is no pledged account or other security other than
real estate securing the Mortgagor's obligations.

(25) No Mortgage Loan has a shared appreciation feature, or
other contingent interest feature.

(26) Each Mortgage Loan contains a customary *"due on sale"*
clause.

(27) As of the Closing Date, 4 of the Mortgage Loans in Loan
Group 1 and 351 of the Mortgage Loans in Loan Group 3 provide for a
prepayment
penalty.

(28) Each Mortgage Loan that had a Loan-to-Value Ratio at
origination in excess of 80% is the subject of a Primary Insurance Policy
that
insures that portion of the principal balance equal to a specified percentage
times the sum of the remaining principal balance of the related Mortgage
Loan,
the accrued interest thereon and the related foreclosure expenses. The
specified coverage percentage for mortgage loans with terms to maturity
between 25 and 30 years is 12% for Loan-to-Value Ratios between 80.01% and
85.00%, 25% for Loan-to-Value Ratios between 85.01% and 90.00%, 30% for
Loan-to-Value Ratios between 90.01% and 95.00% and 35% for Loan-to-Value
Ratios between 95.01% and 100%. The specified coverage percentage for
mortgage
loans with terms to maturity of up to 20 years ranges from 6% to 12% for
Loan-to-Value Ratios between 80.01% to 85.00%, from 12% to 20% for
Loan-to-Value Ratios between 85.01% to 90.00% and 20% to 25% for Loan-to-
Value
Ratios between 90.01% to 95.00%. Each such Primary Insurance Policy is issued
by a Qualified Insurer. All provisions of any such Primary Insurance Policy
have been and are being complied with, any such policy is in full force and
effect, and all premiums due thereunder have been paid. Any Mortgage subject
to any such Primary Insurance Policy obligates either the Mortgagor or the
mortgagee thereunder to maintain such insurance and to pay all premiums and
charges in connection therewith, subject, in each case, to the provisions of
Section 3.09(b) of the Pooling and Servicing Agreement. The Mortgage Rate for
each Mortgage Loan is net of any such insurance premium.

(29) As of the Closing Date, the improvements upon each
Mortgaged Property are covered by a valid and existing hazard insurance
policy
with a generally acceptable carrier that provides for fire and extended
coverage and coverage for such other hazards as are customary in the area
where the Mortgaged Property is located in an amount which is at least equal
to the lesser of (i) the maximum insurable value of the improvements securing
such Mortgage Loan or (ii) the greater of (a) the outstanding principal
balance of the Mortgage Loan and (b) an amount such that the proceeds of such
policy shall be sufficient to prevent the Mortgagor and/or the mortgagee from
becoming a co-insurer. If the Mortgaged Property is a condominium unit, it is
included under the coverage afforded by a blanket policy for the condominium
unit. All such individual insurance policies and all flood policies referred
to in item (30) below contain a standard mortgagee clause naming Countrywide

or the original mortgagee, and its successors in interest, as mortgagee, and
Countrywide has received no notice that any premiums due and payable thereon
have not been paid; the Mortgage obligates the Mortgagor thereunder to
maintain all such insurance including flood insurance at the Mortgagor's cost
and expense, and upon the Mortgagor's failure to do so, authorizes the holder

S-III-A-4

| EX-99.1 | 144th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 144th |

of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost
and expense and to seek reimbursement therefor from the Mortgagor.

(30) If the Mortgaged Property is in an area identified in the
Federal Register by the Federal Emergency Management Agency as having special
flood hazards, a flood insurance policy in a form meeting the requirements of
the current guidelines of the Flood Insurance Administration is in effect
with
respect to such Mortgaged Property with a generally acceptable carrier in an
amount representing coverage not less than the least of (A) the original
outstanding principal balance of the Mortgage Loan, (B) the minimum amount
required to compensate for damage or loss on a replacement cost basis, or (C)
the maximum amount of insurance that is available under the Flood Disaster
Protection Act of 1973, as amended.

(31) To the best of Countrywide's knowledge, there is no
proceeding occurring, pending or threatened for the total or partial
condemnation of the Mortgaged Property.

(32) There is no material monetary default existing under any
Mortgage or the related Mortgage Note and, to the best of Countrywide's
knowledge, there is no material event which, with the passage of time or with
notice and the expiration of any grace or cure period, would constitute a
default, breach, violation or event of acceleration under the Mortgage or the
related Mortgage Note; and Countrywide has not waived any default, breach,
violation or event of acceleration.

(33) Each Mortgaged Property is improved by a one- to four-
family residential dwelling including condominium units and dwelling units in
PUDs, which, to the best of Countrywide's knowledge, does not include
cooperatives or mobile homes and does not constitute other than real property
under state law.

(34) Each Mortgage Loan is being master serviced by the Master
Servicer.

(35) Any future advances made prior to the Cut-off Date have
been consolidated with the outstanding principal amount secured by the
Mortgage, and the secured principal amount, as consolidated, bears a single
interest rate and single repayment term reflected on the Mortgage Loan
Schedule. The consolidated principal amount does not exceed the original
principal amount of the Mortgage Loan. The Mortgage Note does not permit or
obligate the Master Servicer to make future advances to the Mortgagor at the
option of the Mortgagor.

(36) All taxes, governmental assessments, insurance premiums,

water, sewer and municipal charges, leasehold payments or ground rents which
previously became due and owing have been paid, or an escrow of funds has
been
established in an amount sufficient to pay for every such item which remains
unpaid and which has been assessed, but is not yet due and payable. Except
for
(A) payments in the nature of escrow payments, and (B) interest accruing from
the date of the Mortgage Note or date of disbursement of the Mortgage
proceeds, whichever is later, to the day which precedes by one month the Due
Date of the first installment of principal and interest, including without
limitation, taxes and insurance payments, the Master Servicer has not
advanced
funds, or induced, solicited or knowingly received any advance of funds by a
party other than the Mortgagor, directly or indirectly, for the payment of
any
amount required by the Mortgage.

### S-III-A-5

(37) Each Mortgage Loan was underwritten in all material
respects in accordance with Countrywide's underwriting guidelines as set
forth
in the Prospectus Supplement.

(38) Other than with respect to any Streamlined Documentation
Mortgage Loan as to which the loan-to-value ratio of the related Original
Mortgage Loan was less than 90% at the time of the origination of such
Original Mortgage Loan, prior to the approval of the Mortgage Loan
application, an appraisal of the related Mortgaged Property was obtained from
a qualified appraiser, duly appointed by the originator, who had no interest,
direct or indirect, in the Mortgaged Property or in any loan made on the
security thereof, and whose compensation is not affected by the approval or
disapproval of the Mortgage Loan; such appraisal is in a form acceptable to
FNMA and FHLMC.

(39) None of the Mortgage Loans is a graduated payment
mortgage
loan or a growing equity mortgage loan, and none of the Mortgage Loans is
subject to a buydown or similar arrangement.

(40) Any leasehold estate securing a Mortgage Loan has a term
of not less than five years in excess of the term of the related Mortgage
Loan.

(41) The Mortgage Loans were selected from among the
outstanding adjustable-rate one- to four-family mortgage loans in the
portfolios of the Sellers at the Closing Date as to which the representations
and warranties made as to the Mortgage Loans set forth in this Schedule III-A
can be made. Such selection was not made in a manner intended to adversely
affect the interests of Certificateholders.

(42) Except for 42 Mortgage Loans in Loan Group 1, 342
Mortgage
Loans in Loan Group 2 and 18 Mortgage Loans in Loan Group 3, each Mortgage
Loan has a payment date on or before the Due Date in the month of the first
Distribution Date.

(43) With respect to any Mortgage Loan as to which an
affidavit
has been delivered to the Trustee certifying that the original Mortgage Note
is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default,
the
enforcement of such Mortgage Loan or of the related Mortgage by or on behalf
of the Trustee will not be materially adversely affected by the absence of
the
original Mortgage Note. A *"Lost Mortgage Note"* is a Mortgage Note the
original
of which was permanently lost or destroyed and has not been replaced.

(44) The Mortgage Loans, individually and in the aggregate,
conform in all material respects to the descriptions thereof in the
Prospectus
Supplement.

(45) No Mortgage Loan originated on or after October 1, 2002
through March 6, 2003 is governed by the Georgia Fair Lending Act.

(46) None of the Mortgage Loans is a *"high cost"* loan as
defined by applicable predatory and abusive lending laws.

(47) None of the Mortgage Loans is covered by the Home
Ownership and Equity Protection Act of 1994 (*"HOEPA"*).

S-III-A-6

| EX-99.1 | 145th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 145th |

(48) All of the Mortgage Loans were originated in compliance
with all applicable laws, including, but not limited to, all applicable
anti-predatory and abusive lending laws.

(49) No Mortgage Loan is a High Cost Loan or Covered Loan, as
applicable, and with respect to the foregoing, the terms *"High Cost Loan"* and
*"Covered Loan"* have the meaning assigned to them in the then current Standard
& Poor's LEVELS(R) Version 5.6 Glossary Revised, Appendix E which is attached
hereto as Exhibit Q (the *"Glossary"*) where (x) a *"High Cost Loan"* is each
loan
identified in the column *"Category under applicable anti-predatory lending
law"* of the table entitled *"Standard & Poor's High Cost Loan Categorization"*
in the Glossary as each such loan is defined in the applicable anti-predatory
lending law of the State or jurisdiction specified in such table and (y) a
*"Covered Loan"* is each loan identified in the column *"Category under
applicable anti-predatory lending law"* of the table entitled *"Standard &
Poor's Covered Loan Categorization"* in the Glossary as each such loan is
defined in the applicable anti-predatory lending law of the State or
jurisdiction specified in such table.

(50) No Mortgage Loan is a *"High-Cost Home Loan"* as defined
in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A.
46:10B-22 et seq.).

(51) No Mortgage Loan is a *"High-Cost Home Loan"* as defined
in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M.

Stat. Ann. ss.ss. 58-21A-1 et seq.).

S-III-A-7

| EX-99.1 | 146th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 146th |

**SCHEDULE III-B**

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2005-7

Representations and Warranties of Countrywide as to the
Countrywide Mortgage Loans

Countrywide Home Loans, Inc. ("*Countrywide*") hereby makes the
representations and warranties set forth in this Schedule III-B to the
Depositor, the Master Servicer and the Trustee, with respect to the
Countrywide Mortgage Loans that are Mortgage Loans as of the Closing Date, or
if so specified herein, as of the Cut-off Date. Capitalized terms used but
not
otherwise defined in this Schedule III-B shall have the meanings ascribed
thereto in the Pooling and Servicing Agreement (the "*Pooling and Servicing
Agreement*") relating to the above-referenced Series, among Countrywide, as a
seller, Park Granada LLC, as a seller, Countrywide Home Loans Servicing LP,
as
master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as
trustee.

(1) Immediately prior to the assignment of each Countrywide Mortgage
Loan to the Depositor, Countrywide had good title to, and was the sole owner
of, such Countrywide Mortgage Loan free and clear of any pledge, lien,
encumbrance or security interest and had full right and authority, subject to
no interest or participation of, or agreement with, any other party, to sell
and assign the same pursuant to the Pooling and Servicing Agreement.

S-III-B-1

| EX-99.1 | 147th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 147th |

**SCHEDULE III-C**

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2005-7

Representations and Warranties of Park Granada as to the
Park Granada Mortgage Loans

Park Granada LLC ("*Park Granada*") hereby makes the representations
and warranties set forth in this Schedule III-C to the Depositor, the Master

Servicer and the Trustee, with respect to the Park Granada Mortgage Loans
that
are Mortgage Loans as of the Closing Date, or if so specified herein, as of
the Cut-off Date. Capitalized terms used but not otherwise defined in this
Schedule III-C shall have the meanings ascribed thereto in the Pooling and
Servicing Agreement (the *"Pooling and Servicing Agreement"*) relating to the
above-referenced Series, among Countrywide Home Loans, Inc., as a seller,
Park
Granada, as a seller, Countrywide Home Loans Servicing LP, as master
servicer,
CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

(1) Immediately prior to the assignment of each Park Granada Mortgage
Loan to the Depositor, Park Granada had good title to, and was the sole owner
of, such Park Granada Mortgage Loan free and clear of any pledge, lien,
encumbrance or security interest and had full right and authority, subject to
no interest or participation of, or agreement with, any other party, to sell
and assign the same pursuant to the Pooling and Servicing Agreement.

S-III-C-1

| EX-99.1 | 148th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 148th |
| --- | --- | --- | --- | --- | --- | --- | --- |

SCHEDULE IV

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2005-7

Representations and Warranties of the Master Servicer

Countrywide Home Loans Servicing LP (*"Countrywide Servicing"*) hereby
makes the representations and warranties set forth in this Schedule IV to the
Depositor, the Sellers and the Trustee, as of the Closing Date. Capitalized
terms used but not otherwise defined in this Schedule IV shall have the
meanings ascribed thereto in the Pooling and Servicing Agreement (the
*"Pooling*
*and Servicing Agreement"*) relating to the above-referenced Series, among
Countrywide Home Loans, Inc., as a seller, Park Granada LLC, as a seller,
Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as
depositor, and The Bank of New York, as trustee.

(1) Countrywide Servicing is duly organized as a limited
partnership and is validly existing and in good standing under the laws of
the
State of Texas and is duly authorized and qualified to transact any and all
business contemplated by the Pooling and Servicing Agreement to be conducted
by Countrywide Servicing in any state in which a Mortgaged Property is
located
or is otherwise not required under applicable law to effect such
qualification
and, in any event, is in compliance with the doing business laws of any such
state, to the extent necessary to perform any of its obligations under the
Pooling and Servicing Agreement in accordance with the terms thereof.

(2) Countrywide Servicing has the full partnership power and authority to service each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by the Pooling and Servicing Agreement and has duly authorized by all necessary partnership action on the part of Countrywide Servicing the execution, delivery and performance of the Pooling and Servicing Agreement; and the Pooling and Servicing Agreement, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of Countrywide Servicing, enforceable against Countrywide Servicing in accordance with its terms, except that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing Agreement by Countrywide Servicing, the servicing of the Mortgage Loans by Countrywide Servicing under the Pooling and Servicing Agreement, the consummation of any other of the transactions contemplated by the Pooling and Servicing Agreement, and the fulfillment of or compliance with the terms thereof are in the ordinary course of business of Countrywide Servicing and will not (A) result in a material breach of any term or provision of the certificate of limited partnership, partnership agreement or other organizational document of Countrywide Servicing or

S-IV-1

| EX-99.1 | 149th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 149th |

(B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, the terms of any other material agreement or instrument to which Countrywide Servicing is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to Countrywide Servicing of any court, regulatory body, administrative agency or governmental body having jurisdiction over Countrywide Servicing; and Countrywide Servicing is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it which breach or violation may materially impair the ability of Countrywide Servicing to perform or meet any of its obligations under the Pooling and Servicing Agreement.

(4) Countrywide Servicing is an approved servicer of conventional mortgage loans for FNMA or FHLMC and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act.

(5) No litigation is pending or, to the best of Countrywide's Servicing knowledge, threatened, against Countrywide Servicing that would

materially and adversely affect the execution, delivery or enforceability of
the Pooling and Servicing Agreement or the ability of Countrywide Servicing
to
service the Mortgage Loans or to perform any of its other obligations under
the Pooling and Servicing Agreement in accordance with the terms thereof.

(6) No consent, approval, authorization or order of any court
or governmental agency or body is required for the execution, delivery and
performance by Countrywide Servicing of, or compliance by Countrywide
Servicing with, the Pooling and Servicing Agreement or the consummation of
the
transactions contemplated thereby, or if any such consent, approval,
authorization or order is required, Countrywide Servicing has obtained the
same.

(7) Countrywide Servicing is a member of MERS in good
standing,
and will comply in all material respects with the rules and procedures of
MERS
in connection with the servicing of the MERS Mortgage Loans for as long as
such Mortgage Loans are registered with MERS.

S-IV-2

| EX-99.1 | 150th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 150th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**SCHEDULE V**

Principal Balance Schedules

*[Attached to Prospectus Supplement, if applicable.]

S-V-1

| EX-99.1 | 151st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 151st |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**SCHEDULE VI**
Form of Monthly Master Servicer Report

[Enlarge/Download
Table]

===========================================================================
======
*LOAN LEVEL REPORTING SYSTEM*
---------------------------------------------------------------------------
--------
*DATABASE STRUCTURE*
---------------------------------------------------------------------------
--------
*[MONTH, YEAR]*
---------------------------------------------------------------------------

| *Field Number* | *Field Name* | *Field Type* | *Field Width* | *Dec* |
|----------------|--------------|--------------|---------------|-------|
| 1 | INVNUM | Numeric | 4 | |

--------

| | | | | |
|---|---|---|---|---|
| 2 | INVBLK | Numeric | 4 | |
| 3 | INACNU | Character | 8 | |
| 4 | BEGSCH | Numeric | 15 | 2 |
| 5 | SCHPRN | Numeric | 13 | 2 |
| 6 | TADPRN | Numeric | 11 | 2 |
| 7 | LIQEPB | Numeric | 11 | 2 |
| 8 | ACTCOD | Numeric | 11 | |
| 9 | ACTDAT | Numeric | 4 | |
| 10 | INTPMT | Numeric | 8 | |
| 11 | PRNPMT | Numeric | 13 | 2 |
| 12 | ENDSCH | Numeric | 13 | 2 |
| 13 | SCHNOT | Numeric | 13 | 2 |
| 14 | SCHPAS | Numeric | 7 | 3 |
| 15 | PRINPT | Numeric | 7 | 3 |
| 16 | PRIBAL | Numeric | 11 | 2 |
| 17 | LPIDTE | Numeric | 13 | 2 |
| 18 | DELPRN | Numeric | 7 | |
| 19 | PPDPRN | Numeric | 11 | 2 |
| 20 | DELPRN | Numeric | 11 | 2 |
| 21 | NXTCHG | Numeric | 8 | |
| 22 | ARMNOT | Numeric | 7 | 3 |
| 23 | ARMPAS | Numeric | 7 | 3 |
| 24 | ARMPMT | Numeric | 11 | 2 |
| 25 | ZZTYPE | Character | 2 | |
| 26 | ISSUID | Character | 1 | |
| 27 | KEYNAME | Character | 8 | |

```
-----------------------------------------------------------------------------------------------
   TOTAL                                       ----------                                    240
-----------------------------------------------------------------------------------------------
                           Suggested Format:      DBASE file
                                                  Modem transmission
===============================================================================================
                                          ==========
```

S-VI-1

EXHIBIT A

[FORM OF SENIOR CERTIFICATE]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE
OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING
UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE
TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A
REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE
BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,
AS AMENDED, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE
AGREEMENT REFERRED TO HEREIN. SUCH REPRESENTATION SHALL BE DEEMED TO HAVE
BEEN
MADE TO THE TRUSTEE BY THE TRANSFEREE'S ACCEPTANCE OF A CERTIFICATE OF THIS
CLASS AND BY A BENEFICIAL OWNER'S ACCEPTANCE OF ITS INTEREST IN A CERTIFICATE
OF THIS CLASS. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, UNTIL
THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING UNDERWRITING,
ANY
PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT
PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL
SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO
EFFECT.]

A-1

Certificate No.                          :

Cut-off Date                                    :

First Distribution Date                         :

            __Initial Certificate Balance__
                __of this Certificate__
    ("_Denomination_")                          :       $

            Initial Certificate Balance
                of all Certificates of
this Class                                      :       $

    **CUSIP**                                   :

    Interest Rate                               :

    Maturity Date                               :

                        **CWMBS, INC.**
        Mortgage Pass-Through Certificates, Series 200____-____
                        Class [ ]

    evidencing a percentage interest in the distributions allocable to
    the Certificates of the above-referenced Class with respect to a
    Trust Fund consisting primarily of a pool of conventional mortgage
    loans (the "_Mortgage Loans_") secured by first liens on one- to
                four-family residential properties

                CWMBS, Inc., as Depositor

        Principal in respect of this Certificate is distributable monthly as
    set forth herein. Accordingly, the Certificate Balance at any time may be
                                    less
    than the Certificate Balance as set forth herein. This Certificate does not
    evidence an obligation of, or an interest in, and is not guaranteed by the
    Depositor, the Sellers, the Master Servicer or the Trustee referred to below
    or any of their respective affiliates. Neither this Certificate nor the
    Mortgage Loans are guaranteed or insured by any governmental agency or
                            instrumentality.

        This certifies that _____ is the registered owner of the
    Percentage Interest evidenced by this Certificate (obtained by dividing the
    denomination of this Certificate by the aggregate Initial Certificate Balance
    of all Certificates of the Class to which this Certificate belongs) in
                                certain
    monthly distributions with respect to a Trust Fund consisting primarily of
                                    the
                                Mortgage

                                    **A-2**

Loans deposited by CWMBS, Inc. (the "_Depositor_"). The Trust Fund was created
    pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date

specified above (the *"Agreement"*) among the Depositor, Countrywide Home Loans,
Inc., as a seller (*"CHL"*), Park Granada LLC, as a seller (*"Park Granada"* and, together with CHL, the *"Sellers"*), Countrywide Home Loans Servicing LP, as master servicer (the *"Master Servicer"*) and The Bank of New York, as trustee (the *"Trustee"*). To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued
under and is subject to the terms, provisions and conditions of the Agreement,
to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

[Until this certificate has been the subject of an ERISA-Qualifying Underwriting, no transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, or (ii) in the case of any such Certificate presented for registration in the name of an employee benefit plan
subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee or the Master Servicer. Such representation shall be deemed to have been made to the Trustee by the Transferee's acceptance of a Certificate of this Class and by a beneficial owner's acceptance of its interest in a Certificate of this Class. Notwithstanding anything else to the contrary herein, until such certificate has been the subject of an ERISA-Qualifying Underwriting, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to the Code without the
opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

\*          \*          \*

A-3

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be
duly executed.

Dated: _____, 20__

THE BANK OF NEW YORK,
as Trustee

By _____

Countersigned:

By_____
Authorized Signatory of
THE BANK OF NEW YORK,
as Trustee

A-4

| EX-99.1 | 156th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 156th |
| --- | --- | --- | --- | --- | --- | --- | --- |

**EXHIBIT B**

**[FORM OF SUBORDINATED CERTIFICATE]**

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("*DTC*"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE
OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "*REGULAR
INTEREST*" IN A "*REAL ESTATE MORTGAGE INVESTMENT CONDUIT,*" AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "*CODE*").

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO CERTAIN CERTIFICATES
AS DESCRIBED IN THE AGREEMENT REFERRED TO HEREIN.

[THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933,
AS
AMENDED (THE "*ACT*"). ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT
REGISTRATION THEREOF UNDER THE ACT MAY ONLY BE MADE IN A TRANSACTION EXEMPTED
FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND IN ACCORDANCE WITH THE
PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.]

[NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS
THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE
EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR IF SUCH

CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA-QUALIFYING UNDERWRITING, A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR A PERSON INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF SUCH A PLAN, OR THAT SUCH TRANSFEREE IS AN INSURANCE COMPANY WHICH IS PURCHASING CERTIFICATES WITH FUNDS CONTAINED IN AN "INSURANCE
COMPANY GENERAL ACCOUNTS" AS SUCH TERM IS DEFINED IN SECTION V(e) OF PROHIBITED TRANSACTION CLASS EXEMPTION 95-60 ("PTCE 95-60"), AND THE PURCHASE AND HOLDING OF SUCH CERTIFICATES ARE COVERED UNDER SECTION I AND III OF PTCE 95-60 OR AN OPINION OF COUNSEL IN

B-1

| EX-99.1 | 157th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 157th |

ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.]

B-2

| EX-99.1 | 158th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 158th |

Certificate No.  :

Cut-off Date                          :

First Distribution Date               :

**Initial Certificate Balance of this Certificate**
("_Denomination_")               :       $

Initial Certificate Balance of all Certificates of this Class                          :       $

**CUSIP**                              :

Interest Rate                         :

Maturity Date                         :

**CWMBS, INC.**
Mortgage Pass-Through Certificates, Series 200___-___
Class [ ]

evidencing a percentage interest in the distributions allocable to the Certificates of the above-referenced Class with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "_Mortgage Loans_") secured by first liens on one- to four-family residential properties

CWMBS, Inc., as Depositor

Principal in respect of this Certificate is distributable monthly as set forth herein. Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein. This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Sellers, the Master Servicer or the Trustee referred to below or any of their respective affiliates. Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies _____ that is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate Initial Certificate Balance of all Certificates of the Class to which this Certificate

B-3

| EX-99.1 | 159th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 159th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage Loans deposited by CWMBS, Inc. (the *"Depositor"*). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the *"Agreement"*) among the Depositor, Countrywide Home Loans, Inc., as a seller (*"CHL"*), Park Granada LLC, as a seller (*"Park Granada"* and, together with CHL, the *"Sellers"*), Countrywide Home Loans Servicing LP, as master servicer (the *"Master Servicer"*) and The Bank of New York, as trustee (the *"Trustee"*). To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

[No transfer of a Certificate of this Class shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under said Act and such laws. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer. In the event that such a transfer is to be made within three years from the date of the initial issuance of Certificates pursuant hereto, there shall also be delivered (except in the case of a transfer pursuant to Rule 144A of the Securities Act) to the Trustee an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act and such state securities laws, which Opinion of Counsel shall not be obtained at the expense of the Trustee, the Sellers, the Master Servicer or the Depositor. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee

and the Depositor against any liability that may result if the transfer is
not
so exempt or is not made in accordance with such federal and state laws.]

[No transfer of a Certificate of this Class shall be made unless the
Trustee shall have received either (i) a representation letter from the
transferee of such Certificate, acceptable to and in form and substance
satisfactory to the Trustee, to the effect that such transferee is not an
employee benefit plan subject to Section 406 of ERISA or a plan subject to
Section 4975 of the Code, nor a person acting on behalf of or investing plan
assets of any such plan, which representation letter shall not be an expense
of the Trustee or the Master Servicer, (ii) if such certificate has been the
subject of an ERISA Qualifying Underwriting and the purchaser is an insurance
company, a representation that the purchaser is an insurance company which is
purchasing such Certificates with funds contained in an *insurance company
general account* (as such term is defined in Section V(e) of Prohibited
Transaction Class Exemption 95-60 (*"PTCE 95-60"*)) and that the purchase and
holding of such Certificates are covered under Sections I and III of PTCE
95-60, or (iii) in the case of any such Certificate presented for
registration
in the name of an employee benefit plan subject to ERISA or Section 4975 of
the Code (or comparable provisions of any subsequent enactments), or a
trustee
of any such plan or any other person acting on behalf of any such plan, an
Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the
effect that the purchase or holding of such Certificate will

B-4

not result in a prohibited transaction under Section 406 of ERISA or Section
4975 of the Code, will not result in the assets of the Trust Fund being
deemed
to be *plan assets* and subject to the prohibited transaction provisions of
ERISA and the Code and will not subject the Trustee to any obligation in
addition to those undertaken in the Agreement, which Opinion of Counsel shall
not be an expense of the Trustee or the Master Servicer. Notwithstanding
anything else to the contrary herein, any purported transfer of a Certificate
of this Class to or on behalf of an employee benefit plan subject to ERISA or
to the Code without the opinion of counsel satisfactory to the Trustee as
described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this
Certificate set forth on the reverse hereof, which further provisions shall
for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the
Agreement or be valid for any purpose unless manually countersigned by an
authorized signatory of the Trustee.

*      *      *

B-5

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

THE BANK OF NEW YORK,
as Trustee

By _____

Countersigned:

By_____
Authorized Signatory of
THE BANK OF NEW YORK,
as Trustee

B-6

EXHIBIT C

[FORM OF RESIDUAL CERTIFICATE]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE PROPOSED TRANSFEREE DELIVERS TO THE TRUSTEE A TRANSFER AFFIDAVIT IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR A PERSON INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF SUCH A PLAN, OR THAT SUCH TRANSFEREE IS AN INSURANCE COMPANY WHICH IS PURCHASING CERTIFICATES WITH FUNDS CONTAINED IN AN "INSURANCE COMPANY GENERAL ACCOUNTS" AS SUCH TERM IS DEFINED IN SECTION V(e) OF PROHIBITED TRANSACTION CLASS EXEMPTION 95-60 ("PTCE 95-60"), AND THE PURCHASE AND HOLDING OF SUCH CERTIFICATES ARE COVERED UNDER SECTION I AND III OF PTCE 95-60 OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED

TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.

[THIS CERTIFICATE REPRESENTS THE *"TAX MATTERS PERSON RESIDUAL INTEREST"* ISSUED UNDER THE POOLING AND SERVICING AGREEMENT REFERRED TO BELOW AND MAY NOT BE TRANSFERRED TO ANY PERSON EXCEPT IN CONNECTION WITH THE ASSUMPTION BY THE TRANSFEREE OF THE DUTIES OF THE SERVICER UNDER SUCH AGREEMENT.]

C-1

| EX-99.1 | 163rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 163rd |

Certificate No.                                    :

Cut-off Date                                       :

First Distribution Date                            :

**Initial Certificate Balance of this Certificate**
("*Denomination*")                                 :        $

Initial Certificate Balance
of all Certificates of
this Class                                         :        $

**CUSIP**                                          :

Interest Rate                                      :

Maturity Date                                      :

**CWMBS, INC.**
Mortgage Pass-Through Certificates, Series 200___-____
Class A-R

evidencing the distributions allocable to the Class A-R Certificates with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the *"Mortgage Loans"*) secured by first liens on one- to four-family residential properties

CWMBS, Inc., as Depositor

Principal in respect of this Certificate is distributable monthly as set forth herein. Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein. This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Sellers, the Master Servicer or the Trustee referred to below or any of their respective affiliates. Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the
Percentage Interest (obtained by dividing the Denomination of this
Certificate
by the aggregate Initial Certificate Balance of all Certificates of the Class
to which this Certificate belongs) in certain monthly distributions with
respect to a Trust Fund consisting of the Mortgage Loans deposited by CWMBS,
Inc. (the

C-2

| EX-99.1 | 164th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 164th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

"*Depositor*"). The Trust Fund was created pursuant to a Pooling and Servicing
Agreement dated as of the Cut-off Date specified above (the "*Agreement*")
among
the Depositor, Countrywide Home Loans, Inc., as a seller ("CHL"), Park
Granada
LLC, as a seller ("*Park Granada*" and together with CHL, the "*Sellers*"),
Countrywide Home Loans Servicing LP, as master servicer (the "*Master
Servicer*") and The Bank of New York, as trustee (the "*Trustee*"). To the
extent
not defined herein, the capitalized terms used herein have the meanings
assigned in the Agreement. This Certificate is issued under and is subject to
the terms, provisions and conditions of the Agreement, to which Agreement the
Holder of this Certificate by virtue of the acceptance hereof assents and by
which such Holder is bound.

Any distribution of the proceeds of any remaining assets of the Trust
Fund will be made only upon presentment and surrender of this Class A-R
Certificate at the Corporate Trust Office or the office or agency maintained
by the Trustee in New York, New York.

No transfer of a Class A-R Certificate shall be made unless the
Trustee shall have received either (i) a representation letter from the
transferee of such Certificate, acceptable to and in form and substance
satisfactory to the Trustee, to the effect that such transferee is not an
employee benefit plan subject to Section 406 of ERISA or a plan subject to
Section 4975 of the Code, nor a person acting on behalf of or investing plan
assets of any such plan, which representation letter shall not be an expense
of the Trustee or the Master Servicer, (ii) or that such Transferee is an
insurance company which is purchasing such Certificates with funds contained
in an "*insurance company general account*" (as such term is defined in Section
V(e) of Prohibited Transaction Class Exemption 95-60 ("*PTCE 95-60*")) and that
the purchase and holding of such Certificates are covered under Sections I
and
III of PTCE 95-60 or (iii) an Opinion of Counsel satisfactory to the Trustee
and the Master Servicer to the effect that the purchase or holding of such
Class A-R Certificate will not result in a non-exempt prohibited transaction
under Section 406 of ERISA or Section 4975 of the Code and will not subject
the Trustee or the Master Servicer to any obligation in addition to those
undertaken in this Agreement, which Opinion of Counsel shall not be an
expense
of the Trustee or the Master Servicer. Notwithstanding anything else to the
contrary herein, any purported transfer of a Class A-R Certificate to or on
behalf of an employee benefit plan subject to ERISA or to the Code without
the

opinion of counsel satisfactory to the Trustee as described above shall be
void and of no effect.

Each Holder of this Class A-R Certificate will be deemed to have
agreed to be bound by the restrictions of the Agreement, including but not
limited to the restrictions that (i) each person holding or acquiring any
Ownership Interest in this Class A-R Certificate must be a Permitted
Transferee, (ii) no Ownership Interest in this Class A-R Certificate may be
transferred without delivery to the Trustee of (a) a transfer affidavit of
the
proposed transferee and (b) a transfer certificate of the transferor, each of
such documents to be in the form described in the Agreement, (iii) each
person
holding or acquiring any Ownership Interest in this Class A-R Certificate
must
agree to require a transfer affidavit and to deliver a transfer certificate
to
the Trustee as required pursuant to the Agreement, (iv) each person holding
or
acquiring an Ownership Interest

C-3

| EX-99.1 | 165th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 165th |

in this Class A-R Certificate must agree not to transfer an Ownership
Interest
in this Class A-R Certificate if it has actual knowledge that the proposed
transferee is not a Permitted Transferee and (v) any attempted or purported
transfer of any Ownership Interest in this Class A-R Certificate in violation
of such restrictions will be absolutely null and void and will vest no rights
in the purported transferee.

Reference is hereby made to the further provisions of this
Certificate set forth on the reverse hereof, which further provisions shall
for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the
Agreement or be valid for any purpose unless manually countersigned by an
authorized signatory of the Trustee.

*     *     *

C-4

| EX-99.1 | 166th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 166th |

IN WITNESS WHEREOF, the Trustee has caused this Certificate
to be duly executed.

Dated: _____, 20__

THE BANK OF NEW YORK,
as Trustee

                                         By _____

              Countersigned:

         By _____
              Authorized Signatory of
              **THE BANK OF NEW YORK,**
                   as Trustee

                         C-5

| EX-99.1 | 167th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 167th |

### EXHIBIT D

### [FORM OF NOTIONAL AMOUNT CERTIFICATE]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE
OR
OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS CERTIFICATE HAS NO PRINCIPAL BALANCE AND IS NOT ENTITLED TO ANY
DISTRIBUTION IN RESPECT OF PRINCIPAL.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING
UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE
TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A
REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE
BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,
AS AMENDED, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE
AGREEMENT REFERRED TO HEREIN. SUCH REPRESENTATION SHALL BE DEEMED TO HAVE
BEEN
MADE TO THE TRUSTEE BY THE TRANSFEREE'S ACCEPTANCE OF A CERTIFICATE OF THIS
CLASS AND BY A BENEFICIAL OWNER'S ACCEPTANCE OF ITS INTEREST IN A CERTIFICATE
OF THIS CLASS. NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, UNTIL
THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA QUALIFYING UNDERWRITING,
ANY
PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT
PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL
SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO
EFFECT.]

                         D-1

Certificate No.                                        :

Cut-off Date                                           :

First Distribution Date                                :

**Initial Notional Amount
of this Certificate**
("*Denomination*")                          :          $

Initial Notional Amount
of all Certificates
of this Class                               :          $

**CUSIP**                                              :

Interest Rate                              :       Interest Only

Maturity Date                                          :

**CWMBS, INC.**
Mortgage Pass-Through Certificates, Series 200____-____
Class [ ]

evidencing a percentage interest in the distributions allocable to
the Certificates of the above-referenced Class with respect to a
Trust Fund consisting primarily of a pool of conventional mortgage
loans (the "*Mortgage Loans*") secured by first liens on one- to
four-family residential properties

CWMBS, Inc., as Depositor

The Notional Amount of this certificate at any time, may be less than
the Notional Amount as set forth herein. This Certificate does not evidence
an
obligation of, or an interest in, and is not guaranteed by the Depositor, the
Sellers, the Master Servicer or the Trustee referred to below or any of their
respective affiliates. Neither this Certificate nor the Mortgage Loans are
guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the
Percentage Interest evidenced by this Certificate (obtained by dividing the
denomination of this Certificate by the aggregate Initial Notional Amount of
all Certificates of the Class to which this Certificate belongs) in certain
monthly distributions with respect to a Trust Fund consisting primarily of
the
Mortgage Loans deposited by CWMBS, Inc. (the "*Depositor*"). The Trust Fund was
created

D-2

pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date
specified above (the "_Agreement_") among the Depositor, Countrywide Home
Loans,
Inc., as a seller ("_CHL_"), Park Granada LLC, as a seller ("_Park Granada_" and,
together with CHL, the "_Sellers_"), Countrywide Home Loans Servicing LP, as
master servicer (the "_Master Servicer_") and The Bank of New York, as trustee
(the "_Trustee_"). To the extent not defined herein, the capitalized terms used
herein have the meanings assigned in the Agreement. This Certificate is
issued
under and is subject to the terms, provisions and conditions of the
Agreement,
to which Agreement the Holder of this Certificate by virtue of the acceptance
hereof assents and by which such Holder is bound.

[Until this certificate has been the subject of an ERISA-Qualifying
Underwriting, no transfer of a Certificate of this Class shall be made unless
the Trustee shall have received either (i) a representation letter from the
transferee of such Certificate, acceptable to and in form and substance
satisfactory to the Trustee, to the effect that such transferee is not an
employee benefit plan subject to Section 406 of ERISA or a plan subject to
Section 4975 of the Code, nor a person acting on behalf of or investing plan
assets of any such plan, which representation letter shall not be an expense
of the Trustee or the Master Servicer, or (ii) in the case of any such
Certificate presented for registration in the name of an employee benefit
plan
subject to ERISA or Section 4975 of the Code (or comparable provisions of any
subsequent enactments), or a trustee of any such plan or any other person
acting on behalf of any such plan, an Opinion of Counsel satisfactory to the
Trustee and the Master Servicer to the effect that the purchase or holding of
such Certificate will not result in a non-exempt prohibited transaction under
Section 406 of ERISA or Section 4975 of the Code, and will not subject the
Trustee or the Master Servicer to any obligation in addition to those
undertaken in the Agreement, which Opinion of Counsel shall not be an expense
of the Trustee or the Master Servicer. Such representation shall be deemed to
have been made to the Trustee by the Transferee's acceptance of a Certificate
of this Class and by a beneficial owner's acceptance of its interest in a
Certificate of this Class. Notwithstanding anything else to the contrary
herein, until such certificate has been the subject of an ERISA-Qualifying
Underwriting, any purported transfer of a Certificate of this Class to or on
behalf of an employee benefit plan subject to ERISA or to the Code without
the
opinion of counsel satisfactory to the Trustee as described above shall be
void and of no effect.]

Reference is hereby made to the further provisions of this
Certificate set forth on the reverse hereof, which further provisions shall
for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the
Agreement or be valid for any purpose unless manually countersigned by an
authorized signatory of the Trustee.

*   *   *

D-3

| EX-99.1 | 170th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 170th |

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

THE BANK OF NEW YORK,
as Trustee

By _____

Countersigned:

By _____
Authorized Signatory of
THE BANK OF NEW YORK,
as Trustee

D-4

| EX-99.1 | 171st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 171st |

## EXHIBIT E

[FORM OF REVERSE OF CERTIFICATES]

CWMBS, INC.
Mortgage Pass-Through Certificates

This Certificate is one of a duly authorized issue of Certificates designated as CWMBS, Inc. Mortgage Pass-Through Certificates, of the Series specified on the face hereof (herein collectively called the "*Certificates*"), and representing a beneficial ownership interest in the Trust Fund created by the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the funds on deposit in the Distribution Account for payment hereunder and that the Trustee is not liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights,
duties and immunities of the Trustee.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such day is not a Business Day, the Business Day immediately following (the "*Distribution Date*"), commencing on the first Distribution Date specified on the face hereof, to the Person in whose name this Certificate is registered at the close of business on the applicable Record Date in an amount equal to the product of the Percentage

Interest evidenced by this Certificate and the amount required to be
distributed to Holders of Certificates of the Class to which this Certificate
belongs on such Distribution Date pursuant to the Agreement. The Record Date
applicable to each Distribution Date is the last Business Day of the month
next preceding the month of such Distribution Date.

Distributions on this Certificate shall be made by wire transfer of
immediately available funds to the account of the Holder hereof at a bank or
other entity having appropriate facilities therefor, if such
Certificateholder
shall have so notified the Trustee in writing at least five Business Days
prior to the related Record Date and such Certificateholder shall satisfy the
conditions to receive such form of payment set forth in the Agreement, or, if
not, by check mailed by first class mail to the address of such
Certificateholder appearing in the Certificate Register. The final
distribution on each Certificate will be made in like manner, but only upon
presentment and surrender of such Certificate at the Corporate Trust Office
or
such other location specified in the notice to Certificateholders of such
final distribution.

The Agreement permits, with certain exceptions therein provided, the
amendment thereof and the modification of the rights and obligations of the
Trustee and the rights of the Certificateholders under the Agreement at any
time by the Depositor, the Master Servicer and the

E-1

| EX-99.1 | 172nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 172nd |
|---------|-------------------|-----|-----|----------|------|---------|------------|

Trustee with the consent of the Holders of Certificates affected by such
amendment evidencing the requisite Percentage Interest, as provided in the
Agreement. Any such consent by the Holder of this Certificate shall be
conclusive and binding on such Holder and upon all future Holders of this
Certificate and of any Certificate issued upon the transfer hereof or in
exchange therefor or in lieu hereof whether or not notation of such consent
is
made upon this Certificate. The Agreement also permits the amendment thereof,
in certain limited circumstances, without the consent of the Holders of any
of
the Certificates.

As provided in the Agreement and subject to certain limitations
therein set forth, the transfer of this Certificate is registrable in the
Certificate Register of the Trustee upon surrender of this Certificate for
registration of transfer at the Corporate Trust Office or the office or
agency
maintained by the Trustee in New York, New York, accompanied by a written
instrument of transfer in form satisfactory to the Trustee and the
Certificate
Registrar duly executed by the holder hereof or such holder's attorney duly
authorized in writing, and thereupon one or more new Certificates of the same
Class in authorized denominations and evidencing the same aggregate
Percentage
Interest in the Trust Fund will be issued to the designated transferee or
transferees.

The Certificates are issuable only as registered Certificates without coupons in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Depositor, the Master Servicer, the Sellers and the Trustee and any agent of the Depositor or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Depositor, the Trustee, nor any such agent shall be affected by any notice to the contrary.

On any Distribution Date on which the Pool Stated Principal Balance is less than or equal to 10% of the Cut-off Date Pool Principal Balance, the Master Servicer will have the option, subject to the limitations set forth in the Agreement, to repurchase, in whole, from the Trust Fund all remaining Mortgage Loans and all property acquired in respect of the Mortgage Loans at a
purchase price determined as provided in the Agreement. In the event that no such optional termination occurs, the obligations and responsibilities created
by the Agreement will terminate upon the later of the maturity or other liquidation (or any advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property in respect thereof and the distribution to Certificateholders of all amounts required to be distributed pursuant to the Agreement. In no event, however, will the trust
created by the Agreement continue beyond the

E-2

| EX-99.1 | 173rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 173rd |
|---------|-------------------|-----|-----|----------|------|---------|------------|

expiration of 21 years from the death of the last survivor of the descendants living at the date of the Agreement of a certain person named in the Agreement.

Any term used herein that is defined in the Agreement shall have the meaning assigned in the Agreement, and nothing herein shall be deemed inconsistent with that meaning.

E-3

| EX-99.1 | 174th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 174th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s)

unto

_____

(Please print or typewrite name and address including postal zip code of
assignee)

the Percentage Interest evidenced by the within Certificate and hereby
authorizes the transfer of registration of such Percentage Interest to
assignee on the Certificate Register of the Trust Fund.

    I (We) further direct the Trustee to issue a new Certificate of a
like denomination and Class, to the above named assignee and deliver such
Certificate to the following address:

_____

    Dated:

_____
Signature by or on behalf of assignor

### DISTRIBUTION INSTRUCTIONS

    The assignee should include the following for purposes of
distribution:

    Distributions shall be made, by wire transfer or otherwise, in
immediately available funds to, _____

_____
_____
for the account of

_____
account number _____, or, if mailed by check, to
_____.
Applicable statements should be mailed to

_____
_____

    This information is provided by _____,
the assignee named above, or
_____
as its agent.

E-4

| EX-99.1 | 175th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 175th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**STATE OF**                 )                )
                        ) ss.:
**COUNTY OF**                )

    On the _____day of _____, 20___ before me, a

notary public in and for said State, personally appeared
_____, known to me who, being by me duly
sworn, did depose and say that he executed the foregoing instrument.

_____
Notary Public

[Notarial Seal]

E-5

| EX-99.1 | 176th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 176th |

EXHIBIT F

FORM OF INITIAL CERTIFICATION OF TRUSTEE

[date]

[Depositor]

[Master Servicer]

[Countrywide]

_____
_____

Re:    Pooling and Servicing Agreement among
       CWMBS, Inc., as Depositor, Countrywide
       Home Loans, Inc. ("*Countrywide*"), as a
       Seller, Park Granada LLC, as a Seller,
       Countrywide Home Loans Servicing LP, as Master
       Servicer, and The Bank of New York, as Trustee,
       Mortgage Pass-Through Certificates, Series 200_-_

Gentlemen:

        In accordance with Section 2.02 of the above-captioned Pooling and
Servicing Agreement (the "*Pooling and Servicing Agreement*"), the undersigned,
as Trustee, hereby certifies that, as to each Mortgage Loan listed in the
Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed
                                  on
       the attached schedule) it has received:

        (i) (a) the original Mortgage Note endorsed in the following form:
"*Pay to the order of* _____, *without recourse*" or (b) with respect to any
Lost Mortgage Note, a lost note affidavit from Countrywide stating that the
            original Mortgage Note was lost or destroyed; and

        (ii) a duly executed assignment of the Mortgage (which may be
            included in a blanket assignment or assignments).

        Based on its review and examination and only as to the foregoing
documents, such documents appear regular on their face and related to such

Mortgage Loan.

The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in
the
Pooling and Servicing Agreement. The Trustee makes no representations as to:
(i) the validity, legality, sufficiency, enforceability

F-1

| EX-99.1 | 177th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 177th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

or genuineness of any of the documents contained in each Mortgage File of any
of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the
collectability, insurability, effectiveness or suitability of any such
Mortgage Loan.

Capitalized words and phrases used herein shall have the respective
meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
as Trustee

By: _____

Name:
Title:

F-2

| EX-99.1 | 178th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 178th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

EXHIBIT G

FORM OF DELAY DELIVERY CERTIFICATION

[date]

[Depositor]

[Master Servicer]

[Countrywide]

_____

_____

Re:    Pooling and Servicing Agreement among
       CWMBS, Inc., as Depositor, Countrywide
       Home Loans, Inc., as a Seller ("Countrywide"),
       Park Granada LLC, as a Seller, Countrywide
       Home Loans Servicing LP, as Master
       Servicer, and The Bank of New York, as Trustee,
       Mortgage Pass-Through Certificates, Series 200_-_
       ----------------------------------------------
       Gentlemen:

Reference is made to the Initial Certification of Trustee relating to the above-referenced series, with the schedule of exceptions attached thereto (the *"Schedule A"*), delivered by the undersigned, as Trustee, on the Closing Date in accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the *"Pooling and Servicing Agreement"*). The undersigned hereby certifies that, as to each Delay Delivery Mortgage Loan listed on Schedule A attached hereto (other than any Mortgage Loan paid in full or listed on Schedule B attached hereto) it has received:

    (i)   the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan, without recourse in the following form: *"Pay to the order of _____ without recourse"*, with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;

    (ii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage, [and in the case of each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

G-1

| EX-99.1 | 179th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 179th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

  [(iii) [in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to *"The Bank of New York, as trustee under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse"*, or, in the case of each Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

    (iv) the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage [(noting the presence of a MIN in the case of each MERS Mortgage Loan)];

    (v)  the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) the original or duplicate original lender's title policy or a
printout of the electronic equivalent and all riders thereto
or, in the event such original title policy has not been
received from the insurer, any one of an original title binder,
an original preliminary title report or an original title
commitment, or a copy thereof certified by the title company,
with the original policy of title insurance to be delivered
within one year of the Closing Date.

In the event that in connection with any Mortgage Loan that is not a
MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage
or all interim recorded assignments of the Mortgage satisfying the
requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has
received, in lieu thereof, a true and complete copy of such Mortgage and/or
such assignment or assignments of the Mortgage, as applicable, each certified
by Countrywide, the applicable title company, escrow agent or attorney, or
the
originator of such Mortgage Loan, as the case may be, to be a true and
complete copy of the original Mortgage or assignment of Mortgage submitted
for
recording.

Based on its review and examination and only as to the foregoing
documents, (i) such documents appear regular on their face and related to
such
Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v),
(vi), (viii), (xi) and (xiv) of the definition of the *"Mortgage Loan
Schedule"*
in Article I of the Pooling and Servicing Agreement accurately reflects
information set forth in the Mortgage File.

The Trustee has made no independent examination of any documents
contained in each Mortgage File beyond the review specifically required in
the
above-referenced Pooling and Servicing Agreement. The Trustee makes no
representations as to: (i) the validity, legality, sufficiency,
enforceability
or genuineness of any of the documents contained in each Mortgage File of any
of the Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number
and Borrower Identification Mortgage Loan Schedule] or (ii) the
collectibility, insurability, effectiveness or suitability of any such
Mortgage Loan.

G-2

| EX-99.1 | 180th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 180th |
|---------|-------------------|-----|-----|----------|------|----------|------------|

Capitalized words and phrases used herein shall have the respective
meanings assigned to them in the Pooling and Servicing Agreement.

**THE BANK OF NEW YORK,**
as Trustee

By: _____
Name:

Title:

G-3

**EXHIBIT H**

**FORM OF FINAL CERTIFICATION OF TRUSTEE**

[date]

[Depositor]

[Master Servicer]

[Countrywide]

Re:        Pooling and Servicing Agreement among
           CWMBS, Inc., as Depositor, Countrywide
           Home Loans, Inc., as Seller ("*Countrywide*"),
           Park Granada LLC, as a Seller, Countrywide
           Home Loans Servicing LP, as Master
           Servicer, and The Bank of New York, as Trustee,
           Mortgage Pass-Through Certificates, Series 200_-_

Gentlemen:

In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "*Pooling and Servicing Agreement*"), the undersigned, as Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received:

(i)     the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan, without recourse in the following form: "*Pay to the order of _____ without recourse*", with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;

(ii)    in the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage, [and in the case of each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is

H-1

a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

[(iii) [in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage to "*The Bank of New York, as trustee under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse*", or, in the case of each Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv) the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage [(noting the presence of a MIN in the case of each Mortgage Loan that is a MERS Mortgage Loan)];

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such

Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the *"Mortgage Loan Schedule"*
in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

H-2

| EX-99.1 | 183rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 183rd |
|---------|-------------------|-----|-----|----------|------|---------|------------|

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement. The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectibility, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

**THE BANK OF NEW YORK,**
as Trustee

By :_____
Name:
Title:

H-3

| EX-99.1 | 184th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 184th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**EXHIBIT I**

**TRANSFER AFFIDAVIT**

CWMBS, Inc.
Mortgage Pass-Through Certificates
Series 200_-_

STATE OF                              )
                              ) ss.:
COUNTY OF                          )

The undersigned, being first duly sworn, deposes and says as follows:

1. The undersigned is an officer of _____, the proposed Transferee of an Ownership Interest in a Class A-R Certificate (the *"Certificate"*) issued pursuant to the Pooling and Servicing Agreement, (the *"Agreement"*), relating to the above-referenced Series, by and among CWMBS, Inc., as depositor (the *"Depositor"*), Countrywide Home Loans, Inc., as a

seller, Park Granada LLC, as a seller, Countrywide Home Loans Servicing LP,
as
master servicer and The Bank of New York, as Trustee. Capitalized terms used,
but not defined herein or in Exhibit 1 hereto, shall have the meanings
ascribed to such terms in the Agreement. The Transferee has authorized the
undersigned to make this affidavit on behalf of the Transferee.

2. The Transferee is, as of the date hereof, and will be, as of the
date of the Transfer, a Permitted Transferee. The Transferee is acquiring its
Ownership Interest in the Certificate for its own account or as the nominee,
trustee or agent of another Person, in which case the Transferee has attached
hereto an affidavit from such Person in substantially the same form as this
affidavit. The Transferee has no knowledge that any such affidavit is false.

3. The Transferee has been advised of, and understands that (i) a tax
will be imposed on Transfers of the Certificate to Persons that are not
Permitted Transferees; (ii) such tax will be imposed on the transferor, or,
if
such Transfer is through an agent (which includes a broker, nominee or
middleman) for a Person that is not a Permitted Transferee, on the agent; and
(iii) the Person otherwise liable for the tax shall be relieved of liability
for the tax if the subsequent Transferee furnished to such Person an
affidavit
that such subsequent Transferee is a Permitted Transferee and, at the time of
Transfer, such Person does not have actual knowledge that the affidavit is
false.

4. The Transferee has been advised of, and understands that a tax
will be imposed on a *"pass-through entity"* holding the Certificate if at any
time during the taxable year of the pass-through entity a Person that is not
a
Permitted Transferee is the record holder of an interest in such entity. The
Transferee understands that such tax will not be imposed for any period with
respect to which the record holder furnishes to the pass-through entity an
affidavit that such record holder is a Permitted Transferee and the
pass-through entity does not have actual

I-1

| EX-99.1 | 185th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 185th |

knowledge that such affidavit is false. (For this purpose, a *"pass-through
entity"* includes a regulated investment company, a real estate investment
trust or common trust fund, a partnership, trust or estate, and certain
cooperatives and, except as may be provided in Treasury Regulations, persons
holding interests in pass-through entities as a nominee for another Person.)

5. The Transferee has reviewed the provisions of Section 5.02(c) of
the Agreement (attached hereto as Exhibit 2 and incorporated herein by
reference) and understands the legal consequences of the acquisition of an
Ownership Interest in the Certificate including, without limitation, the
restrictions on subsequent Transfers and the provisions regarding voiding the
Transfer and mandatory sales. The Transferee expressly agrees to be bound by
and to abide by the provisions of Section 5.02(c) of the Agreement and the
restrictions noted on the face of the Certificate. The Transferee understands

and agrees that any breach of any of the representations included herein shall
render the Transfer to the Transferee contemplated hereby null and void.

6. The Transferee agrees to require a Transfer Affidavit from any Person to whom the Transferee attempts to Transfer its Ownership Interest in the Certificate, and in connection with any Transfer by a Person for whom the Transferee is acting as nominee, trustee or agent, and the Transferee will not Transfer its Ownership Interest or cause any Ownership Interest to be Transferred to any Person that the Transferee knows is not a Permitted Transferee. In connection with any such Transfer by the Transferee, the Transferee agrees to deliver to the Trustee a certificate substantially in the form set forth as Exhibit J to the Agreement (a *"Transferor Certificate"*) to the effect that such Transferee has no actual knowledge that the Person to which the Transfer is to be made is not a Permitted Transferee.

7. The Transferee does not have the intention to impede the assessment or collection of any tax legally required to be paid with respect to the Certificate.

8. The Transferee's taxpayer identification number is _____.

9. The Transferee is a U.S. Person as defined in Code Section 7701(a)(30).

10. The Transferee is aware that the Certificate may be a *"noneconomic residual interest"* within the meaning of proposed Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

11. The Transferee anticipates that it will, so long as it holders the Class A-R Certificates, have sufficient assets to pay any taxes owed by the holder of such Class A-R Certificates, and hereby represents to and for the benefit of the person from whom it acquired the Class A-R Certificates that the Transferee intends to pay taxes associated with holding such Class A-R Certificates as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class A-R Certificates. The Transferee has provided financial statements or other financial information requested by the Transferor in connection with the transfer of the Class A-R Certificates to permit the Transferor to assess the financial capability of

I-2

| EX-99.1 | 186th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 186th |

the Transferee to pay such taxes. The Transferee is not an employee benefit plan that is subject to ERISA or a plan that is subject to Section 4975 of the Code, and the Transferee is not acting on behalf of such a plan.

12. Either (i) the Transferee is not an employee benefit plan subject
to Section 406 of ERISA or Section 4975 of the Code, nor a person acting on
behalf of any such plan or using the assets of such plan to effect such
acquisition, or, (ii) the source of funds for the purchase of such Class A-R
Certificate is an *"insurance company general account"* within the meaning of
Prohibited Transaction Class Exemption 95-60 (PTCE 95-60"), 60 Fed. Reg.
35925
(July 12, 1995), and the terms and conditions of Sections I and III of PTCE
95-60 are applicable to the acquisition and holding of such Class A-R
Certificate.

\*    \*    \*

I-3

| **EX-99.1** | **187th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 187th |
|---|---|---|---|---|---|---|---|

IN WITNESS WHEREOF, the Transferee has caused this instrument to be
executed on its behalf, pursuant to authority of its Board of Directors, by
its duly authorized officer and its corporate seal to be hereunto affixed,
duly attested, this ____ day of _____, 20__.

_____
**PRINT NAME OF TRANSFEREE**

By:_____
Name:
Title:

[Corporate Seal]

**ATTEST:**

_____
[Assistant] Secretary

Personally appeared before me the above-named _____, known
or proved to me to be the same person who executed the foregoing instrument
and to be the _____ of the Transferee, and acknowledged that
he
executed the same as his free act and deed and the free act and deed of the
Transferee.

Subscribed and sworn before me this _____ day of _____, 20__.

_____
**NOTARY PUBLIC**

My Commission expires the
____ day of _____, 20__

I-4

| **EX-99.1** | **188th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 188th |
|---|---|---|---|---|---|---|---|

EXHIBIT 1
to EXHIBIT I

Certain Definitions
-------------------

"*Ownership Interest*": As to any Certificate, any ownership interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

"*Permitted Transferee*": Any Person other than (i) the United States, any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in Code Section 521) which is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by Code Section 511 on unrelated business taxable income) on any excess inclusions (as defined in Code Section 860E(c)(1)) with respect to any Class A-R Certificate, (iv) rural electric and telephone cooperatives described in Code Section 1381(a)(2)(c), (v) a Person that is not a citizen or resident of the United States, a corporation, partnership, or other entity created or organized in or under the laws of the United States or any political subdivision thereof, an estate whose income from sources without the United States is includible in gross income for United States federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, (v) an "*electing large partnership*" within the meaning of Section 775 of the Code, and (vii) any other Person so designated by the Trustee based upon an Opinion of Counsel that the Transfer of an Ownership Interest in a Class A-R Certificate to such Person may cause the Trust Fund to fail to qualify as a REMIC at any time that certain Certificates are Outstanding. The terms "*United States*," "*State*" and "*International Organization*" shall have the meanings set forth in Code Section 7701 or successor provisions. A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof if all of its activities are subject to tax, and, with the exception of the FHLMC, a majority of its board of directors is not selected by such governmental unit.

"*Person*": Any individual, corporation, partnership, joint venture, bank, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"*Transfer*": Any direct or indirect transfer or sale of any Ownership Interest in a Certificate, including the acquisition of a Certificate by the Depositor.

*"Transferee"*: Any Person who is acquiring by Transfer any Ownership
Interest in a Certificate.

I-5

| EX-99.1 | 189th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 189th |

**EXHIBIT 2**
to EXHIBIT I

Section 5.02(c) of the Agreement
--------------------------------

(c) Each Person who has or who acquires any Ownership Interest in a
Class A-R Certificate shall be deemed by the acceptance or acquisition of
such
Ownership Interest to have agreed to be bound by the following provisions,
and
the rights of each Person acquiring any Ownership Interest in a Class A-R
Certificate are expressly subject to the following provisions:

(i) Each Person holding or acquiring any Ownership Interest in
a Class A-R Certificate shall be a Permitted Transferee and shall
promptly notify the Trustee of any change or impending change in its
status as a Permitted Transferee.

(ii) No Ownership Interest in a Class A-R Certificate may be
registered on the Closing Date or thereafter transferred, and the
Trustee shall not register the Transfer of any Class A-R Certificate
unless, in addition to the certificates required to be delivered to
the Trustee under subparagraph (b) above, the Trustee shall have
been furnished with an affidavit (a *"Transfer Affidavit"*) of the
initial owner or the proposed transferee in the form attached hereto
as Exhibit I.

(iii) Each Person holding or acquiring any Ownership Interest
in a Class A-R Certificate shall agree (A) to obtain a Transfer
Affidavit from any other Person to whom such Person attempts to
Transfer its Ownership Interest in a Class A-R Certificate, (B) to
obtain a Transfer Affidavit from any Person for whom such Person is
acting as nominee, trustee or agent in connection with any Transfer
of a Class A-R Certificate and (C) not to Transfer its Ownership
Interest in a Class A-R Certificate or to cause the Transfer of an
Ownership Interest in a Class A-R Certificate to any other Person if
it has actual knowledge that such Person is not a Permitted
Transferee.

(iv) Any attempted or purported Transfer of any Ownership
Interest in a Class A-R Certificate in violation of the provisions
of this Section 5.02(c) shall be absolutely null and void and shall
vest no rights in the purported Transferee. If any purported
transferee shall become a Holder of a Class A-R Certificate in
violation of the provisions of this Section 5.02(c), then the last
preceding Permitted Transferee shall be restored to all rights as
Holder thereof retroactive to the date of registration of Transfer
of such Class A-R Certificate. The Trustee shall be under no

liability to any Person for any registration of Transfer of a Class
A-R Certificate that is in fact not permitted by Section 5.02(b) and
this Section 5.02(c) or for making any payments due on such
Certificate to the Holder thereof or taking any other action with
respect to such Holder under the provisions of this Agreement so
long as the Transfer was registered after receipt of the related
Transfer Affidavit, Transferor Certificate and either the Rule 144A
Letter or the Investment Letter. The Trustee shall be entitled but
not obligated to recover from any Holder of a Class A-R

I-6

| **EX-99.1** | **190th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 190th |

Certificate that was in fact not a Permitted Transferee at the time
it became a Holder or, at such subsequent time as it became other
than a Permitted Transferee, all payments made on such Class A-R
Certificate at and after either such time. Any such payments so
recovered by the Trustee shall be paid and delivered by the Trustee
to the last preceding Permitted Transferee of such Certificate.

(v) The Depositor shall use its best efforts to make available,
upon receipt of written request from the Trustee, all information
necessary to compute any tax imposed under Section 860E(e) of the
Code as a result of a Transfer of an Ownership Interest in a Class
A-R Certificate to any Holder who is not a Permitted Transferee.

I-7

| **EX-99.1** | **191st Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 191st |

EXHIBIT J-1

FORM OF TRANSFEROR CERTIFICATE
(RESIDUAL)

_____
Date

CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:  David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:     Mortgage-Backed Securities Group
                    Series 200_-_
Re:CWMBS, Inc. Mortgage Pass-Through Certificates,
          Series 200_-_, Class _____

Ladies and Gentlemen:

In connection with our disposition of the above Certificates we certify that to the extent we are disposing of a Class A-R Certificate, we have no knowledge the Transferee is not a Permitted Transferee.

Very truly yours,

_____
Print Name of Transferor

By:_____
                Authorized Officer

J-1-1

| EX-99.1 | 192nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 192nd |

**EXHIBIT J-2**

**FORM OF TRANSFEROR CERTIFICATE**
**(PRIVATE)**

_____
Date

CWMBS, Inc.
4500 Park Granada
Calabasas, California 91302
Attention:    David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:    Mortgage-Backed Securities Group
              Series 200_-_
Re:CWMBS, Inc. Mortgage Pass-Through Certificates,
   Series 200_-_, Class
_____

Ladies and Gentlemen:

In connection with our disposition of the above Certificates we certify that (a) we understand that the Certificates have not been registered under the Securities Act of 1933, as amended (the "Act"), and are being disposed by us in a transaction that is exempt from the registration requirements of the Act, (b) we have not offered or sold any Certificates to, or solicited offers to buy any Certificates from, any person, or otherwise approached or negotiated with any person with respect thereto, in a manner that would be deemed, or taken any other action which would result in, a violation of Section 5 of the Act.

Very truly yours,

_____
Print Name of Transferor

By: _____
                    Authorized Officer

**J-2-1**

**EXHIBIT K**

**FORM OF INVESTMENT LETTER (NON-RULE 144A)**

                                    _____
                                    Date

CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:      David A. Spector

The Bank of New York
101 Barclay Street - 8W
New York, New York 10286

Attention:      Mortgage-Backed Securities Group
Series 200_-_

Re:      CWMBS, Inc. Mortgage Pass-Through Certificates,
Series 200_-_, Class

_____

Ladies and Gentlemen:

        In connection with our acquisition of the above Certificates we
certify that (a) we understand that the Certificates are not being registered
under the Securities Act of 1933, as amended (the "Act"), or any state
securities laws and are being transferred to us in a transaction that is
exempt from the registration requirements of the Act and any such laws, (b)
                                    we
are an "accredited investor," as defined in Regulation D under the Act, and
have such knowledge and experience in financial and business matters that we
are capable of evaluating the merits and risks of investments in the
Certificates, (c) we have had the opportunity to ask questions of and receive
answers from the Depositor concerning the purchase of the Certificates and
                                    all
matters relating thereto or any additional information deemed necessary to
                                    our
decision to purchase the Certificates, (d) either (i) we are not an employee
benefit plan that is subject to the Employee Retirement Income Security Act
                                    of
1974, as amended, or a plan or arrangement that is subject to Section 4975 of
the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of
any such plan or arrangement, nor are we using the assets of any such plan or
arrangement to effect such acquisition or (ii) if the Certificates have been
the subject of an ERISA-Qualifying Underwriting and we are an insurance
company, we are an insurance company which is purchasing such Certificates

with funds contained in an *"insurance company general account"* (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 (*"PTCE 95-60"*)) and the purchase and holding of such Certificates are covered under Sections I

K-1

| EX-99.1 | 194th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 194th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

and III of PTCE 95-60, (e) we are acquiring the Certificates for investment for our own account and not with a view to any distribution of such Certificates (but without prejudice to our right at all times to sell or otherwise dispose of the Certificates in accordance with clause (g) below), (f) we have not offered or sold any Certificates to, or solicited offers to buy any Certificates from, any person, or otherwise approached or negotiated with any person with respect thereto, or taken any other action which would result in a violation of Section 5 of the Act, and (g) we will not sell, transfer or otherwise dispose of any Certificates unless (1) such sale, transfer or other disposition is made pursuant to an effective registration statement under the Act or is exempt from such registration requirements, and if requested, we will at our expense provide an opinion of counsel satisfactory to the addressees of this Certificate that such sale, transfer or other disposition may be made pursuant to an exemption from the Act, (2) the purchaser or transferee of such Certificate has executed and delivered to you a certificate to substantially the same effect as this certificate, and (3) the purchaser or transferee has otherwise complied with any conditions for transfer set forth in the Pooling and Servicing Agreement.

Very truly yours,

_____
Print Name of Transferee

By: _____
         Authorized Officer

K-2

| EX-99.1 | 195th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 195th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**EXHIBIT L**

**FORM OF RULE 144A LETTER**

_____
         Date

CWMBS, Inc.
4500 Park Granada
Calabasas, California  91302
Attention:    David A. Spector

The Bank of New York
101 Barclay Street - 8W

New York, New York 10286

Attention:        Mortgage-Backed Securities Group
                  Series 200_-_

Re:      CWMBS, Inc. Mortgage Pass-Through Certificates,
         Series 200_-_, Class

Ladies and Gentlemen:

In connection with our acquisition of the above Certificates we
certify that (a) we understand that the Certificates are not being registered
under the Securities Act of 1933, as amended (the "Act"), or any state
securities laws and are being transferred to us in a transaction that is
exempt from the registration requirements of the Act and any such laws, (b)
we
have such knowledge and experience in financial and business matters that we
are capable of evaluating the merits and risks of investments in the
Certificates, (c) we have had the opportunity to ask questions of and receive
answers from the Depositor concerning the purchase of the Certificates and
all
matters relating thereto or any additional information deemed necessary to
our
decision to purchase the Certificates, (d) either (i) we are not an employee
benefit plan that is subject to the Employee Retirement Income Security Act
of
1974, as amended, or a plan or arrangement that is subject to Section 4975 of
the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of
any such plan or arrangement, nor are we using the assets of any such plan or
arrangement to effect such acquisition or (ii) if the Certificates have been
the subject of an ERISA-Qualifying Underwriting and we are an insurance
company, we are an insurance company which is purchasing such Certificates
with funds contained in an "insurance company general account" (as such term
is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60
("PTCE 95-60")) and the purchase and holding of such Certificates are covered
under Sections I and III of PTCE 95-60, (e) we have not, nor has anyone
acting
on our

L-1

behalf offered, transferred, pledged, sold or otherwise disposed of the
Certificates, any interest in the Certificates or any other similar security
to, or solicited any offer to buy or accept a transfer, pledge or other
disposition of the Certificates, any interest in the Certificates or any
other
similar security from, or otherwise approached or negotiated with respect to
the Certificates, any interest in the Certificates or any other similar
security with, any person in any manner, or made any general solicitation by
means of general advertising or in any other manner, or taken any other
action, that would constitute a distribution of the Certificates under the
Securities Act or that would render the disposition of the Certificates a
violation of Section 5 of the Securities Act or require registration pursuant

thereto, nor will act, nor has authorized or will authorize any person to act,
in such manner with respect to the Certificates, (f) we are a *"qualified institutional buyer"* as that term is defined in Rule 144A under the Securities
Act and have completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2. We are aware that the sale to us is being made in reliance on Rule 144A. We are acquiring the Certificates for our
own account or for resale pursuant to Rule 144A and further, understand that such Certificates may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the Securities Act.

Very truly yours,

_____
Print Name of Transferee

By:_____
                Authorized Officer

L-2

ANNEX 1 TO EXHIBIT L
--------------------

### QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A
----------------------------------------------------------

[For Transferees Other Than Registered Investment Companies]

The undersigned (the *"Buyer"*) hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

1. As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2. In connection with purchases by the Buyer, the Buyer is a *"qualified institutional buyer"* as that term is defined in Rule 144A under the
Securities Act of 1933, as amended (*"Rule 144A"*) because (i) the Buyer owned and/or invested on a discretionary basis either at least $100,000 in securities or, if Buyer is a dealer, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A and (ii) the Buyer satisfies the criteria in the category marked below.

_____ Corporation, etc. The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

_____ Bank. The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

_____ Savings and Loan. The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

L-3

| EX-99.1 | 198th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 198th |

_____ Broker-dealer. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

_____ Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State, territory or the District of Columbia.

_____ State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

_____ ERISA Plan. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

____    Investment Advisor.  The Buyer is an investment
advisor registered under the Investment Advisors
Act of 1940.

____    Small Business Investment Company.  Buyer is a
small business investment company licensed by the
U.S. Small Business Administration under Section
301(c) or (d) of the Small Business Investment
Act of 1958.

____    Business Development Company.  Buyer is a business
development company as defined in Section
202(a)(22)
of the Investment Advisors Act of 1940.

3. The term *"securities"* as used herein does not include (i)
securities of issuers that are affiliated with the Buyer, (ii) securities
that
are part of an unsold allotment to or subscription by the Buyer, if the Buyer
is a dealer, (iii) securities issued or guaranteed by the U.S. or any
instrumentality thereof, (iv) bank deposit notes and certificates of deposit,
(v) loan participations, (vi) repurchase agreements, (vii) securities owned
but subject to a repurchase agreement and (viii) currency, interest rate and
commodity swaps.

4. For purposes of determining the aggregate amount of securities
owned and/or invested on a discretionary basis by the Buyer, the Buyer used
the cost of such securities to the Buyer and did not include any of the
securities referred to in the preceding paragraph, except (i) where the Buyer
reports its securities holdings in its financial statements on the basis of
their market value, and (ii) no current information with respect to the cost
of those securities has been published. If clause (ii) in the preceding
sentence applies, the securities may be valued at market. Further, in
determining such aggregate amount, the Buyer may have included securities
owned by subsidiaries of the Buyer, but only if such subsidiaries are
consolidated with the Buyer in its financial statements prepared in
accordance
with generally accepted accounting principles and if the investments of such
subsidiaries are managed under the Buyer's direction. However, such
securities
were not included if the Buyer is a majority-owned, consolidated subsidiary
of

L-4

| EX-99.1 | 199th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 199th |

another enterprise and the Buyer is not itself a reporting company under the
Securities Exchange Act of 1934, as amended.

5. The Buyer acknowledges that it is familiar with Rule 144A and
understands that the seller to it and other parties related to the
Certificates are relying and will continue to rely on the statements made
herein because one or more sales to the Buyer may be in reliance on Rule
144A.

6. Until the date of purchase of the Rule 144A Securities, the Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice is given,
the Buyer's purchase of the Certificates will constitute a reaffirmation of this certification as of the date of such purchase. In addition, if the Buyer is a bank or savings and loan is provided above, the Buyer agrees that it will
furnish to such parties updated annual financial statements promptly after they become available.

```
                                    _____
                                         Print Name of Buyer

                                    By:_____

                                    Name:
                                    Title:

                                    Date:_____
```

L-5

| EX-99.1 | 200th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 200th |

ANNEX 2 TO EXHIBIT L
--------------------

### QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A
----------------------------------------------------------

[For Transferees That are Registered Investment Companies]

The undersigned (the *"Buyer"*) hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a *"qualified institutional buyer"* as that term is defined in Rule 144A under the
Securities Act of 1933, as amended (*"Rule 144A"*) because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

2. In connection with purchases by Buyer, the Buyer is a *"qualified institutional buyer"* as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, as amended and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned
by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used, except (i) where the Buyer or the Buyer's Family of Investment Companies reports its securities holdings in its financial

statements on the basis of their market value, and (ii) no current
information
with respect to the cost of those securities has been published. If clause
(ii) in the preceding sentence applies, the securities may be valued at
market.

    \_\_\_\_    The Buyer owned $_____ in securities (other than
the excluded securities referred to below) as of
the end of the Buyer's most recent fiscal year
(such amount being calculated in accordance with
Rule 144A).

    \_\_\_\_    The Buyer is part of a Family of Investment
Companies which owned in the aggregate $_____ in
securities (other than the excluded securities
referred to below) as of the end of the Buyer's
most recent fiscal year (such amount being
calculated in accordance with Rule 144A).

3. The term *"Family of Investment Companies"* as used herein means two
or more registered investment companies (or series thereof) that have the
same
investment adviser or investment advisers that are affiliated (by virtue of
being majority owned subsidiaries of the same parent or because one
investment
adviser is a majority owned subsidiary of the other).

L-6

| EX-99.1 | 201st Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 201st |
|---------|-------------------|-----|-----|----------|------|---------|------------|

4. The term *"securities"* as used herein does not include (i)
securities of issuers that are affiliated with the Buyer or are part of the
Buyer's Family of Investment Companies, (ii) securities issued or guaranteed
by the U.S. or any instrumentality thereof, (iii) bank deposit notes and
certificates of deposit, (iv) loan participations, (v) repurchase agreements,
(vi) securities owned but subject to a repurchase agreement and (vii)
currency, interest rate and commodity swaps.

5. The Buyer is familiar with Rule 144A and understands that the
parties listed in the Rule 144A Transferee Certificate to which this
certification relates are relying and will continue to rely on the statements
made herein because one or more sales to the Buyer will be in reliance on
Rule
144A. In addition, the Buyer will only purchase for the Buyer's own account.

6. Until the date of purchase of the Certificates, the undersigned
will notify the parties listed in the Rule 144A Transferee Certificate to
which this certification relates of any changes in the information and
conclusions herein. Until such notice is given, the Buyer's purchase of the
Certificates will constitute a reaffirmation of this certification by the
undersigned as of the date of such purchase.

_____
Print Name of Buyer or Adviser

By: _____
Name:
Title:

**IF AN ADVISER:**

_____
Print Name of Buyer

Date: _____

L-7

| EX-99.1 | 202nd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 202nd |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**EXHIBIT M**

**REQUEST FOR RELEASE**
(for Trustee)

CWMBS, Inc.
Mortgage Pass-Through Certificates
Series 200_-_

Loan Information
----------------

Name of Mortgagor: _____

Servicer Loan No.: _____

**Trustee**
-------

Name: _____

Address: _____

_____

_____

**Trustee**
Mortgage File No.: _____

      The undersigned Master Servicer hereby acknowledges that it has
received from The Bank of New York, as Trustee for the Holders of Mortgage
Pass-Through Certificates, of the above-referenced Series, the documents
referred to below (the *"Documents"*). All capitalized terms not otherwise
defined in this Request for Release shall have the meanings given them in the
Pooling and Servicing Agreement (the *"Pooling and Servicing Agreement"*)
relating to the above-referenced Series among the Trustee, Countrywide Home
Loans, Inc., as a Seller, Park Granada LLC, as a Seller, Countrywide Home
Loans Servicing LP, as Master Servicer and CWMBS, Inc., as Depositor.

( )   Mortgage Note dated _____, 20__, in the original
      principal sum of $_____, made by _____,
         payable to, or endorsed to the order of, the Trustee.

( )   Mortgage recorded on _____ as instrument no.
_____ in the County Recorder's Office of the County
of _____, State of _____ in
book/reel/docket _____ of official records at
         page/image _____.

M-1

| EX-99.1 | **203rd Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 203rd |

( )   Deed of Trust recorded on _____ as instrument no.
_____ in the County Recorder's Office of the County of
_____, State of _____ in
book/reel/docket _____ of official records at
         page/image _____.

( )   Assignment of Mortgage or Deed of Trust to the Trustee, recorded on
_____ as instrument no. _____ in the
County Recorder's Office of the County of _____,
State of _____ in book/reel/docket _____ of
official records at page/image _____.

( )   Other documents, including any amendments, assignments or other
         assumptions of the Mortgage Note or Mortgage.

( ) _____

( ) _____

( ) _____

( ) _____

The undersigned Master Servicer hereby acknowledges and agrees as
                           follows:

      (1) The Master Servicer shall hold and retain possession of the
Documents in trust for the benefit of the Trustee, solely for the
      purposes provided in the Agreement.

      (2) The Master Servicer shall not cause or knowingly permit the
Documents to become subject to, or encumbered by, any claim, liens,
security interest, charges, writs of attachment or other impositions
nor shall the Servicer assert or seek to assert any claims or rights
of setoff to or against the Documents or any proceeds thereof.

      (3) The Master Servicer shall return each and every Document
previously requested from the Mortgage File to the Trustee when the
need therefor no longer exists, unless the Mortgage Loan relating to
the Documents has been liquidated and the proceeds thereof have been
remitted to the Certificate Account and except as expressly provided
                      in the Agreement.

(4) The Documents and any proceeds thereof, including any proceeds of proceeds, coming into the possession or control of the Master Servicer shall at all times be earmarked for the account of the Trustee, and the Master Servicer shall keep the Documents and any proceeds separate and distinct from all other property in the Master Servicer's possession, custody or control.

M-2

| EX-99.1 | 204th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 204th |

COUNTRYWIDE HOME LOANS
SERVICING LP

By _____  _____

Its _____

Date: _____, 20__

M-3

| EX-99.1 | 205th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 205th |

**EXHIBIT N**

**REQUEST FOR RELEASE OF DOCUMENTS**

To:    The Bank of New York                      Attn:   Mortgage
                              Custody
                                                Services

Re:    The Pooling & Servicing Agreement dated [month] 1, 2004, among Countrywide Home Loans, Inc., as a Seller, Park Granada LLC, as a Seller, Countrywide Home Loans Servicing LP, as Master Servicer, CWMBS, Inc. and The Bank of New York, as Trustee

Ladies and Gentlemen:

In connection with the administration of the Mortgage Loans held by you as Trustee for CWMBS, Inc., we request the release of the Mortgage Loan File for the Mortgage Loan(s) described below, for the reason indicated.

FT Account #:                                    Pool #:

Mortgagor's Name, Address and Zip Code:

Mortgage Loan Number:

Reason for Requesting Documents (check one)

1.   Mortgage Loan paid in full (Countrywide Home Loans, Inc.

```
                    hereby certifies that all amounts have been received).

          2.   Mortgage Loan Liquidated (Countrywide Home Loans, Inc.
               hereby certifies that all proceeds of foreclosure,
               insurance, or other liquidation have been finally received).

               3.   Mortgage Loan in Foreclosure.

                    4.   Other (explain):

          If item 1 or 2 above is checked, and if all or part of the Mortgage
     File was previously released to us, please release to us our previous receipt
     on file with you, as well as any additional documents in your possession
     relating to the above-specified Mortgage Loan. If item 3 or 4 is checked,
                                       upon
     return of all of the above documents to you as Trustee, please acknowledge
     your receipt by signing in the space indicated below, and returning this
                                       form.

                                       N-1
```

| EX-99.1 | 206th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 206th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

```
                         COUNTRYWIDE HOME LOANS, INC.
                              4500 Park Granada
                         Calabasas, California  91302

               By:_____
               Name:_____
               Title:_____
               Date:_____

                    TRUSTEE CONSENT TO RELEASE AND
                    ACKNOWLEDGEMENT OF RECEIPT

               By:_____
               Name:_____
               Title:_____
               Date:_____

                                  N-2
```

| EX-99.1 | 207th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 207th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

```
                              EXHIBIT O

                              [RESERVED]

                                 O-1
```

| EX-99.1 | 208th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 208th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

```
                              EXHIBIT P

                              [RESERVED]
```

P-1

| EX-99.1 | 209th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 209th |

EXHIBIT Q
**FORM OF STANDARD & POOR'S LEVELS(R) VERSION 5.6 GLOSSARY REVISED, APPENDIX E**

**APPENDIX E: STANDARD & POOR'S PREDATORY LENDING CATEGORIZATION**

Standard & Poor's has categorized loans governed by anti-predatory lending laws in the jurisdictions listed below into three categories based upon a combination of factors that include (a) the risk exposure associated with the assignee liability and (b) the tests and thresholds set forth in those laws. Note that certain loans classified by the relevant statute as Covered are included in Standard & Poor's High Cost Loan category because they included thresholds and tests that are typical of what is generally considered High Cost by the industry.

[Enlarge/Download Table]

---

***Standard & Poor's High-Cost Loan Categorization***

---

| State/jurisdiction | Name of Anti-Predatory Lending Law/Effective Date |
|---|---|
| Arkansas | Arkansas Home Loan Protection Act, Ark. Code Ann. ss.ss. 23-53-101 et seq. Effective July 16, 2003 |
| Cleveland Heights, Ohio | Ordinance No. 72-2003 (PSH), Mun. Code ss.ss. 757.01 et seq. Effective June 2, 2003 |
| Colorado | Consumer Equity Protection, Colo. Stat. Ann. ss.ss. 5-3.5-101 et seq. Effective for covered loans offered or entered into on or after Jan. 1, 2003. Other provisions of the Act took effect on June 7, 2002 |

| | |
|---|---|
| Connecticut | Connecticut Abusive Home Loan Lending Practices Act, Conn. Gen. Stat. ss.ss. 36a-746 et seq. Effective Oct. 1, 2001 |
| District of Columbia | Home Loan Protection Act, D.C. Code ss.ss. 26-1151.01 et seq. Effective for loans closed on or after Jan. 28, 2003 |
| Florida | Fair Lending Act, Fla. Stat. Ann. ss.ss. 494.0078 et seq. Effective Oct. 2, 2002 |
| Georgia (Oct. 1, 2002 - March 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. ss.ss. 7-6A-1 et seq. Effective Oct. 1, 2002-March 6, 2003 |
| Georgia as amended (March 7, 2003 - current) | Georgia Fair Lending Act, Ga. Code Ann. ss.ss. 7-6A-1 et seq. Effective for loans closed on or after March 7, 2003 |
| HOEPA Section 32 | Home Ownership and Equity Protection Act of 1994, 15 U.S.C. ss. 1639, 12 C.F.R. ss.ss. 226.32 and 226.34. Effective Oct. 1, 1995, amendments Oct. 1, 2002 |
| Illinois | High Risk Home Loan Act, Ill. Comp. Stat. tit. 815, ss.ss. 137/5 et seq. Effective Jan. 1, 2004 (prior to this date, regulations under Residential Mortgage License Act effective from May 14, 2001) |
| Kansas | Consumer Credit Code, Kan. Stat. Ann. ss.ss. 16a-1-101 et seq. Sections 16a-1-301 and 16a-3-207 became effective April 14, 1999; Section 16a-3-308a |

became effective <u>July 1, 1999</u>

----------------------------------------------------------------------
----------------------------

Q-1

----------------------------------------------------------------------
----------------------------
*Standard & Poor's High-Cost Loan Categorization*
----------------------------------------------------------------------
----------------------------

| State/jurisdiction | Name of Anti-Predatory Lending Law/Effective Date |
|---|---|
| Kentucky | 2003 KY H.B. 287 - High Cost Home Loan Act, Ky. Rev. Stat. ss.ss. 360.100 et seq. Effective <u>June 24, 2003</u> |
| Maine | Truth in Lending, Me. Rev. Stat. tit. 9-A, ss.ss. 8-101 et seq. Effective <u>Sept. 29, 1995</u>, and as amended from time to time |
| Massachusetts | Part 40 and Part 32, 209 C.M.R. ss.ss. 32.00 et seq. and 209 C.M.R. ss.ss. 40.01 et seq. Effective <u>March 22, 2001</u>, and amended from time to time |
| Nevada | Assembly Bill No. 284, Nev. Rev. Stat. ss.ss. 598D.010 et seq. Effective <u>Oct. 1, 2003</u> |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. ss.ss. 46:10B-22 et seq. Effective for loans closed on or after <u>Nov. 27, 2003</u> |

| | |
|---|---|
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. ss.ss. 58-21A-1 et seq. Effective as of Jan. 1, 2004; Revised as of Feb. 26, 2004 |
| New York | N.Y. Banking Law Article 6-1. Effective for applications made on or after April 1, 2003 |
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. ss.ss. 24-1.1E et seq. Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) |
| Ohio | H.B. 386 (codified in various sections of the Ohio Code), Ohio Rev. Code Ann. ss.ss. 1349.25 et seq. Effective May 24, 2002 |
| Oklahoma | Consumer Credit Code (codified in various sections of Title 14A). Effective July 1, 2000; amended effective Jan. 1, 2004 |
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code Ann. ss.ss. 37-23-10 et seq. Effective for loans taken on or after Jan. 1, 2004 |
| West Virginia | West Virginia Residential Mortgage Lender, Broker and Servicer Act, W. Va. Code Ann. ss.ss. 31-17-1 et seq. Effective June 5, 2002 |

[Enlarge/Download Table]



---------------------------------------------------------------------------
----------------------------
*Standard & Poor's Covered Loan Categorization*
---------------------------------------------------------------------------
----------------------------

| State/jurisdiction | Name of Anti-Predatory Lending Law/Effective Date |
|---|---|
| Georgia (Oct. 1, 2002 - March 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. ss.ss. 7-6A-1 et seq. Effective Oct. 1, 2002-March 6, 2003 |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. ss.ss. 46:10B-22 et seq. Effective Nov. 27, 2003-July 5, 2004 |

Q-2

| EX-99.1 | 211th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 211th |

[Enlarge/Download Table]

*Standard & Poor's Home Loan Categorization*

| State/jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under applicable anti-predatory lending law |
|---|---|---|
| Georgia (Oct. 1, 2002-March 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann. ss.ss. 7-6A-1 et seq. Effective Oct. 1, 2002-March 6, 2003 | Home Loan |
| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat. ss.ss. 46:10B-22 et seq. Effective for loans closed on or after Nov. 27, 2003 | Home Loan |
| New Mexico | Home Loan Protection Act, N.M. Rev. Stat. ss.ss. 58-21A-1 et seq. Effective as of Jan. 1, 2004; revised as of Feb. 26, 2004 | Home Loan |

```
-------------------------------------------------------------------------
                              -----
                    Restrictions and Limitations on High Cost        Consumer Home
                                       Loan
                               Home Loans, N.C. Gen. Stat. ss.ss. 24-1.1E et
       North Carolina         seq. Effective July 1, 2000; amended Oct.
                              1, 2003 (adding open-end lines of credit)
-------------------------------------------------------------------------
                              -----
                    South Carolina High Cost and Consumer Home        Consumer Home
                                       Loan
                    Loans Act, S.C. Code Ann. ss.ss. 37-23-10 et
       South Carolina         seq. Effective for loans taken on or
                                    after Jan. 1, 2004
-------------------------------------------------------------------------
                              -----
```

Q-3

| EX-99.1 | 212th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 212th |
|---------|-------------------|-----|-----|----------|------|---------|-----------|

EXHIBIT R
FORM OF CAP CONTRACT

DATE:                                    _____, 20___

TO:
ATTENTION:
TELEPHONE:
FACSIMILE:

FROM:
TELEPHONE:
FACSIMILE:

SUBJECT:

REFERENCE NUMBER:

The purpose of this letter agreement ("*Agreement*") is to confirm the terms
and
conditions of the Transaction entered into on the Trade Date specified below
(the "*Transaction*") between _____ (the "*Cap Provider*") and _____,
("*Counterparty*"). This Agreement, which evidences a complete and binding
agreement between the Cap Provider and Counterparty to enter into the
Transaction on the terms set forth below, constitutes a "*Confirmation*" as
referred to in the "*ISDA Form Master Agreement*" (as defined below), as well
as
a "*Schedule*" as referred to in the ISDA Form Master Agreement.

1.   This Agreement is subject to and incorporates the 2000 ISDA Definitions
     (the "*Definitions*"), as published by the International Swaps and
     Derivatives Association, Inc. ("*ISDA*"). The Cap Provider and Counterparty
     have agreed to enter into this Agreement in lieu of negotiating a
     Schedule to the 1992 ISDA Master Agreement (Multicurrency--Cross Border)
     form (the "*ISDA Form Master Agreement*"). An ISDA Form Master Agreement
     shall be deemed to have been executed by the Cap Provider and
     Counterparty on the date we entered into the Transaction. All provisions
     contained in, or incorporated by reference to, the ISDA Form Master

Agreement shall govern the Transaction referenced in this Confirmation
except as expressly modified herein. In the event of any inconsistency
between the provisions of this Agreement and the Definitions or the ISDA
Form Master Agreement, this Agreement shall prevail for purposes of the
Transaction.

2.    The terms of the particular Transaction to which this Confirmation
relates are as follows:

Type of Transaction:                     Rate Cap

Notional Amount:                         Shall equal:

R-1

(i) USD _____ for the
initial Calculation Period,
and

(ii) the amount as detailed in
the Schedule of Notional Amounts
and Cap Rates attached hereto.

Trade Date:                      _____, 20___

**Effective Date:**              _____, 20___

Termination Date:               _____, 20___, subject to
adjustment in accordance with
the Business Day Convention.

Fixed Amount (Premium):

Fixed Rate Payer:               Counterparty

Fixed Rate Payer
Payment Date:                   _____, 20__

Fixed Amount:                   USD _____

Floating Amounts:

Floating Rate Payer:            The Cap Provider

Cap Rate I:                     As set forth in the Schedule of
Notional Amounts and Cap Rates
attached hereto.

Floating Rate Payer             The 25th calendar day of each
Period End Dates:               month during the Term of this
Transaction, commencing _____,
20___ and ending on the
Termination Date, subject to
adjustment in accordance with

the Business Day Convention.

Floating Rate Payer
Payment Dates:

Early Payment shall be
applicable. One Business Day
preceding each Floating Rate
Payer Period End Date.

Floating Rate Option:

USD-LIBOR-BBA, provided,
however,

that if the Floating Rate
determined from such Floating
Rate Option for any Calculation
Period is greater than Cap Rate
II (set forth in the Schedule
of Notional Amounts and Cap
Rates attached hereto) then
the Floating Rate for such
Calculation Period shall be
deemed equal to Cap Rate II.

Designated Maturity:

One month

R-2

| EX-99.1 | 214th Page of <u>226</u> | TOC | 1st | Previous | Next | ↓Bottom | Just 214th |
|---------|--------------------------|-----|-----|----------|------|---------|------------|

Floating Rate Day Count
Fraction:

Actual/360

Reset Dates:

The first day of each
Calculation
Period.

Compounding:

Inapplicable

Business Days for payments:

New York and London

Business Day Convention:

Modified Following

3.    Additional Provisions:

1) Each party hereto is hereby
advised and acknowledges that
the

other party has engaged in (or
refrained from engaging in)
substantial financial
transactions and has taken (or
refrained from taking) other
material actions in reliance
upon the entry by the parties
into the Transaction being
entered into on the terms
and conditions set forth herein
and in the Confirmation relating
to such Transaction, as
applicable. This paragraph (1)
shall be deemed repeated on the

trade date of each Transaction.

4.      Provisions Deemed Incorporated in a Schedule to the Master
Agreement:

1)      The parties agree that subparagraph (ii) of Section 2(c) of the ISDA
Form Master Agreement will apply to any Transaction.

2)      .   Termination Provisions. For purposes of the Master Agreement:

(a)      "Specified Entity" is not applicable to the Cap Provider or
Counterparty for any purpose.

(b)      "Specified Transaction" is not applicable to the Cap Provider or
Counterparty for any purpose, and, accordingly, Section 5(a)(v) shall
not apply to the Cap Provider or Counterparty.

(c)      The "Cross Default" provisions of Section 5(a)(vi) will not apply to
the Cap Provider or to Counterparty.

(d)      The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will
not apply to the Cap Provider or to Counterparty.

(e)      The "Automatic Early Termination" provision of Section 6(a) will not
apply to the Cap Provider or to Counterparty.

(f)      Payments on Early Termination. For the purpose of Section 6(e) of
this Agreement:

R-3

| EX-99.1 | 215th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 215th |

(i)      Market Quotation will apply.

(ii)      The Second Method will apply.

(g)      "Termination Currency" means United States Dollars.

3)      Tax Representations. Not applicable

4)      Limitation on Events of Default. Notwithstanding the terms of
Sections 5 and 6 of this Agreement, if at any time and so long as the
Counterparty has satisfied in full all its payment obligations under Section
2(a)(i) of this Agreement and has at the time no future payment obligations,
whether absolute or contingent, under such Section, then unless the Cap
Provider is required pursuant to appropriate proceedings to return to the
Counterparty or otherwise returns to the Counterparty upon demand of the
Counterparty any portion of any such payment, (a) the occurrence of an event
described in Section 5(a) of this Agreement with respect to the Counterparty
shall not constitute an Event of Default or Potential Event of Default with
respect to the Counterparty as Defaulting Party and (b) the Cap Provider
shall
be entitled to designate an Early Termination Date pursuant to Section 6 of
this Agreement only as a result of the occurrence of a Termination Event set
forth in either Section 5(b)(i) or 5(b)(ii) of this Agreement with respect to

the Cap Provider as the Affected Party.

5)        Documents to be Delivered. For the purpose of Section 4(a):

(1)      Tax forms, documents, or certificates to be delivered are:

[Enlarge/Download Table]

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| The Cap Provider and the Counterparty | Any document required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on the account of any Tax or with such deduction or withholding at a reduced rate | Promptly after the earlier of (i) reasonable demand by either party or (ii) learning that such form or document is required |

R-4

| EX-99.1 | 216th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 216th |
|---|---|---|---|---|---|---|---|

(2)     Other documents to be delivered are:

[Enlarge/Download Table]

| Party required to deliver document | Form/Document/ Certificate | Section 3(d) Representation | Date by which to be delivered | Covered by |
|---|---|---|---|---|
| The Cap Provider and the Counterparty | Any documents required by the receiving party to evidence the authority of the delivering party or its Credit Support Provider, if any, for it to execute and deliver this Agreement, any Confirmation, and any Credit Support Documents to which it is a party, and to evidence the authority of the delivering party or its Credit Support Provider to perform its obligations under this Agreement, such Confirmation and/or Credit Support Document, as the case may be | | Upon the execution and delivery of this Agreement and such Confirmation | Yes |
| The Cap Provider and | A certificate of an authorized | | Upon the execution and | Yes |

| the Counterparty | officer of the party, as to the incumbency and authority of the respective officers of the party signing this Agreement, any relevant Credit Support Document, or any Confirmation, as the case may be | delivery of this Agreement and such Confirmation |

6)      Miscellaneous. Miscellaneous

(a)      Address for Notices: For the purposes of Section 12(a) of this Agreement:

Address for notices or communications to the Cap Provider:

Address:
Attention:

R-5

| EX-99.1 | 217th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 217th |

Facsimile:

with a copy to:

Address:
Attention:
Facsimile:

(For all purposes)

Address for notices or communications to the Counterparty:

Address:
Attention:
Facsimile:
Phone:

(b)      Process Agent. For the purpose of Section 13(c):

The Cap Provider appoints
as its
Process Agent:          Not Applicable

The Counterparty appoints as its
Process Agent:          Not Applicable

(c)      Offices. The provisions of Section 10(a) will not apply to this Agreement; neither the Cap Provider nor the Counterparty have any Offices other than as set forth in the Notices Section and the Cap Provider agrees that, for purposes of Section 6(b) of this Agreement, it shall not in future have any Office other than one in the United States.

(d)      Multibranch Party. For the purpose of Section 10(c) of this Agreement:

The Cap Provider is not a Multibranch Party.

The Counterparty is not a Multibranch Party.

(e)     Calculation Agent. The Calculation Agent is the Cap Provider;
provided, however, that if an Event of Default occurs with respect to
the Cap Provider, then the Counterparty shall be entitled to appoint
a financial institution which would qualify as a Reference
Market-maker to act as Calculation Agent.

(f)     Credit Support Document. Not applicable for either the Cap Provider
or the Counterparty.

(g)     Credit Support Provider.

R-6

| EX-99.1 | 218th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 218th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

**The Cap Provider:** Not Applicable

**The Counterparty:** Not Applicable

(h)     Governing Law. The parties to this Agreement hereby agree that the
law of the State of New York shall govern their rights and duties in
whole.

(i)     Severability. If any term, provision, covenant, or condition of this
Agreement, or the application thereof to any party or circumstance,
shall be held to be invalid or unenforceable (in whole or in part)
for any reason, the remaining terms, provisions, covenants, and
conditions hereof shall continue in full force and effect as if this
Agreement had been executed with the invalid or unenforceable portion
eliminated, so long as this Agreement as so modified continues to
express, without material change, the original intentions of the
parties as to the subject matter of this Agreement and the deletion
of such portion of this Agreement will not substantially impair the
respective benefits or expectations of the parties.

The parties shall endeavor to engage in good faith negotiations to replace
any
invalid or unenforceable term, provision, covenant or condition with a valid
or enforceable term, provision, covenant or condition, the economic effect of
which comes as close as possible to that of the invalid or unenforceable
term,
provision, covenant or condition.

(j)     Consent to Recording. Each party hereto consents to the monitoring
or
recording, at any time and from time to time, by the other party of any and
all communications between officers or employees of the parties, waives any
further notice of such monitoring or recording, and agrees to notify its
officers and employees of such monitoring or recording.

(k)     Waiver of Jury Trial. Each party waives any right it may have to a
trial by jury in respect of any Proceedings relating to this Agreement or any
Credit Support Document.

(1)        The Cap Provider will not unreasonably withhold or delay its consent to an assignment of this Agreement to any other third party.

(m)        Set-off. The provisions for Set-off set forth in Section 6(e) of the ISDA Form Master Agreement shall not apply for purposes of this Transaction.

7)        *"Affiliate"* will have the meaning specified in Section 14 of the ISDA Form Master Agreement, provided that the Cap Provider shall not be deemed to have any Affiliates for purposes of this Agreement, including for purposes of Section 6(b)(ii).

8)        Section 3 of the ISDA Form Master Agreement is hereby amended by adding at the end thereof the following subsection (g):

"(g) Relationship Between Parties.

R-7

| EX-99.1 | 219th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 219th |

Each party represents to the other party on each date when it enters into a Transaction that:--

(1) Nonreliance. It is not relying on any statement or representation of the other party regarding the Transaction (whether written or oral), other than the representations expressly made in this Agreement or the Confirmation in respect of that Transaction.

(2) Evaluation and Understanding.

(i) It has the capacity to evaluate (internally or through independent professional advice) the Transaction and has made its own decision to enter into the Transaction; and

(ii) It understands the terms, conditions and risks of the Transaction and is willing and able to accept those terms and conditions and to assume those risks, financially and otherwise.

(3) Purpose. It is entering into the Transaction for the purposes of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with a line of business.

Principal. It is entering into the Transaction as principal, and not as agent or in any other capacity, fiduciary or otherwise.

5.        Account Details and
Settlement Information:        Payments to the Cap Provider:
[   ]

Payments to Counterparty:
[   ]

This Agreement may be executed in several counterparts, each of which shall be

deemed an original but all of which together shall constitute one and the
same
instrument.

Counterparty hereby agrees to check this Confirmation and to confirm that the
foregoing correctly sets forth the terms of the Transaction by signing in the
space provided below and returning to the Cap Provider a facsimile of the
fully-executed Confirmation to _____. For inquiries regarding U.S.
Transactions, please contact _____ by telephone at _____. For all
other inquiries please contact Derivatives Documentation by telephone at
_____. Originals will be provided for your execution upon your request.

R-8

| **EX-99.1** | **220th Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 220th |
|---|---|---|---|---|---|---|---|

We are very pleased to have executed this Transaction with you and we look
forward to completing other transactions with you in the near future.

Very truly yours,

[    ]

By: _____

Name:
Title:

Counterparty, acting through its duly authorized signatory, hereby agrees to,
accepts and confirms the terms of the foregoing as of the Trade Date.

[    ]

By: _____

Name:
Title:

R-9

| **EX-99.1** | **221st Page of 226** | TOC | 1st | Previous | Next | ↓Bottom | Just 221st |
|---|---|---|---|---|---|---|---|

**SCHEDULE OF NOTIONAL AMOUNTS AND CAP RATES**
(all such dates subject to adjustment in accordance with
the Business Day Convention)

[Enlarge/Download
Table]

| *From and including* | *To but excluding* | *Notional Amount (USD)* | *Cap Rate I (%)* | *Cap Rate II (%)* |
|---|---|---|---|---|
| ------------------- | ---------------- | --------------------- | -------------- | --------------- |

R-10

EXHIBIT S
FORM OF ASSIGNMENT AGREEMENT

ASSIGNMENT AGREEMENT, dated as of _____, 20_____ ("*Assignment Agreement*"), among COUNTRYWIDE HOME LOANS, INC. ("*Assignor*"), THE BANK OF NEW YORK, NOT IN **AN INDIVIDUAL CAPACITY, BUT AS TRUSTEE FOR CWMBS MORTGAGE PASS-THROUGH** CERTIFICATES, SERIES 200___-____ ("*Assignee*"), pursuant to a Pooling and Servicing Agreement dated as of _____, 20___ (the "*Pooling and Servicing Agreement*") among CWMBS, Inc., as depositor, Assignor, as a seller, Park Granada LLC, as a seller, Countrywide Home Loans Servicing LP, as master servicer, and Assignee, as trustee, and _____ ("*Remaining Party*").

W I T N E S S E T H :

WHEREAS, effective as of _____, 20___, Assignor desires to assign all of its rights and delegate all of its duties and obligations to Assignee under those certain Transactions (the "*Assigned Transactions*") as evidenced by those certain confirmations with a Trade Date of _____, 20___ whose _____ reference number[s] [are/is] [_____ and _____, respectively,] ([each, a "*Confirmation*" and collectively, the "*Confirmations*"]), [a copy/copies] of which [are/is] attached hereto as Exhibit I;

WHEREAS, Assignor and Remaining Party executed and delivered the Confirmations in connection with an ISDA Master Agreement (Multicurrency--Cross Border) form (the "*ISDA Form Master Agreement*");

WHEREAS, Assignee desires to accept the assignment of rights and assume the delegation of duties and obligations of the Assignor under the Assigned Transactions and the Confirmations, including any modifications that may be agreed to by Assignee and Remaining Party; and

WHEREAS, Assignor desires to obtain the written consent of Remaining Party to the assignment, delegation, and assumption and Remaining Party desires to grant such consent in accordance with the terms hereof;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Assignment and Assumption. Effective as of and from _____, 20___ (the "*Effective Date*"), Assignor hereby assigns all of its rights and delegates all of its duties and obligations to Assignee and Assignee hereby assumes all Assignor's rights, duties, and obligations under the Assigned Transactions and the Confirmations arising on or after the Effective Date.

Release. Effective as of and from the Effective Date, Remaining Party and

Assignor hereby release one another from all duties and obligations owed under
and in respect of the Assigned

S-1

| EX-99.1 | 223rd Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 223rd |

Transactions and the Confirmations, and Assignor hereby terminates its rights under and in respect of the Assigned Transactions; provided, that such release
shall not affect Assignor's obligation to pay each Fixed Amount (Premium) in accordance with the terms of the Assigned Transactions and the Confirmations.

Amendment to the Confirmations. Assignee and Remaining Party agree that each of the Confirmations and thus each of the Assigned Transactions shall be amended so that with respect to the Business Days for Payments section, the words "New York and London" shall be deleted and replaced with the words "New York".

Limitation on Liability. Assignor and Remaining Party agree to the following: (a) the sole recourse in respect of the obligations of Assignee hereunder and under the Assigned Transactions shall be to the Trust Fund (as defined in the Pooling and Servicing Agreement); (b) The Bank of New York ("BNY") is entering
into this Assignment Agreement solely in its capacity as trustee and not in its individual capacity under the Pooling and Servicing Agreement; and (c) in no case shall BNY (or any person acting as successor trustee under the Pooling
and Servicing Agreement) be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be
those of Assignor under the terms of the Assigned Transactions, all such liability, if any, being expressly waived by Assignor and Remaining Party and any person claiming by, through or under either such party.

Consent and Acknowledgment of Remaining Party. Remaining Party hereby consents
to the assignment and delegation by Assignor to Assignee of all the rights, duties, and obligations of Assignor under the Assigned Transactions pursuant to this Assignment Agreement. In addition, Remaining Party hereby acknowledges
that the responsibilities of Assignee under the Assigned Transactions and the Confirmations will be performed on its behalf by Countrywide Home Loans Servicing LP, as master servicer under the Pooling and Servicing Agreement.

Governing Agreement. The Assigned Transactions and the Confirmations shall form a part of, and be subject to, the Master Agreement (Multicurrency - Cross
Border) (the "ISDA Form") in the form published by the International Swaps and
Derivatives Association, Inc. ("ISDA"), as if Assignee and Remaining Party had
executed such an agreement (but without any Schedule except for the election of the laws of the State of New York as the governing law and United States Dollars as the Termination Currency) on the trade date of the first

Transaction between Assignee and Remaining Party (the *"Assignee Agreement"*). The Confirmations, together with all other documents referring to the ISDA Form confirming transactions entered into between Assignee and Remaining Party, shall form a part of, and be subject to, the Assignee Agreement. For the purposes of this paragraph, capitalized terms used herein and not otherwise defined shall have the meanings assigned in the ISDA Form.

Representations. Each party hereby represents and warrants to the other parties as follows:

It is duly organized, validly existing and in good standing under the laws of its organization or incorporation;

S-2

| EX-99.1 | 224th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 224th |
|---|---|---|---|---|---|---|---|

It has the power to execute and deliver this Assignment Agreement; and

Its obligations under this Assignment Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms.

Each of Assignor and Remaining Party represents that no event or condition has occurred that constitutes an Event of Default, a Potential Event of Default or, to the party's knowledge, a Termination Event (as such terms are defined in the Confirmations and Assignee Agreement), with respect to the party, and no such event would occur as a result of the party's entering into or performing its obligations under this Assignment Agreement.

Indemnity. Each of Assignor and Remaining Party hereby agrees to indemnify and hold harmless Assignee with respect to any and all claims arising under the Assigned Transactions prior to the Effective Date. Each of Assignee (subject to the limitations set forth in paragraph 4 above) and Remaining Party hereby agrees to indemnify and hold harmless Assignor with respect to any and all claims arising under the Assigned Transactions on or after the Effective Date.

Governing Law. This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Notices. For the purposes of this Assignment Agreement and Section 12(a) of the ISDA Form Master Agreement of the Assigned Transactions, the addresses for notices or communications are as follows: (i) in the case of Assignor, Countrywide Home Loans, Inc., 4500 Park Granada, Calabasas, California 91302, Attention: Josh Adler, with a copy to the same address, Attention: Legal Department, or such other address as may be hereafter furnished in writing to Assignee and Remaining Party; (ii) in the case of Assignee, The Bank of New York, 101 Barclay, New York, New York 10286, Attention: Corporate Trust MBS Administration, CWMBS, Series 20___-___ or such other address as may be hereafter furnished in writing to Assignor and Remaining Party; and (iii) in

the case of Remaining Party,

```
Address:          [    ]
Attention:        [    ]
Telex No.         [    ]
```

copy to:      One Metrotech Center North, Brooklyn, New York, 11201
   Attention:    Derivative Operations - 7th Floor
        Telex No:      212-272-1634

such other address as may be hereafter furnished in writing to Assignor and
Assignee.

Payments. All payments remitted by Remaining Party under the Assigned
Transactions shall be made by wire transfer according to the following
instructions:

The Bank of New York

S-3

| EX-99.1 | 225th Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 225th |
|---------|-------------------|-----|-----|----------|------|---------|------------|

New York, NY
**ABA # [    ]**
**GLA # [    ]**
For Further Credit:  [    ]
Attn: [    ]

Counterparts. This Assignment Agreement may be executed and delivered in
counterparts (including by facsimile transmission), each of which when
executed shall be deemed to be an original but all of which taken together
shall constitute one and the same instrument.

S-4

| EX-99.1 | Last Page of 226 | TOC | 1st | Previous | Next | ↓Bottom | Just 226th |
|---------|------------------|-----|-----|----------|------|---------|------------|

IN WITNESS WHEREOF, the parties hereto have executed this Assignment
Agreement
as of the date first above written.

**COUNTRYWIDE HOME LOANS, INC.**

By:_____
Name:_____
Title:_____

**THE BANK OF NEW YORK, NOT IN AN INDIVIDUAL
CAPACITY, BUT AS TRUSTEE FOR CWMBS, INC.
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 20____-___**

By:_____
Name:_____

Title:_____

[_____]

By:_____
Name:_____
Title:_____

S-5

---

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| This 8-K Filing | Date | Referenced- On Page First | Last | Other Filings |
|---|---|---|---|---|
| | 7/12/95 | 186 | | |
| | 9/29/95 | 210 | | |
| | 10/1/95 | 209 | | |
| | 4/14/99 | 209 | | |
| | 7/1/99 | 209 | | |
| | 7/1/00 | 210 | 211 | |
| | 3/22/01 | 210 | | |
| | 5/14/01 | 209 | | |
| | 10/1/01 | 209 | | 424B5 |
| | 5/24/02 | 210 | | 8-K |
| | 6/5/02 | 210 | | 8-K |
| | 6/7/02 | 209 | | |
| | 10/1/02 | 144 | 211 | 424B5, 8-K |
| | 10/2/02 | 209 | | 424B5, 8-K |
| | 1/1/03 | 209 | | |
| | 1/28/03 | 209 | | 8-K |
| | 3/6/03 | 144 | 211 | |
| | 3/7/03 | 209 | | |
| | 4/1/03 | 210 | | |
| | 6/2/03 | 209 | | |
| | 6/24/03 | 210 | | |
| | 7/16/03 | 209 | | 8-K |
| | 10/1/03 | 210 | 211 | 424B5 |
| | 11/27/03 | 145 | 211 | |
| | 1/1/04 | 145 | 211 | |
| | 2/26/04 | 210 | 211 | 424B5, 8-K |
| | 7/5/04 | 210 | | |
| | 8/24/04 | 46 | | 8-K |
| | 1/1/05 | 2 | 45 | |
| | 1/19/05 | 29 | | |

|  | 1/25/05 | 46 | 8-K |
|---|---|---|---|
|  | 1/27/05 | 28 | 8-K |
| For The Period Ended | 1/30/05 |  | 8-K |
| Filed On / Filed As Of | 4/13/05 |  |  |
|  | 12/23/14 | 30 |  |

Top                                             List All Filings

Filing Submission 0000905148-05-002444  –  Alternative Formats (Word / Rich Text, HTML,
Plain Text, et al.)

*Copyright © 2014 Fran Finnegan & Company. All Rights Reserved.*
*About – Privacy – Redactions – Help — Tue, 4 Feb 21:50:08.1 GMT*

**Exhibit 10**

ELIZABETH C. FARRELL   (State Bar # 280056)                    January 31, 2014
of SEVERSON & WERSON
19100 Von Karman Avenue
Suite 700
Irvine, CA 92612 Tel: 949-225-3782; 949-442-7118 fax
<u>Sent by email to: ecf@severson.com</u>            **and**          **via USPS Certified Mail No.**
                                                                     **7012 3050 0001 8906 4404**


## NOTICE TO CEASE AND DESIST-DEMAND FOR ORDER TO VACATE VOID RULING

### RE: Your motion to dismiss filed September 27, 2013 concerning CASE NO. 13cv2080-MMA (BGS), Mayen v. BANK OF AMERICA, N.A., et al.


Ms. ELIZABETH C. FARRELL:

    Your Motion To Dismiss dated and filed September 27, 2013 in the United States District Court in the Southern District of California and recently ruled upon by United States District Judge, the Honorable Michael M. Anello on January 7, 2014 upon further review appears to have been an instrument employed in the miscarriage of justice.

    Your Motion appears to be a fraud on the court by either you or your client as is misrepresented in the said motion filed with the court on behalf of defendant BANK OF AMERICA, N.A., in case 13cv2080-MMA (BGS). Again, this **NOTICE** intends to bring this matter to your attention prior to the necessity of having to notice the court. I am writing to affirmatively bring this matter to your attention prior to the necessity of having to notice the court by seeking sanctions. It is my hope by our mutual agreement that a FRCP Rules 11(c), 56(h) contest before the court will become unnecessary. I will be happy to receive your prompt response in disposition of the following.

    The Content of your motion indicates that either you or your client has made erroneous assumptions regarding the status of your client being a debt collector as opposed to being the original loan servicer. One assumption contained in your motion on page 4, line 6 down to line 9 where you openly allege that your alleged client, "...Bank of America was the loan servicer at the time of the loan origination." Ms. Farrell, the burden of proof was upon you or your alleged client to support your claim as I am not in receipt of any admissible evidence filed of record that Bank of America, N.A. was the loan servicer at the time of the loan origination, and believe that none exist. I am further not in receipt of any admissible evidence filed of record that Bank of America, N.A. is mentioned, referenced in any foundational documentation pertaining to the origination of said loan being involved in any capacity with said loan and believe that none exist.

    Your next assumption contained in your motion states: "Therefore, the debt was **not in default** when Bank of America became the loan servicer, ...". I am further not in receipt of any admissible evidence filed of record that your alleged client, Bank of America, N.A., was appointed to the status of loan servicer prior to the date when the alleged default occurred on March 1, 2009, and believe that none exist.  Ms. Farrell, there are a number of other misleading statements and outright lies contained in your motion, the above should be sufficient for you to address within the next 24-72 hours prior to my filing said notice to the court to address FRCP Rules 11(c), 56(h) contest.

Further Ms. Farrell upon review of your resume, if you will, contained on the website of your associate, Severson & Werson, provides a statement that you "served as a judicial extern to the Honorable Michael M. Anello, U.S. District Court for the Southern District of California." Hmmm, it would seem that your relationship with the judge of record would appear to conflict with my inherent right to the due process of law, namely having my matter which pertains to my life, heard before a disinterested arbiter who does not have a dog in this fight or a familiar, i.e. *protégé* engaged in the battle before him. Would you not say? The words of Roscoe Pound and Professor Wigmore come to mind, namely, "whatever happened to the sporting theory of justice?" Here you stand with such an impressive resume, highly trained in the Socratic method if you will, Juris Doctorate, high prestige of a well-regarded "Professional Law Corporation" that's main headquarters is in the Embarcadero Center in San Francisco no less, all the trappings of success in the legal arena and yet you want an additional advantage to an already lopsided contest in terms of equal footing is truly nauseating to behold.

Ms. Farrell, your actions in this matter smacks of apparent moral turpitude on your part in light of the foregoing, and further in light of the fact that your alleged client is in point of fact a debt collector as defined by statute and case law in spite of the false statements contained in your motion apparently relied upon by your former mentor in his ruling does not take away the truth of Bank of America, N.A. being a debt collector as evident in their written communications to me. In good faith I am providing you with a copy of said written communications (five of them) to me from your alleged client that open and notoriously state that they are a debt collector. Four letters sent through the United States Mail Service dated: February 26, 2013, September 10, 2013, September 10, 2013, and October 16, 2013. Also on Payoff Statement dated September 26, 2013. See copies of same that are attached for your perusal and consideration. In light of the foregoing, Ms. Farrell either you perpetrated fraud on the court or your alleged client outright lied to you.

While I will and do recognize a duty of counsel to pursue a cause of action for his/her client to obtain a just and valid remedy, that fact cannot empower you as their legal representative and attorney to make misrepresentations as to the facts and circumstances of the status of your alleged client before the court as is set out in your Notice of Dismissal dated September 27, 2013. From my vantage point, even a cursory examination of your motion leaves any doubt the reality of your fraud upon the court as a matter of law. Thusly, the jurisdiction of the court is being abused by the filing of any specious motion such as said motion in behalf of your alleged client. The facts, if they had been properly vetted with due diligence as required by the rules, would have merely corroborated the facial absence of any legitimate justiciable claim or claims and assertions made by your alleged client.

Accordingly, I request that you carefully consider the foregoing and that you exercise this opportunity to make an informed choice as to whether to withdraw or otherwise abate the false, fraudulent and fictitious allegations as are contained in your motion and immediately draft a motion to vacate the order of the court in the interest of justice as a matter of law, otherwise I will be forced to take proactive steps on my own accord regarding the foregoing.

As you are aware, you have an affirmative duty under the Federal Rules of Civil Procedure, Rule 11 to ascertain the truthfulness of your alleged client's position as stated in your motion via a diligent inquiry into the facts, the evidence and the law applicable in this case that are reasonable under the circumstances. It appears, and your Motion demonstrates dispositively, that you have failed to meet the criteria of the foundational threshold mandated under the thrust of FRCP Rule 11(c) which now necessitates a Rule 56(h) contest.

You either knew or you should have known these facts and circumstances from an affirmative inquiry prior to placing any motion before the court based upon the assertions in said Motion. As stated, I hope that this matter can be explained as you're having been misled by your alleged client, and that these are not your affirmative acts of overt misrepresentation. Unfortunately, under these circumstances, they remain as your affirmative errors and omissions. Further, these circumstances bring into question your own standing as counsel in this case and as an officer of the court. I fear that you have been misled by either the prevarications of your alleged client and/or your own lack of due diligence as required by the rules of court.

Prudence dictates that you reconsider your position in this matter prior to any further hearings before the court. I hereby extend this opportunity for you to do so.

Please advise me immediately of your intention to cease and desist via email and I will refrain from further prosecuting any formal complaint against you and/or your law firm before the court and/or before the State Bar which would be proper as a matter of law. Alternatively, consider yourself and your law firm as named defendants.

Should you have questions or comment please feel free to contact me at ekultan@gmail.com . Despite my offer to abate my promised actions after your emailed notice that you intend to correct the error of law herein described by motion to vacate or other proper process, be advised that in the meantime I am now and will continue to move diligently forward with the prosecution of the FDCPA complaint consistent with the rule of law and will not tolerate any unlawful intrusions or threats against the due and lawful execution of my inherent rights under said law/s

I can assure you that I do not take the foregoing matter lightly.

Sincerely,

_____/s/ Julio Mayen_____
Julio Mayen
15335 Castle Peak Lane, Jamul, California state [91935]
Email: ekultan@gmail.com